IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                    :

    Plaintiffs,                          :
                                                    Case No. 3:05cv169
        vs.                          :
                                                    JUDGE WALTER HERBERT RICE
SUPERVALU HOLDINGS, INC., et al.,         :

    Defendants.                          :

---

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF ANDRE HIGHTOWER
(DOC. #76); JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF
DEFENDANTS AGAINST PLAINTIFF ANDRE HIGHTOWER**

---


      The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13. The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1] Doc. #23. The

---

      [1]The Amended Complaints lists the Plaintiffs as follows: Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.). The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name. The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2]The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3]The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Andre Hightower ("Plaintiff"). Doc. #76.  In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4.  Thus, at this stage of the litigation, the following claims remain:  (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI).  The Defendants have moved for summary judgment on all of Hightower's claims. Doc. #76.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts.  It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

---

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment.  Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II.  Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

I.    Facts[5]

SuperValu hired Hightower in 1986. Doc. #69-1 (Hightower Dep. at 11).

Since that time, Hightower has worked in various jobs, including order selector,

loader and forklift operator. Id. at 11-13.


A.    Collective Bargaining Agreement and Anti Harassment/Discrimination
       Policy

As a member of the local union, Hightower's employment terms are covered

by the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #69-1 (Hightower Dep. at 13); Doc. #69-9 (CBA).  Some of the specifics

covered by the CBA include the following:

- Job Bidding.  Bargaining unit jobs are awarded by seniority.  Job
  openings are posted for five days and are then filled with the

---

[5]Since this case comes before the Court on the Defendants' Motion for
Summary Judgment, the Court sets forth the facts and circumstances giving rise to
such Motion in the manner most favorable to the Plaintiff, as the party against
whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments,
475 F.3d 783, 790 (6th Cir. 2007).
     The Court has spent an inordinate amount of time organizing the facts, in
this case.  Not only did the Defendants file an excessively long memorandum in
support of their Motion for Summary Judgment (42 pages, not including table of
contents or summary of arguments) (Doc. #76), but they also set forth the majority
of their lengthy factual assertions in single-spaced footnotes, in small font.  In
doing so, the Defendants have set forth far more facts than the Plaintiff.  In
drafting the present Opinion, the Court has relied upon those facts pointed to by
the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts
generally set forth in the Amended Complaint (Doc. #3), which have been
expounded upon by the Defendants.  As to the facts raised by the Defendants, but
not relied upon by the Plaintiff in either the Amended Complaint or memorandum in
opposition to the Motion for Summary Judgment, the Court considers those facts
inapplicable to the present case.

4

qualified employee with the most seniority. Doc. #69-9 (CBA) at 12.

- Overtime Assignments.  Overtime assignments are made to the most senior employee who volunteers and is qualified.  If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #69-10 (CBA) at 1-2.

- Nondiscrimination. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #69-11 at 4.

- Grievance and Arbitration Procedure. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #69-9 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Doc. #76-11.  SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #76-9 (Schulcz Aff.) ¶ 4, Attachs. C-D.

B.      Facts Specific to the Plaintiff's Disparate Treatment Claim

The parties set forth the following facts pertinent to Hightower's disparate treatment claim:

- Discipline for Unwanted Physical Contact.  In 1994 or earlier, Warehouse manager Gault temporarily terminated Hightower (and then hired him back) after black supervisor Cooper reported that Hightower had jerked Cooper out of his chair, although Hightower had only pinched the material on Cooper's

collar. Doc. #69-1 (Hightower Dep. at 34-41). Hightower alleges that he was "fired" based on his race because Cooper told him, "If I get rid of you, they will promote me," and because white co-worker Koogler was not terminated after bruising the ribs of warehouse manager Doran while giving him a "bear hug," in an unspecified year. Id. at 39-41; Doc. #69-4 (Hightower Dep. at 254-55).

- Discipline for Insufficient Productivity.
  - Hightower testifies that supervisor Studley gave him a one-day suspension for running a 93% production rate, while Studley did not discipline white co-workers Mangan and Hebel for running 20-40% production rates. Doc. #69-1 (Hightower Dep. at 41-43). Studley left SuperValu in 1997. Doc. #76-9 (Schulcz Aff.) ¶ 13. The company contends that the only time Hightower was suspended for an insufficient production rate was in early 1992, when his rate had fallen to 82% despite six previous warnings under the progressive discipline system (including the Company's prior waiver of the suspension step). Doc. #76-9 (Schulcz Aff. ¶ 6); Doc. #76-15 (Not. of Disp. Action). Furthermore, company management states that Mangan and Hebel both received frequent disciplinary measures (including suspensions) for poor production, and that Hebel was ultimately discharged for poor production. Doc. #76-9 (Schulcz Aff.¶ 7).
  - According to Hightower, supervisor Hunter terminated black co-worker Nickles for running an 89% production rate, in approximately 2000-2002, while white co-workers Mangan and Hebel, both of whom allegedly had lower production rates than Nickles, were not terminated. Doc. #69-1 (Hightower Dep. at 46-51).
  - Hightower alleges that, on July 31,2006, distribution manager Gunderson questioned (but did not discipline) black co-worker Robinson about his productivity, but did not question white co-worker Saunders, who allegedly had not performed as much work as Robinson. Doc. #69-2 (Hightower Dep. at 135-37).

- Inconsistent Application of Rules Pertaining to Breaks.
  - Prior to leaving SuperValu in 1997, supervisor Studley would walk past a group of unidentified white employees and approach a group of unidentified black employees to say, "boys, get back to work." Doc. #69-1 (Hightower Dep. at 73-75); Doc. #76-9 (Schulcz Aff.) ¶ 13 (noting that Studley left SuperValu's employ in 1997).
  - During 2003 and 2004, supervisor Keyes would direct her breakroom instructions to get back to work to black employees, rather than to white employees, who were also on break and whom she also supervised. Doc.

#69-2 (Hightower Dep. at 107-12).  Hightower did not file a grievance about this issue. Id. at 114.  SuperValu states that white employees have also been instructed to "get back to work" while in the breakroom, and white employees have been disciplined when they failed to comply with this instruction. Doc. #76-9 (Schulcz Aff.) ¶ 14, Attach. J.  Hightower concedes that supervisors have, at times, ordered white employees to get back to work. Doc. #69-2 (Hightower Dep. at 77).  Further, SuperValu has warned all employees that break abuses will not be tolerated, as it violates company rules. Doc. #76-9 (Schulcz Aff.) ¶ 15; Attach. K.  The Company has also disciplined white and black employees for abusing breaks. Id. ¶¶ 15, 17; Attachs. J, N.[6]

- Job Assignments/Overtime.[7]
  - In October 2005, managers Tankersley and Gunderson awarded white co-worker Archer a "driving bid" while he was laid off, which Hightower felt should have been awarded to black co-worker Harding. Doc. #69-2 (Hightower Dep. at 119-21).
  - Although he has never been passed over for a job assignment, Hightower alleges that at unknown times, unknown supervisors passed over black co-worker Robinson for a job assignment when he was not present during the job selection period, while job assignments have been held open for white co-workers Carr, Newton, and Brown when they were not present during the job selection period.  Doc. #69-2 (Hightower Dep. at 115-19).

---

[6]Hightower also states that on January 18, 2005, supervisor Zoll allegedly came into the breakroom and remarked that black co-worker Smith was in the breakroom "a little early," but did not say anything to other employees in the breakroom. Doc. #69-3 (Hightower Dep. at 211).  Hightower does not point to anything to suggest whether the "other employees" were minority (or when any of the employees' breaks were supposed to commence), so the Court will not consider this contention when ruling herein.

[7]Hightower also complains that, in 2005, SuperValu selected more senior employees for overtime, but stopped giving overtime assignments when he was the next most senior employee on the list to volunteer for such. Doc. #69-2 (Hightower Dep. at 78-79).  He concedes that the selection of the most senior employees was proper under union guidelines (id. at 80-84), but argues that racial discrimination came into play as evidenced by a comment made by co-worker Constable. Id. at 83-87.  Constable's alleged statement is clearly hearsay, however.  Given that Hightower has offered nothing to qualify the statement for an exception to the hearsay rules, the Court will not consider the same when ruling herein.

- When Hightower was an order selector, he was "routinely assigned to heavy orders," despite assurances that tickets were randomly assigned. Doc. #69-4 (Hightower Dep. at 228-29). Hightower has "no idea" when these heavy orders were assigned or who assigned them. Id. at 229. Hightower admits that he has no reason to believe that tickets were not randomly assigned or that white employees were not assigned heavy orders. Id. at 229-30. Further, he never complained to management about his assignments. Id. at 229.
- Hightower alleges that he was given a "less favorable job assignment." Doc. #69-4 (Hightower Dep. at 243). When asked to explain, Hightower rather confusingly responded, "base[d] upon the number of hours, the number of order selectors required to complete the work, and a situation where if there [are] normally five guys given jobs and now you've moved up to that fifth spot and you never receive that upgrade and you know you are going to get done early, then you didn't get it." Id. When questioned whether he thought this had ever happened to a white employee, he stated that he did not know. Id.

- Training.
  - Sometime prior to 1996, supervisor VanOss caused Hightower to miss the first part of a training session, because he (Hightower) was needed on the warehouse floor. Doc. #69-3 (Hightower Dep. at 205-08); Doc. #76-9 (Schulcz Aff.) ¶ 19.

- Drug Testing.
  - Sometime between 1997 and 2002, Hightower was involved in two accidents at work (the details of which he does not recall). Manager Hatton sent him for drug testing after each, while he did not send white co-worker Bailey to be drug tested, after an accident that occurred at a later point in time. Doc. #69-3 (Hightower Dep. at 164-72). According to company policy, employees must undergo post-accident drug testing in certain situations (e.g., accidents that cause over $1,000 in vehicular damage). Doc. #76-9 (Schulcz Aff.) ¶ 23; Ex. R. Hightower does not know when or how Bailey's accident occurred or what injuries he sustained. Doc. #69-3 (Hightower Dep. at 166-70).[8]

---

[8]Hightower also alleges that black co-workers White and Leverett were disciplined for using the word "nigger," in approximately 2004 and 2005, while it was his understanding that white co-worker Everitt was not disciplined for allegedly saying, "if you want a race war, I'll show you a race war," in 2002. Doc. #69-1 (Hightower Dep. at 52-59). However, SuperValu has pointed to uncontroverted evidence demonstrating that Everitt was, in fact, disciplined for

C.  <u>Facts Specific to the Plaintiff's Hostile Work Environment Claim</u>[9]

The parties set forth the following facts pertinent to Hightower's hostile work environment claim:

● On an unknown date, supervisor Brown told Hightower that he (Brown) had told another employee, "look at the big buck in the orange hat," which

_____

making the statement in question. Doc. #76-9 (Schulcz Aff.) ¶ 9; Doc. #76-18 (Not. of Discpl. Action).  Further, Hightower believed that white co-worker Thomas was not disciplined for allegedly calling black co-worker Edwards by the "N word", in either 2003 or 2004. Doc. #69-2 (Hightower Dep. at 70-73).  However, SuperValu points to uncontroverted evidence to indicate that Edwards retired in 1998 (indicating that the 2003-2004 incident could not have taken place). Doc. #76-9 (Schulcz Aff.) ¶ 10.

[9]Hightower also makes the following allegations, for which he does not provide an exception to the hearsay rule of evidentiary exclusion:

● On an unknown date, Hightower heard from an unidentified co-worker that white co-worker Everitt told black co-worker Robinson, "if you want a race war, I will show you a race war." Doc. #69-4 (Hightower Dep. at 216).
● Co-worker Berryman told Hightower that there was a drawing of O.J. Simpson on the wall of the freezer. Doc. #69-2 (Hightower Dep. at 122-23).
● On January 8, 2006, black co-worker Scott told Hightower that there were swastikas in the warehouse and in the bathroom. <u>Id.</u> (Hightower Dep. at 127, 130).
● White co-worker Tackett told Hightower that, on an unknown date, co-worker Everitt said, "if the company fires me, I will get paid like the monkeys." Doc. #69-4 (Hightower Dep. at 220-21).

As before, the Plaintiff points to no exceptions to the hearsay rule, which would allow the Court to consider these assertions.  Thus, the Court will not consider the same when ruling herein.

The Court recognizes that these statements are not necessarily being offered for the truth of the matter asserted, with regard to the Plaintiff's <u>subjective</u> claim of hostile work environment, thus taking them out of the realm of hearsay statements. Fed. R. Evid. 801(c).  However, since the Court does not reach the issue of whether the Plaintiff <u>subjectively</u> perceived his work environment to be hostile, as explained <i>infra</i>, it need not consider the otherwise inadmissible hearsay statements when ruling herein.

Hightower took as a reference to him (Hightower). Doc. # 69-2 (Hightower Dep. at 97-99). Hightower did not file a grievance about this incident. <u>Id.</u> at 100.

- In 1997 or earlier, white co-worker Patrick said "F you, Buckwheat" over the warehouse intercom system. Doc. # 69-3 (Hightower Dep. at 179-80). Hightower assumes that Patrick's comment was directed at him because he was the last person to speak on the intercom before Patrick. <u>Id.</u> at 180-81. Hightower alleges that supervisor Studley later stated that Patrick's use of the word "Buckwheat" was the same as using the word "nigger". <u>Id.</u> at 182-83. Hightower did not agree with Studley's assessment and apparently felt that, by saying this, Studley was simply taking advantage of an opportunity to call him a "nigger". <u>Id.</u> at 182-84. Hightower did not file a grievance about this. <u>Id.</u> at 185. SuperValu points out that, in the late 1990s, SuperValu reconfigured the intercom system so that it could only be used by authorized personnel broadcasting from the office, thereby preventing misuse of the intercom system on the warehouse floor. Doc. #76-1 (Hatton Aff.) ¶ 13.

- In late 2004, white co-worker Pullins was playing music that used the word "nigger". Doc. # 69-1 (Hightower Dep. at 59-60). Hightower did not report this incident, but management otherwise became aware of it and spoke to Pullins about it the same day. <u>Id.</u> at 60-61. SuperValu offers that it has issued written memoranda warning employees to avoid playing music with offensive lyrics, as well as meeting with both black and white employees to remind them about the Company's policies with regard to music selections, to warn them about playing offensive music and to document said warnings. Doc. #76-9 (Schulcz Aff.) ¶¶ 27-28; Attachs. D, S.

- At least once a year between 1986 and 2005, Hightower saw the word "nigger", with or without other words, written on the bathroom stalls. Doc. #69-1 (Hightower Dep. at 23-28). Hightower does not know who wrote this graffiti, and he did not report it to management. <u>Id.</u> at 27. Hightower admits that the graffiti was always eventually removed. <u>Id.</u> at 28.

- Sometime prior to 2000, Hightower saw photographs that were taken of the word "nigger" written on the warehouse floor, along with a drawing of people with "large lips, nappy hair". Doc. # 69-1 (Hightower Dep. at 30-33). Hightower does not know who was responsible for this graffiti and did not report it to management. <u>Id.</u> at 31. Hightower states that the graffiti was eventually removed. <u>Id.</u> at 32.


II. <u>Summary Judgment Standard</u>

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Id.</u> at 323; <u>see also</u> <u>Boretti v. Wiscomb</u>, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." <u>Talley v. Bravo Pitino Rest., Ltd.</u>, 61 F.3d 1241, 1245 (6th Cir. 1995); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506

12

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . ."). Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

attention by the parties.


III.    Legal Analysis

   A.    Disparate Treatment, under Title VII (Count I), under 42 U.S.C.
         § 1981 (part of Count II) and under Ohio Law (Count III)

   Hightower brings race discrimination claims against SuperValu, based on the

theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II)

and Ohio law (Count III). Doc. #3 (Am. Compl.). He also alleges disparate

treatment against the individual Defendants, under Ohio law (Count III). Id.

   At the onset, the Court notes that both parties have relied upon certain

factual allegations, in support of their arguments for and against Hightower's

disparate treatment claim, which pertain to the alleged disparate treatment of other

employees, rather than to the alleged disparate treatment of Hightower. Because a

disparate treatment claim, in a non-class action suit, is an individual claim wherein

an employee is alleging that his employer discriminated against him because of his

race, rather than that the employer discriminated against another employee

13

because of his or her race, see <u>Upshaw v. Ford Motor Co.</u>, 576 F.3d 576, 584

(6th Cir. 2009) (setting forth *prima facie* case of race discrimination claim, which

focuses entirely on alleged disparate treatment of plaintiff), the Court will not

consider the following factual allegations, in analyzing Hightower's disparate

treatment claim:

- Termination of black co-worker Nickles for running 89% production rate

- Questioning of black co-worker Robinson about productivity

- Awarding "driving bid" to white co-worker Archer, rather than to black co-worker Harding

- Passing black co-worker Robinson for job assignments when he was not present during job selection period

The Court will now proceed with an analysis of the Defendants' Motion, as it

pertains to the alleged disparate treatment of Hightower, with the remaining

applicable factual assertions.

 

      1.   <u>Whether Certain Claims are Time Barred</u>

SuperValu initially argues that certain of the Plaintiff's disparate treatment

claims are time barred. Initially, the Court notes that the proper starting point for

this analysis is the date that each discrete discriminatory act occurred. <u>See</u>

<u>AMTRAK v. Morgan</u>, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106

(2002). In other words, in a disparate treatment context (as opposed to a hostile

work environment context),[10] a plaintiff may not "convert[] related discrete acts into a single unlawful practice for the purposes of timely filing." Id. at 111. As to the extent that discrete acts of discrimination that fall outside the applicable statute of limitations are helpful or harmful to a plaintiff's case, the Supreme Court instructs as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. . . . The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id. at 113. Relying on the final sentence quoted above, the Plaintiff correctly argues that this Court may consider, even if untimely, "prior acts as background evidence in support of a timely claim." Id. In sum, therefore, although the Court

---

[10]In contrast, plaintiffs may convert related discrete acts into an unlawful practice, for purposes of timely filing in the hostile work environment context. As explained by the Supreme Court,

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

Morgan, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed. 1996); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

will not take outdated acts into consideration for purposes of determining whether those acts constitute disparate treatment, it will take them into consideration as background evidence in considering timely acts of alleged discrimination.  Having established that the starting point for its statute of limitations analysis is each discrete act of discrimination, the Court will proceed with its analysis of the proper time periods within which to examine the allegedly discriminatory conduct.

As to the Title VII claim, the Defendants correctly point out that Title VII requires complainants to file a claim with the Equal Opportunity Employment Commission ("EEOC") within 300 days after each discrete act of alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S. App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)).  In the present case, the Plaintiff filed his EEOC claim on August 20, 2004. Doc. #3-4 (Hightower EEOC Charge).  Therefore, as to the Plaintiff's Title VII claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to October 25, 2003 (300 days prior to the filing of the EEOC claim on August 20, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of

limitations.[11] 28 U.S.C. § 1658(a); <u>see also</u> <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Thus, for purposes of the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under § 4112 is six years." <u>Harrison v. City of Akron</u>, 2002 U.S. App. LEXIS 16263, *5,

---

[11]The Defendants argue that claims arising in Ohio, under § 1981, are subject to a two year statute of limitations. Doc. #76 at 15. Such was the law prior to 2004. <u>See</u> <u>Bd. of Regents v. Tomanio</u>, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980) (noting that when Congress does not establish a statute of limitations, courts typically "borrow" the state law statute of limitations governing analogous causes of action); <u>Nelson v. GE</u>, 2001 U.S. App. LEXIS 1145, **7-8, 2 Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of limitations for such claims). However, in 2004, the Supreme Court decided <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a), establishing a four year statute of limitations period for "civil action[s] arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990]." <u>Id.</u> at 375. The Court further concluded that the plaintiff's claims for hostile work environment, wrongful termination, and failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners' causes of action were made possible by that Act," given that the 1991 Act overturned case law precedent that previously held that "racial harassment relating to the conditions of employment is not actionable under § 1981." <u>Id.</u> at 383 (quoting <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 171, 105 L Ed 2d 132, 109 S Ct 2363 (1989)). Thus, the current Plaintiff's § 1981 claim for race discrimination (as well as hostile work environment) is covered by the § 1658 four year statute of limitations. <u>See also</u> <u>Dandy v. UPS</u>, 388 F.3d 263, 269 (7th Cir. Wis. 2004) (applying § 1658's four year statute of limitations period to disparate treatment and hostile work environment claims, based on <u>Jones</u>).

43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code

§§ 2305.07, 4112.99; <u>Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.</u>, 70 Ohio

St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)).  Thus, for purposes of the

Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of

disparate treatment that occurred prior to May 17, 1999 (six years prior to the

filing date of May 16, 2005).

　　　　With regard to the claims that are undated, the Defendants urge the Court to

consider the same as time barred.  In support of this argument, they point to a

Southern District of Indiana case, which holds as follows:

> [The plaintiff] cannot avoid the 300 day statute of limitations merely
> by failing to provide the dates on which the alleged acts occurred.
> Baker's obligation as the plaintiff is to "set forth specific facts
> showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).
> To create a "genuine issue" Baker must present evidence such that a
> reasonable jury could find in his favor.  We find that Baker has failed
> to present such evidence.

<u>Baker v. Ind. Family & Soc. Servs. Admin.</u>, 2004 U.S. Dist. LEXIS 25838, *13

n.10 (S.D. Ind. Dec. 10, 2004) (one citation omitted); <u>see also</u> <u>French v. Potter</u>,

2005 U.S. Dist. LEXIS 44605, *7 (S.D. Ohio July 12, 2005) (pointing out that a

court "is unable to determine whether plaintiff has complied with the statutory

prerequisites to bringing suit under Title VII" if the plaintiff does not provide dates

on which the alleged violations occurred).  Although the Court agrees with the

ultimate conclusion urged by the Defendants, it finds the approach used by the

Southern District of Indiana to be inconsistent with Sixth Circuit case law, as to

18

the burdens the parties carry in cases such as the one presently before this Court.

In speaking of which party carries the burden of establishing an affirmative defense, such as the statute of limitations, the Sixth Circuit instructs as follows:

> A party who moves for summary judgment "bears the initial burden of showing the absence of a genuine issue of material fact." Furthermore, [the defendant] has the burden of proof on all affirmative defenses, such as the statute of limitations. Thus, if [the defendant] failed to meet its burden of proof, [the plaintiff] had no obligation to proffer any additional evidence in order to rebut the statute of limitations defense.

Fonseca v. CONRAIL, 246 F.3d 585, 590-91 (6th Cir. 2001) (citing, among others, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). Further, in Arnett v. Myers, 281 F.2d 552 (6th Cir. 2002), the Sixth Circuit discussed what the moving party must show to be entitled to summary judgment on an issue upon which it will bear the burden of persuasion at trial. "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Id. at 561 (quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)).

In the present case, the Court concludes that the Defendants have set forth sufficient evidence to satisfy their burden as to their statute of limitations defense in the instances where they questioned the Plaintiff as to the time period of his

various allegations and the Plaintiff provided nothing in response. Once a defendant takes the initiative to satisfy its affirmative defense burden, by asking the proper question regarding the timing of the alleged wrongdoing, a plaintiff should not be able to impede the application of a statutory time bar simply by refusing to provide the answer. Thus, to the extent the Defendants questioned the Plaintiff about the timing of the alleged discriminatory acts and the Plaintiff provided no indication of a time period in response, the Court concludes that the Defendants have satisfied their burden, as to this affirmative defense.

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after October 25, 2003. With regard to the § 1981 claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after May 17, 2001, and with regard to the state law claim, from and after May 17, 1999. Thus, the following alleged incidents of disparate treatment are time barred, for purposes of all disparate treatment claims:

- Manager Gault temporarily terminating Hightower after black supervisor Cooper reported that Hightower had jerked Cooper out of his chair, in 1994 or earlier

- Supervisor Studley giving Hightower a one-day suspension for lack of productivity, while not disciplining white employees for more significant productivity problems, on or before 1997

- Supervisor Studley telling black employees to get back to work, while ignoring white employees, on or before 1997

- Supervisor VanOss causing Hightower to miss part of a training

20

session, prior to 1996

Furthermore, the Court will not consider the following alleged fact, given that the

Defendants questioned the Plaintiff about the timing of it and the Plaintiff provided

no indication of a time period, in response:

- Hightower's assignment to "heavy orders"

Based on the remaining factual allegations, all of which are timely, the Court will

now turn to a consideration of whether the Plaintiff has pointed to sufficient

evidence to create a genuine issue of material fact, as to the various elements of

his disparate treatment claim.


        2.    Disparate Treatment - Burden Shifting Analysis

        Absent direct evidence of discrimination, the Court initially notes that courts

analyze all three of the Plaintiff's disparate treatment claims (under Title VII,

§ 1981 and Ohio law) using the burden shifting framework, as set forth by the

Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36

L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450

U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). E.g., Upshaw v. Ford Motor

Co., 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII);

Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination

claim under § 1981); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio

Civil Rights Comm., 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination

claim under Ohio Revised Code Chapter 4112). The Sixth Circuit provides the following summary of that analytical framework:

> First, the plaintiff must make out a prima facie case of race discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. Throughout this burden-shifting process, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing DiCarlo v. Potter, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing Dews v. A.B. Dick Co., 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not intended to be onerous." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008) (citation omitted). The Sixth Circuit instructs that in order to establish a *prima facie* case of disparate treatment, a plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for the position; 3) she was subjected to an adverse employment decision; and 4) she was replaced by a person outside the protected class, or treated differently than similarly situated non-protected employees. Vaughn v. Louisville Water Co., 2008 U.S. App. LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either

the first or second prong of his *prima facie* test; rather, they claim that he has not

set forth sufficient proof to create a genuine issue of material fact as to the third

and fourth prongs.  The Court will begin with a consideration of the fourth prong

(whether the Plaintiff was treated differently than similarly situated non-protected

employees) and then turn to the third prong.


a.    Whether Plaintiff was Treated Differently than Similarly
Situated Non-Protected Employees

The Sixth Circuit states that in order for a plaintiff to demonstrate that a

non-protected employee is "similarly situated", he must "prove that all of the

relevant aspects of his employment situation were 'nearly identical' to those of [the

non-protected employee's] employment situation." Ercegovich v. Goodyear Tire &

Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (quoting Pierce v. Commonwealth

Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original).  Further-

more, in order to be deemed similarly situated, "the individuals with whom the

plaintiff seeks to compare [his] treatment must have dealt with the same

supervisor, have been subject to the same standards and have engaged in the

same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." Id. (quoting

Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

In the present case, the Plaintiff contends that SuperValu discriminated

against him, in three ways,[12] to wit: subjecting him to directions to get back to work after breaks, giving him a less favorable job assignment, and sending him for drug testing after two work accidents.[13] With regard to the breakroom directions and similarly situated employees, the facts indicate that black employees were "disciplined, verbally or otherwise, for taking extended breaks," but white employees were not, and that Supervisor Keyes, who allegedly supervised all the breakroom employees, was responsible for doling out the inconsistent discipline. There are no facts on the record regarding similarly situated employees and Hightower's claim regarding the less favorable job assignments. As to the drug testing allegation, the facts indicate that manager Hatton sent Hightower for drug testing after two workplace accidents, while he did not send white co-worker

_____

[12]The Plaintiff also attempts to argue that he has satisfied the fourth prong of his disparate treatment *prima facie* case, because of the casual attitude of the supervisors toward the alleged racial harassment.

> The supervisors' casual attitude toward harassment, and their own
> use of racial slurs[] is indicative of the atmosphere of the warehouse.
> A general working environment that tolerates this sort of harassment
> is evidence that implies a discriminatory reason for the adverse
> employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a disparate treatment claim, the Court will consider the same when assessing the Plaintiff's hostile work environment claim below.

[13]This claim is cognizable only under § 1981 and state law, as Hightower states that the incident occurred sometime between 1997 and 2002. However, should this claim proceed to trial and a jury ultimately conclude that the event happened prior to May 17, 2001, the claim will be barred under § 1981; if prior to May 17, 1999, the claim will be barred under state law, also.

Bailey to be drug tested after a workplace accident.

The Court concludes that the Plaintiff <u>has not</u> set forth sufficient evidence to create a genuine issue of material fact as to whether the individuals with whom he seeks to compare his treatment were similarly situated, with regard to two of his claims (less favorable job assignments and drug testing), but that he <u>has</u> set forth sufficient evidence, as to the other claim (breakroom reprimands).  With regard to his claim that he was given less favorable job assignments, Hightower points to no specifics about the nature of the job assignments or any details about comparable employees.  As to the drug testing claim, Hightower provides no information about the nature of his workplace accidents, as compared to the nature of white co-worker Bailey's accidents.  Given that the company has a policy that mandates drug testing for some accidents, but not others, Hightower has not satisfied his burden (demonstrating that all relevant aspects of his employment situation were "nearly identical" to those of the comparable employee), with regard to this claim.

Conversely, the Court concludes that Hightower has set forth sufficient facts to support the fourth prong of his *prima facie* case, pertinent to the breakroom discipline claim, given that the same supervisor seemingly supervised all employees in the breakroom and reprimanded the black employees, but not the white employees, for not reporting back to work in a timely fashion.  The Court will now proceed to an analysis of the third prong of the *prima facie* case (whether the alleged actions constituted adverse employment actions), with regard to this

remaining disparate treatment claim.

b.  Whether the Alleged Misconduct Constituted an Adverse Employment Action

The third prong of the *prima facie* case of disparate treatment requires a plaintiff to establish that he suffered an adverse employment action.  "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257 (1998)), cert. denied, 129 S. Ct. 2380 (2009).  Stated another way, an adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted). Thus, the Court must discern whether the Plaintiff's remaining alleged adverse employment action (breakroom reprimands) constitutes a materially adverse change in the terms or conditions of his employment.

The only case pointed to by the Plaintiff, which is arguably applicable to his claim is Campbell v. Univ. of Akron, 2006 U.S. App. LEXIS 25876, 211 Fed. Appx. 333 (6th Cir. Oct. 17, 2006).  The Plaintiff cites Campbell for his proposition that "[d]iscipline for alleged violation of a break policy can also

26

constitute adverse employment action." Doc. #92 at 15.  However, in <u>Campbell</u>,

the defendant conceded that the disciplinary measures in question (an oral warning

and a written warning for violating a lunch-break policy) were adverse employment

actions and, thus, the Appellate Court had no reason to resolve the question

presently before this Court.[14] <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *3.

As to the breakroom reprimands in the present case, the Court concludes

that such do not constitute adverse employment actions.  The Plaintiff points to no

case wherein a court determined that a supervisor's reprimand of employees for

not reporting back to work in a timely fashion (apparently without any formal

discipline) was an adverse employment action and the Court has found none.  Such

a reprimand does not constitute a significant change in employment status, such as

"hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." <u>See</u> <u>White</u>,

533 F.3d at 402 (quotation omitted).  Therefore, the Court concludes that the

Plaintiff has not pointed to sufficient evidence to support this claim.


In sum, the Plaintiff has not set forth sufficient facts to create a genuine

---

[14]As noted by the <u>Campbell</u> Court, "[f]or reasons that are not entirely clear, the University does not contest that the disciplinary actions the PFOC took against Campbell were 'adverse employment actions' actionable under Title VII." <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *21 n.5.  Therefore, the Court continued, "we do not decide that issue, and assume for purposes of this opinion that these disciplinary actions do constitute 'adverse employment actions.'" <u>Id.</u>

issue of material fact as to any part of his disparate treatment claims. Thus, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #76), with regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III).

B.   Hostile Environment, under 42 U.S.C. § 1981 (remaining part of Count II) and under Ohio Law (Count V)

Hightower brings hostile work environment claims against all Defendants, under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am. Compl.). He submits that he suffered a hostile work environment based on his race, at the hands of supervisors, co-workers and unknown perpetrators, to wit: on an unknown date, supervisor Brown calling him "the big buck in the orange hat" (supervisor harassment); in 1997 or earlier, co-worker Patrick saying "F you, Buckwheat" (co-worker harassment); at the same time (1997 or earlier), supervisor Studley stating that Patrick's use of the word "Buckwheat" was the same as using the word "nigger" (supervisor harassment); in 2004, co-worker Pullins playing music that used the word "nigger" (co-worker harassment); yearly between 1986 and 2005, seeing the word "nigger" written on bathroom walls (harassment by unknown perpetrator); prior to 2000, seeing photographs of the word "nigger", which had been written on the warehouse floor, along with a drawing of people

with "large lips, nappy hair" (harassment by unknown perpetrator).[15]

---

[15]The Court relies only on the acts of harassment that allegedly happened to the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter, only for those which one or the other of the parties has pointed to admissible evidence in support thereof.  The Court is aware that the Sixth Circuit has instructed that courts must consider the "totality of circumstances" when deciding cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999).

In Jackson v. Quanex Corp., the Appellate Court directed that the "totality of circumstances" approach necessitates aggregating alleged acts of harassment towards minority employees, in cases such as the present one. Id.  In so doing, the Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v. Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)).  Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees.  "Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." Id. (emphasis added); see also id. ("We have also credited evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above.  Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them.  The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3.  Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only

The Sixth Circuit instructs that courts are to use the same standard when evaluating hostile work environment claims under Title VII, § 1981 and Ohio Revised Code Chapter 4112. <u>Noble v. Brinker Int'l, Inc.</u>, 391 F.3d 715, 720 (6th Cir. 2004). To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following:

> (1) [He] is a member of a protected class . . . ; (2) [he] was subjected to harassment, either through words or actions, based on [his protected class]; (3) the harassment had the effect of unreasonably interfering with [his] work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

<u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 270 (6th Cir. 2009) (quoting <u>Grace v. USCAR</u>, 521 F.3d 655, 678 (6th Cir. 2008)).[16] As to the final prong, whether there is a basis for employer liability, such depends on whether the plaintiff is alleging harassment by supervisors or co-workers. Quoting from a Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses as follows:

> The Supreme Court has ruled that employers are not automatically liable for [] harassment perpetrated by their employees. <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d 633 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275, 141 L. Ed.2d 662 (1998). Where an employee is the victim of [] harassment, including harassment in the form of a hostile work

those facts pertinent to the present Plaintiff, which are set forth above.

[16]<u>Gallagher</u> was a hostile work environment case, based on sexual harassment, as opposed to racial harassment. The Sixth Circuit applies the same legal standard to both sorts of claims, however. <u>See</u> <u>Ladd v. Grand Trunk Western R.R.</u>, 552 F.3d 495, 500 (6th Cir. 2009).

environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. See Faragher v. City of Boca Raton, 524 U.S. at 789; accord Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir.2000). Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; if it did, "the employer will, ipso facto, be vicariously liable," Mack v. Otis Elevator Co., 326 F.3d at 124 [(2d Cir. 2003)]. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; accord Faragher v. City of Boca Raton, 524 U.S. at 807, 118 S. Ct. 2275; Mack v. Otis Elevator Co., 326 F.3d at 125.

Gallagher, 567 F.3d at 275 (quoting Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004)).

The Defendants, in the present action, do not contest the first prong of the *prima facie* case. They do, however, assert that Hightower has failed to set forth sufficient proof as to the second prong, for certain of his assertions of harassment, and for the third and fourth prongs for all of his assertions.[17]

---

[17]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #76 at 38 n.23. The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did

1.    Whether the Plaintiff was Subjected to Harassment Based on
      Race

In order to be actionable as a racial harassment claim, a plaintiff must

demonstrate that he was harassed because of his race. Booker v. Budget

Rent-A-Car Sys., 17 F. Supp. 2d 735, 743 (M.D. Tenn. 1998).  SuperValu argues

that the incidents involving white co-worker Pullins playing music that used the

word "nigger" and white supervisor Brown referring to Hightower as the "big buck

in the orange hat" were not based on race.  The Court disagrees.  Other courts

have concluded that decidedly racial epithets (such as the word "nigger") and

arguably racial epithets (such as the phrase "big buck") were sufficient to at least

create a genuine issue of material fact on the question of whether an employee

endured harassment that was based on race. E.g., id. (alleging that supervisor

referred to black employees as "niggers" and to one black employee as his

"whipping boy").  Therefore, the Court will proceed with an analysis of the

remaining prongs of the Plaintiff's *prima facie* case.


2.    Whether Harassment Had Effect of Unreasonably Interfering
      with Plaintiff's Work Performance and Creating an Objectively
      Intimidating, Hostile, or Offensive Work Environment

The Sixth Circuit has identified the governing standard for the third prong of

---

form one continuous hostile work environment, need not consider the Defendants'
argument, on this point.  Thus, the Court does not reach the statute of limitations
issue on the allegations constituting the hostile work environment claims.

a plaintiff's *prima facie* case of harassment as follows:

> Conduct that is not severe or pervasive enough to create an
> objectively hostile or abusive work environment--an environment that
> a reasonable person would find hostile or abusive--is beyond Title VII's
> purview.  Likewise, if the victim does not subjectively perceive the
> environment to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no Title VII
> violation.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)

(quoting Williams v. GMC, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed.

2d 295 (1993)).  The Supreme Court states that, in making these assessments,

courts must consider "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."

Harris, 510 U.S. at 23.  Further, in order to constitute a "change in the terms and

conditions of employment", conduct must be "extreme".  Faragher v. City of Boca

Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the incidents that arguably

reflect racial animus were not severe and pervasive enough to alter the terms and

conditions of Hightower's employment.  As to the objective view of the facts,

SuperValu argues that the alleged incidents of harassment occurred over a span of

twenty years, most were not directed at Hightower and none of them was

physically threatening.  As to the subjective view of the facts, SuperValu asserts

that Hightower did not regard the workplace as hostile or abusive, as evidenced by his concession that he has always been able to effectively perform his job. Doc. #69-4 (Hightower Dep. at 237-38). In response, Hightower argues that it is the decades-long history of regular harassment that defines his treatment as severe and pervasive. Further, Hightower argues that his filing of the present lawsuit, along with the fact that he recalls the incidents in question years after they happened, is evidence that he subjectively considered his mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit. In <u>Smith v. Leggett Wire Co.</u>, the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment: "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as a 'gorilla'." <u>Smith</u>, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at Smith, over a twenty-year span of time.").

Conversely, in <u>Jackson v. Quanex Corp.</u>, the Appellate Court found the following facts probative of a severe and pervasively hostile work environment:

34

the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males," graffiti in the men's restroom "depicting lynchings accompanied by the phrase, 'KKK is back'," graffiti on the back door that said "blacks out back," graffiti in the seam grinding area that "depicted the lynching of African-American men," graffiti in the restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of extreme racial misconduct (including calling a new hire "nigger" and "motherfucker", and after he reported these comments, telling him, "Nigger, we want you to quit your job . . . ."; defacing a work shirt with the words "Nigger Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's machine; tampering with acid valves in an attempt to create a safety hazard that would appear to be attributable to a minority worker, and a co-worker calling another co-worker a "nigger bitch" and physically assaulting her). <u>Jackson</u>,191 F.3d 647, 651-55, 62 (6th Cir. 1999).

 SuperValu also points the Court to the Sixth Circuit's unpublished opinion in

<u>Kelly v. Senior Centers, Inc.</u>, wherein the Court found that the following incidents of misconduct, which occurred over four months, did not amount to actionable harassment: "two staff members' use of the pejorative slur word 'nigger' referring to the foster grandparents; Dangelo's description of a Board Member as a 'token black' and her comments that the foster grandparents were slovenly or were 'pigs' at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes'; and comments about an African-American staff member's bathroom habits." <u>Kelly</u>, 2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8, 2006).  In concluding its findings, the Court stated, "[w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." <u>Id.</u> at *17.

SuperValu also cites <u>Bourini v. Bridgestone/Firestone North American Tire, L.L.C.</u>, 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position.  In <u>Bourini</u>, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment:  (1) a co-worker said, "I don't want to … see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the September 11 attacks, a co-worker attempted to back over him while reversing a forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the

sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's voice over the intercom system; (7) someone painted Islamic slurs on the restroom wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For my Muslim Friend;" and (9) the human resources department sent an email relating to plaintiff's immigration status to all employees. Id. at **2-5. The Appellate Court concluded that these incidents "were not sufficiently pervasive to establish an abusive working environment." Id. at *10. Because the incidents were spread out over a five year period, the Court found them to be "relatively infrequent and isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of employment." Id.

In the present case, Hightower alleges five incidents of misconduct over an approximate seven year period (supervisor Brown calling him "the big buck in the orange hat"; co-worker Patrick saying "F you, Buckwheat" and supervisor Studley stating that Patrick's use of the word "Buckwheat" was the same as using the word "nigger"; co-worker Pullins playing music that used the word "nigger"; and seeing photographs of the word "nigger", which had been written on the warehouse floor, along with a drawing of people with "large lips, nappy hair"). He also alleges seeing the word "nigger" written on bathroom walls at least once a year for about 20 years. While this conduct is reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Hightower's employment. The incidents are

closest in severity and pervasiveness to those in <u>Bourini v. Bridgestone/Firestone North American Tire, L.L.C.</u>, *supra*, which the Sixth Circuit found to be insufficient to constitute discriminatory changes in the terms and conditions of employment, as explained above. Thus, regardless of whether he subjectively found that the alleged incidents created a hostile work environment, Hightower has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based harassment. Given that the Plaintiff has not satisfied the third prong of his *prima facie* case of harassment, the Court finds it unnecessary to determine whether he has pointed to sufficient evidence to satisfy the fourth prong (whether there exists some basis for liability on the part of the employer).

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work environment based on race. Therefore, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #76), as to Hightower's hostile work environment claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

C.     <u>Retaliation, in violation of Title VII and/or Ohio law (Count IV)</u>

As Count IV in his Amended Complaint, Hightower asserts a claim for

38

retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.) ¶¶ 60-64. These claims are limited to allegations of retaliation that occurred after the filing of Hightower's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent direct evidence of retaliatory discrimination, a plaintiff must show the following:

(1) [he] engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to defendant;

(3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see also Putney v. Contract Bldg. Components, 2009 Ohio App. LEXIS 5634, **30-31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009). In their memorandum in support of their Motion for Summary Judgment, the Defendants state that they are entitled to summary judgment on this claim, because Hightower admitted that he experienced no retaliation and also because he has set forth no facts to support his retaliation claim. Doc. #76 at 48.

It is true that Hightower conceded that he experienced no retaliation for engaging in activity protected by Title VII. Doc. #69-4 (Hightower Dep. at 248,

250).  It is also true that Hightower makes no argument nor presents any facts in support of his retaliation claim.  <u>See</u> Doc. #92 (Mem. Opp'n).  Because the Plaintiff has pointed to no facts to support his retaliation claim, there is no genuine issue of material fact as to the same and the Defendants' Motion for Summary Judgment (Doc. #76) is SUSTAINED, as to Count IV.


     D.    <u>Respondeat Superior (Count VI)</u>

As Count VI in his Amended Complaint, Hightower alleges that SuperValu is liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77.  In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above (e.g., employer liability component of hostile work environment claim).  Therefore, the Defendants' Motion for Summary Judgment (Doc. #76) is SUSTAINED, as to Count VI.


IV.    <u>Conclusion</u>

The Defendants' Motion for Summary Judgment (Doc. #76) is SUSTAINED, in its entirety.  Judgment is ultimately to be entered on behalf of Defendants

against Plaintiff Hightower, at the conclusion of this litigation.


March 31, 2010


    /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record