IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                    :

    Plaintiffs,                          :
                                            Case No. 3:05cv169

        vs.                          :
                                            JUDGE WALTER HERBERT RICE

SUPERVALU HOLDINGS, INC., et al.,        :

    Defendants.                          :


---

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF ALBERT ROBINSON (DOC.
#77); JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF
DEFENDANTS AGAINST PLAINTIFF ALBERT ROBINSON**

---


       The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13.  The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1]  Doc. #23.  The

---

[1]The Amended Complaints lists the Plaintiffs as follows:  Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.).  The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name.  The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2]The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3]The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Albert Robinson ("Plaintiff"). Doc. #77. In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4. Thus, at this stage of the litigation, the following claims remain: (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI). The Defendants have moved for summary judgment on all of Robinson's claims. Doc. #77.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts. It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

────────────────────

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment. Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II. Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

3

I.    Facts[5]

SuperValu hired Robinson in 1984. Doc. #65-1 (Robinson Dep. at 11).

Since that time, Robinson has worked in various jobs, including order selector,

sanitation worker and forklift operator. Id. at 15-17.


    A.    Collective Bargaining Agreement and Anti Harassment/Discrimination
          Policy

As a member of the local union, Robinson's employment terms are covered

by the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #65-1 (Robinson Dep. at 18); Exhibit 2 (CBA).  Some of the specifics covered

by the CBA include the following:

   ●   Job Bidding.  Bargaining unit jobs are awarded by seniority.  Job
       openings are posted for five days and are then filled with the

_____

[5]Since this case comes before the Court on the Defendants' Motion for
Summary Judgment, the Court sets forth the facts and circumstances giving rise to
such Motion in the manner most favorable to the Plaintiff, as the party against
whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments,
475 F.3d 783, 790 (6th Cir. 2007).
    The Court has spent an inordinate amount of time organizing the facts, in
this case.  Not only did the Defendants file an excessively long memorandum in
support of their Motion for Summary Judgment (34 pages, not including table of
contents or summary of arguments) (Doc. #77), but they also set forth the majority
of their lengthy factual assertions in single-spaced footnotes, in small font.  In
doing so, the Defendants have set forth far more facts than the Plaintiff.  In
drafting the present Opinion, the Court has relied upon those facts pointed to by
the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts
generally set forth in the Amended Complaint (Doc. #3), which have been
expounded upon by the Defendants.  As to the facts raised by the Defendants, but
not relied upon by the Plaintiff in either the Amended Complaint or memorandum in
opposition to the Motion for Summary Judgment, the Court considers those facts
inapplicable to the present case.

4

qualified employee with the most seniority. Doc. #65-9 (CBA) at 12.

- <u>Overtime Assignments</u>.  Overtime assignments are made to the most senior employee who volunteers and is qualified.  If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #65-10 (CBA) at 1-2.

- <u>Nondiscrimination</u>. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #65-11 at 4.

- <u>Grievance and Arbitration Procedure</u>. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #65-9 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Docs. #77-6, #77-7. SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #77-5 (Schulcz Aff.) ¶ 4, Attachs. C-D.


B.    <u>Facts Specific to the Plaintiff's Disparate Treatment Claim</u>

The parties set forth the following facts pertinent to Robinson's disparate treatment claim:

- <u>Alleged Disparate Treatment with Regard to Break Times and Socializing</u>
  - Black supervisor Cooper instructed Robinson to "break it up" when he was talking to a group of employees, but did not instruct unidentified white employees to "break it up" when they were talking. Doc. #65-3

5

(Robinson Dep. at 206-07). Robinson did not report this conduct. Id.
Although Robinson indicated that he thought the incident happened in
2000, unrebutted evidence from SuperValu indicates that Cooper left
SuperValu in December 1998. Id.; Doc. #77-5 (Schulcz Aff.) ¶ 6.

- In the summer of 2003, supervisor Zimmerman told Robinson to "get
  back to work" while he was outside in the smoking tent during work
  time. Doc. #65-2 (Robinson Dep. at 97-99). Although Robinson admits
  that it was not his break time, he feels that Zimmerman should not have
  asked him to get back to work, because he was meeting the Company's
  production standards. Id. at 98-100. Robinson did not file a grievance
  about this incident, but he complained to distribution manager Gunderson
  that he was tired of Zimmerman "harassing" him when he was meeting
  the production standards. Id. at 103-04. Gunderson told Robinson to go
  sit in the breakroom and relax for a while over a cup of coffee, but
  Robinson went back to work instead. Id. at 104-05.

- On several occasions in 2005, supervisor Dunn entered the breakroom
  and told Robinson and other black employees to go back to work while
  they were playing cards, but allowed unknown white employees to stay
  in the breakroom until they finished their hand of cards. Doc. #65-3
  (Robinson Dep. at 202-05).

- In 2004, manager Gunderson entered the breakroom and told only
  Robinson to go back to work. Doc. #65-1 (Robinson Dep. at 34-37).
  There were many other employees in the breakroom at the time, including
  black and white co-workers. Id. The next day, Gunderson apologized to
  Robinson for his conduct. Id. at 38-39. Robinson did not file a grievance
  or complain to management about this incident. Id. at 39.

- At times, supervisors Gunderson, Zimmerman, Key and Dunwoodie
  watched Robinson's computer screen, which displays his production rate,
  and told him to get back to work when he stopped working for fifteen or
  twenty minutes at a time. Doc. #65-2 (Robinson Dep. at 105-08).
  Robinson did not file a grievance or complain to management about this,
  but the Union eventually filed a grievance about this issue on behalf of all
  bargaining unit members. Id. at 108-10. At his deposition, Robinson was
  not asked for a date of this incident, nor did he volunteer one. See id. at
  105-10.

- In January 2007, supervisor Gunderson reprimanded Robinson for staying
  in the breakroom for 10-15 minutes immediately after he reported for
  work late, when it was not his break time. Doc. #65-3 (Robinson Dep. at
  144-47).

- In July 2003, Robinson was suspended by an unnamed supervisor for
  taking an hour-long break without clocking-out. Doc. #65-3 (Robinson
  Dep. at 198-99).

- In September 2003, manager Gunderson told Robinson to clock-out at the gate when he left the premises for breaks, while all other employees could leave the premises without clocking-out. Doc. #65-3 (Robinson Dep. at 162-63). Robinson did not file a grievance about this incident. Id. at 163.
- Supervisor Dunn came into the breakroom and told Robinson, Plaintiff Clegg and Plaintiff Smith to go back to work after their break had ended, but did not order white co-worker Allen, who worked in a different area, to go back to work. Doc. #65-3 (Robinson Dep. at 200-02). At his deposition, Robinson was not asked for a date of this incident, nor did he volunteer one. See id.
- In April 2007, Robinson was disputing discipline he received for being in the breakroom five minutes into his work time. Doc. #65-3 (Robinson Dep. at 187). In discussing the situation, supervisor Hartzog stated, "sorry, but he [Hartzog] wasn't the dumb-ass that was in the break room." Id. Robinson objected to being referred to as a "dumb ass".

- Alleged Disparate Treatment with Regard to Job Assignments
  - On unknown dates, the company held open job upgrades for white co-workers Dave and Bowser, who were not present during the job selection posting, but skipped over Robinson, if he was not present. Doc. #65-3 (Robinson Dep. at 207-10). After these incidents, SuperValu implemented a policy that prohibited the holding of jobs for any employees who were not present. Id.
  - Unidentified supervisor(s) did not assign temporarily vacant jobs (caused by employee absences, on any given day) by seniority at the beginning of the shift because the Company was not initially aware that the employees who normally perform the jobs were absent. Doc. #65-3 (Robinson Dep. at 211-12). After the shift started, the open jobs would be given to less senior employees, like Weckesser (race unknown), rather than Robinson, because the Company no longer had to fill jobs by seniority. Id. at 211-13. At his deposition, Robinson was not asked for a date of this incident, nor did he volunteer one. See id.
  - Supervisor Galinger allocated more casual workers to the meat and dairy area and fewer casual workers to the freezer area, which resulted in Robinson being assigned to the freezer. Doc. #65-4 (Robinson Dep.) at 215. Robinson did not file a grievance about this, as he admits that it was not grievable, because the Bargaining Agreement allows management to schedule employees in this fashion. Id. at 218. Although Robinson estimated that these incidents happened in 2000 or 2002, SuperValu has pointed to unrebutted evidence that indicates that Galinger left the company on May 1, 1999. Id. at 216; Doc. #77-5 (Schulcz Aff.)

7

¶ 12.

- Alleged Disparate Treatment with Regard to Discipline
  - In July 2003, supervisor Gibson wrote up Robinson for improper work. Doc. #65-3 (Robinson Dep. at 153-54). Once the company realized Robinson had been working during his break time, however, it voided the write-up. Id.
  - At a meeting in 2003, supervisor Gunderson told Robinson that he (Robinson) would be fired if he did not meet production standards. Doc. #65-1 (Robinson Dep. at 56-59).
  - In 2006, supervisor Gunderson threatened to write up Robinson for production issues when, in fact, Robinson had produced more pieces than white co-worker Sanders, who was not disciplined. Doc. #65-1 (Robinson Dep. at 29). Once it was discovered how many pieces Robinson had run, however, he was not disciplined. Id. at 29-30.
  - Supervisors Jones and/or Brown wrote up Robinson for being out of his work area (when he was out of his work area). Doc. #65-3 (Robinson Dep. at 179-82). Robinson objected to this, because no supervisor ever wrote up any other employee for such a thing. Id. at 181. Supervisor Brown also searched Robinson's lunchbox, at this time, to which Robinson apparently also objected. Id. at 179-82. At his deposition, Robinson was not asked for a date of this incident, nor did he volunteer one. See id.

C. Facts Specific to the Plaintiff's Hostile Work Environment Claim

The parties set forth the following facts pertinent to Robinson's hostile work environment claim:

- Once in 1984 and once in 2001, Robinson saw the word "nigger" written in one or more bathroom stalls. Doc. #65-2 (Robinson Dep. at 113-17). He does not know who wrote the graffiti and did not speak of it to anyone or otherwise report it. Id. The graffiti was eventually removed. Id.
- In approximately 1992, Robinson overheard white co-worker Randall call white co-worker Hamlet a "nigger lover", because Hamlet and Robinson were good friends. Doc. #65-2 (Robinson Dep. at 134-35). Robinson did not file a grievance about the incident. Id. SuperValu offers evidence that it disciplined Randall, in 1992, for making a race related comment. Doc. #77-5 (Schulcz Aff.) ¶ 5; Ex. O.

8

- On two or three occasions, in the summer of 2000, Robinson saw the word "nigger" written in chalk, along with a caricature of a person with big lips, on pallets in the warehouse. Doc. #65-2 (Robinson Dep. at 121-26). He also saw a caricature of a person with big lips on a water softener. Id. at 126-27. He does not know who was responsible for this graffiti and did not report it, but believes that "[s]omebody else did." Id. at 125-26. The graffiti was eventually removed. Id. at 126.
- In 2006, white co-worker Hamlet informed Robinson that someone had written Robinson's and Plaintiff Berryman's names in the bathroom stalls, but that Hamlet had removed the writing before Robinson and Berryman had arrived at work. Docs. #65-2, #65-3 (Robinson Dep. at 118, 148-19). Robinson asked Human Resources Manager Schulcz to see photos of the graffiti, and Schultz allowed him to see the photos. Id. at 119, 149. The photos depicted graffiti that said "Karen Spurrs likes niggers," and "Someone should call Al's wife and ask her how does Karen Spurrs's pussy taste." Id. at 118-120, 148-150. Robinson does not know who wrote this graffiti, and he admits that Schulcz could not do anything but remove the graffiti because "[h]e [Schulcz] didn't do it. He didn't like it. He didn't think it was right." Id. at 119-20.
- In 2007, Robinson saw writing near a public telephone that read "XXX", which Robinson associated with "KKK". Doc. #65-3 (Robinson Dep. at 143-44). He does not know who was responsible for the graffiti and did not report it. Id.
- On two or three occasions (with the remnants of one still remaining, after an attempt to disguise it), someone defaced the bathroom walls with pictures of swastikas. Doc. #65-2 (Robinson Dep. at 130-31). Robinson does not know who was responsible for the graffiti and did not report it. Id.[6]

---

[6]Robinson also makes the following allegation, for which he does not provide an exception to the hearsay rule of evidentiary exclusion:

- In 2002, white supervisor Pelfry informed Robinson that white co-worker Everrit had called Robinson a "nigger" and complained that Pelfry did not make Robinson do any work. Doc. #65-2 (Robinson Dep. at 136-37).

Because the Plaintiff points to no exceptions to the hearsay rule, which would allow the Court to consider these assertions, the Court will not consider the same when ruling herein.

The Court recognizes that this statement is not necessarily being offered for the truth of the matter asserted, with regard to the Plaintiff's subjective claim of hostile work environment, thus taking it out of the realm of hearsay statements. Fed. R. Evid. 801(c). However, since the Court does not reach the issue of

II.   Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in

_____

whether the Plaintiff subjectively perceived his work environment to be hostile, as explained infra, it need not consider the otherwise inadmissible hearsay statement when ruling herein.

10

support of its position. <u>Celotex</u>, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that

11

might support the nonmoving party's claim." <u>InterRoyal Corp. v. Sponseller</u>, 889

F.2d 108, 111 (6th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1091 (1990); <u>see also</u> <u>L.S.</u>

<u>Heath & Son, Inc. v. AT&T Info. Sys., Inc.</u>, 9 F.3d 561 (7th Cir. 1993); <u>Skotak v.</u>

<u>Tenneco Resins, Inc.</u>, 953 F.2d 909, 915 n.7 (5th Cir. 1992), <u>cert. denied</u>, 506

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . ."). Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

attention by the parties.

III.  <u>Legal Analysis</u>

    A.  <u>Disparate Treatment, under Title VII (Count I), under 42 U.S.C.
       § 1981 (part of Count II) and under Ohio Law (Count III)</u>

Robinson brings race discrimination claims against SuperValu, based on the

theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II)

and Ohio law (Count III). Doc. #3 (Am. Compl.). He also alleges disparate

treatment against the individual Defendants, under Ohio law (Count III). <u>Id.</u>

    1.  <u>Whether Certain Claims are Time Barred</u>

SuperValu initially argues that certain of the Plaintiff's disparate treatment

12

claims are time barred.  Initially, the Court notes that the proper starting point for this analysis is the date that each discrete discriminatory act occurred.  <u>See</u> <u>AMTRAK v. Morgan</u>, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  In other words, in a disparate treatment context (as opposed to a hostile work environment context),[7] a plaintiff may not "convert[] related discrete acts into a single unlawful practice for the purposes of timely filing."  <u>Id.</u> at 111.  As to the extent that discrete acts of discrimination that fall outside the applicable statute of limitations are helpful or harmful to a plaintiff's case, the Supreme Court instructs as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act. . . .  The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely

---

[7]In contrast, plaintiffs may convert related discrete acts into an unlawful practice, for purposes of timely filing in the <u>hostile work environment</u> context.  As explained by the Supreme Court,

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.  The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

<u>Morgan</u>, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed. 1996); <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

claim.

Id. at 113.  Relying on the final sentence quoted above, the Plaintiff correctly

argues that this Court may consider, even if untimely, "prior acts as background

evidence in support of a timely claim." Id.  In sum, therefore, although the Court

will not take outdated acts into consideration for purposes of determining whether

those acts constitute disparate treatment, it will take them into consideration as

background evidence in considering timely acts of alleged discrimination.  Having

established that the starting point for its statute of limitations analysis is each

discrete act of discrimination, the Court will proceed with its analysis of the proper

time periods within which to examine the allegedly discriminatory conduct.

As to the Title VII claim, the Defendants correctly point out that Title VII

requires complainants to file a claim with the Equal Opportunity Employment

Commission ("EEOC") within 300 days after each discrete act of alleged

discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S.

App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in

a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must

have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v.

Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)).  In the present case, the

Plaintiff filed his EEOC claim on September 21, 2004. Doc. #3-9 (Robinson EEOC

Charge).  Therefore, as to the Plaintiff's Title VII claim, the Court will not consider

allegations of discrete acts of disparate treatment that occurred prior to November

14

26, 2003 (300 days prior to the filing of the EEOC claim on September 21, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of limitations.[8] 28 U.S.C. § 1658(a); <u>see also</u> <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Thus, for purposes of the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under

---

[8]The Defendants argue that claims arising in Ohio, under § 1981, are subject to a two year statute of limitations. Doc. #77 at 14. Such was the law prior to 2004. <u>See</u> <u>Bd. of Regents v. Tomanio</u>, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980) (noting that when Congress does not establish a statute of limitations, courts typically "borrow" the state law statute of limitations governing analogous causes of action); <u>Nelson v. GE</u>, 2001 U.S. App. LEXIS 1145, **7-8, 2 Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of limitations for such claims). However, in 2004, the Supreme Court decided <u>Jones v. R.R. Donnelley & Sons Co.</u>, 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a), establishing a four year statute of limitations period for "civil action[s] arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990]." <u>Id.</u> at 375. The Court further concluded that the plaintiff's claims for hostile work environment, wrongful termination, and failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners' causes of action were made possible by that Act," given that the 1991 Act overturned case law precedent that previously held that "racial harassment relating to the conditions of employment is not actionable under § 1981." <u>Id.</u> at 383 (quoting <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164, 171, 105 L Ed 2d 132, 109 S Ct 2363 (1989)). Thus, the current Plaintiff's § 1981 claim for race discrimination (as well as hostile work environment) is covered by the § 1658 four year statute of limitations. <u>See also</u> <u>Dandy v. UPS</u>, 388 F.3d 263, 269 (7th Cir. Wis. 2004) (applying § 1658's four year statute of limitations period to disparate treatment and hostile work environment claims, based on <u>Jones</u>).

§ 4112 is six years." <u>Harrison v. City of Akron</u>, 2002 U.S. App. LEXIS 16263, *5,

43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code

§§ 2305.07, 4112.99; <u>Cosgrove v. Williamsburg of Cincinnati Mgmt. Co.</u>, 70 Ohio

St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)).  Thus, for purposes of the

Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of

disparate treatment that occurred prior to May 17, 1999 (six years prior to the

filing date of May 16, 2005).

With regard to the claims that are undated, the Defendants urge the Court to

consider the same as time barred.  In support of this argument, they point to a

Southern District of Indiana case, which holds as follows:

> [The plaintiff] cannot avoid the 300 day statute of limitations merely
> by failing to provide the dates on which the alleged acts occurred.
> Baker's obligation as the plaintiff is to "set forth specific facts
> showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).
> To create a "genuine issue" Baker must present evidence such that a
> reasonable jury could find in his favor.  We find that Baker has failed
> to present such evidence.

<u>Baker v. Ind. Family & Soc. Servs. Admin.</u>, 2004 U.S. Dist. LEXIS 25838, *13

n.10 (S.D. Ind. Dec. 10, 2004) (one citation omitted); <u>see also</u> <u>French v. Potter</u>,

2005 U.S. Dist. LEXIS 44605, *7 (S.D. Ohio July 12, 2005) (pointing out that a

court "is unable to determine whether plaintiff has complied with the statutory

prerequisites to bringing suit under Title VII" if the plaintiff does not provide dates

on which the alleged violations occurred).  Although the Court agrees with the

ultimate conclusion urged by the Defendants, it finds the approach used by the

Southern District of Indiana to be inconsistent with Sixth Circuit case law, as to

the burdens the parties carry in cases such as the one presently before this Court.

In speaking of which party carries the burden of establishing an affirmative

defense, such as the statute of limitations, the Sixth Circuit instructs as follows:

> A party who moves for summary judgment "bears the initial burden of
> showing the absence of a genuine issue of material fact."
> Furthermore, [the defendant] has the burden of proof on all affirmative
> defenses, such as the statute of limitations. Thus, if [the defendant]
> failed to meet its burden of proof, [the plaintiff] had no obligation to
> proffer any additional evidence in order to rebut the statute of
> limitations defense.

Fonseca v. CONRAIL, 246 F.3d 585, 590-91 (6th Cir. 2001) (citing, among

others, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202,

106 S. Ct. 2505 (1986)). Further, in Arnett v. Myers, 281 F.2d 552 (6th Cir.

2002), the Sixth Circuit discussed what the moving party must show to be entitled

to summary judgment on an issue upon which it will bear the burden of persuasion

at trial. "[I]f the moving party also bears the burden of persuasion at trial, the

moving party's initial summary judgment burden is 'higher in that it must show that

the record contains evidence satisfying the burden of persuasion and that the

evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Id.

at 561 (quoting 11 James William Moore et al., Moore's Federal Practice

§ 56.13[1], at 56-138 (3d ed. 2000)).

In the present case, the Court concludes that the Defendants have set forth

sufficient evidence to satisfy their burden as to their statute of limitations defense

in the instances where they questioned the Plaintiff as to the time period of his various allegations and the Plaintiff provided nothing in response. Once a defendant takes the initiative to satisfy its affirmative defense burden, by asking the proper question regarding the timing of the alleged wrongdoing, a plaintiff should not be able to impede the application of a statutory time bar simply by refusing to provide the answer. Thus, to the extent the Defendants questioned the Plaintiff about the timing of the alleged discriminatory acts and the Plaintiff provided no indication of a time period in response, the Court concludes that the Defendants have satisfied their burden, as to this affirmative defense.

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after November 26, 2003. With regard to the § 1981 claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after May 17, 2001, and with regard to the state law claim, from and after May 17, 1999. Thus, the following alleged incidents of disparate treatment are time barred, for purposes of all disparate treatment claims:

- Supervisor Cooper instructing Robinson to "break it up" when he was talking to a group of employees, but not instructing unidentified white employees to "break it up" when they were talking.

- Supervisor Galinger allocating more casual workers to the meat and dairy area and fewer casual workers to the freezer area, which resulted in Robinson being assigned to the freezer.

Furthermore, the Court will not consider the following alleged fact, given that the

Defendants questioned the Plaintiff about the timing of it and the Plaintiff provided no indication of a time period, in response:

- The company holding open job upgrades for white co-workers Dave and Bowser, who were not present during the job selection posting, but skipping over Robinson, if he was not present.

Based on the remaining factual allegations, all of which are timely, the Court will now turn to a consideration of whether the Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact, as to the various elements of his disparate treatment claim.

### 2. Disparate Treatment - Burden Shifting Analysis

Absent direct evidence of discrimination, the Court initially notes that courts analyze all three of the Plaintiff's disparate treatment claims (under Title VII, § 1981 and Ohio law) using the burden shifting framework, as set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). E.g., Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII); Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination claim under § 1981); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm., 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination claim under Ohio Revised Code Chapter 4112). The Sixth Circuit provides the

following summary of that analytical framework:

> First, the plaintiff must make out a prima facie case of race
> discrimination, after which the burden shifts to the employer to proffer
> a legitimate, nondiscriminatory reason for its decision.  If the employer
> carries its burden, the plaintiff must then prove by a preponderance of
> the evidence that the reasons offered by the employer were
> pretextual.  Throughout this burden-shifting process, "the ultimate
> burden of persuading the trier of fact that the defendant intentionally
> discriminated against the plaintiff remains at all times with the
> plaintiff."

Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing

DiCarlo v. Potter, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing Dews v. A.B.

Dick Co., 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not

intended to be onerous." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d

405, 412 (6th Cir. 2008) (citation omitted).  The Sixth Circuit instructs that in

order to establish a *prima facie* case of disparate treatment, a plaintiff must show

that 1) she is a member of a protected class; 2) she was qualified for the position;

3) she was subjected to an adverse employment decision; and 4) she was replaced

by a person outside the protected class, or treated differently than similarly

situated non-protected employees. Vaughn v. Louisville Water Co., 2008 U.S. App.

LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing

Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either

the first or second prong of his *prima facie* test; rather, they claim that he has not

set forth sufficient proof to create a genuine issue of material fact as to the third and fourth prongs. The Court will begin with a consideration of the fourth prong (whether the Plaintiff was treated differently than similarly situated non-protected employees) and then turn to the third prong.

<blockquote>a.    <u>Whether Plaintiff was Treated Differently than Similarly Situated Non-Protected Employees</u></blockquote>

The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is "similarly situated", he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998) (quoting <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original). Further-more, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." <u>Id.</u> (quoting <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 583 (6th Cir. 1992)).

The following sets forth the ways in which the Plaintiff contends that SuperValu discriminated against him, as well as the individuals with whom the Plaintiff seeks to compare his treatment (if any), for each alleged instance of

21

discrimination:[9]

(1) Supervisor Zimmerman telling the Plaintiff to "get back to work" while he was outside in the smoking tent during work time.[10] *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(2) Supervisor Dunn entering the breakroom and telling the Plaintiff and other black employees to go back to work while they were playing cards, but allowing unnamed white employees to stay in the breakroom until they finished their hand of cards. *The Plaintiff does not identify the similarly situated "unnamed white" employees, as to this alleged incident.*

(3) Manager Gunderson entering the breakroom and telling only the Plaintiff to go back to work. *The Plaintiff seeks to compare his treatment with the treatment of all other employees in the breakroom (including black and white employees).*

(4) Supervisors Gunderson, Zimmerman, Key and Dunwoodie watching the Plaintiff's computer screen, which displays his production rate, and telling him to get back to work when he stopped working for fifteen or twenty minutes at a time. *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

_____

[9]The Plaintiff also attempts to argue that he has satisfied the fourth prong of his disparate treatment *prima facie* case, because of the casual attitude of the supervisors toward the alleged racial harassment.

The supervisors' casual attitude toward harassment, and their own use of racial slurs[] is indicative of the atmosphere of the warehouse. A general working environment that tolerates this sort of harassment is evidence that implies a discriminatory reason for the adverse employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a disparate treatment claim, the Court will consider the same when assessing the Plaintiff's hostile work environment claim below.

[10]As this incident allegedly occurred in the summer of 2003, this claim is cognizable only under § 1981 and state law.

(5)     Supervisor Gunderson reprimanding the Plaintiff for staying in the breakroom for 10-15 minutes immediately after he reported for work late, when it was not his break time. *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(6)     Unnamed supervisor suspending the Plaintiff for taking an hour-long break without clocking out.[11] *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(7)     Manager Gunderson telling the Plaintiff to clock-out at the gate when he left the premises for breaks, while all other employees could leave the premises without clocking-out.[12] *The Plaintiff seeks to compare his treatment with the treatment of all other employees (including black and white employees).*

(8)     Supervisor Dunn telling the Plaintiff, Plaintiff Clegg, and Plaintiff Smith to go back to work after their break had ended, but not ordering white co-worker Allen, who worked in a different area, back to work. *The Plaintiff points to white co-worker Allen as a similarly situated employee, but Allen worked in a different area, and the Plaintiff points to no evidence to indicate if Allen dealt with the same supervisor, had been subject to the same standards and had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it.*

(9)     Supervisor Hartzog referring to the Plaintiff as a "dumb ass" (while the Plaintiff was disputing a discipline charge). *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(10)    Unidentified supervisors giving temporarily vacant jobs (caused by employee absences, on any given day) to less senior

---

[11]As this incident allegedly occurred in July 2003, this claim is cognizable only under § 1981 and state law.

[12]As this incident allegedly occurred in September 2003, this claim is cognizable only under § 1981 and state law.

employees than the Plaintiff, like co-worker Weckesser. *The only comparable employee pointed to by the Plaintiff is Weckesser, whose race he does not identify. Even assuming Weckesser is white, the Plaintiff points to no evidence to indicate that all of the relevant aspects of his employment situation were "nearly identical" to those of Weckesser's employment situation.*

(11) Supervisor Gibson writing up the Plaintiff for improper work, when he was working during his break time, and then voiding the write-up.[13] *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(12) Supervisor Gunderson telling the Plaintiff that he (the Plaintiff) would be fired if he did not meet production standards. *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(13) Supervisor Gunderson threatening to write up the Plaintiff for production issues when, in fact, Robinson had produced more pieces than white co-worker Sanders, who was not disciplined. Gunderson did not actually write up the Plaintiff once he (Gunderson) realized how high the Plaintiff's production numbers were. *The Plaintiff points to white co-worker Sanders as a similarly situated employee, but points to no evidence to indicate if Sanders dealt with the same supervisor, had been subject to the same standards and had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it.*

(14) Supervisors Jones and/or Brown writing up Robinson for being out of his work area (when he was out of his work area) and searching his lunchbox. *The Plaintiff seeks to compare his treatment with the treatment of all other employees (including black and white employees).*

As noted in the italicized text above, the Plaintiff has either not identified an

---

[13]As this incident allegedly occurred in July 2003, this claim is cognizable only under § 1981 and state law.

allegedly similarly situated non-protected co-worker or, in the three instances where he has identified such a co-worker, has not demonstrated that all of the relevant aspects of his employment situation were "nearly identical" to those of the non-protected co-worker's employment situation, as required in order to carry his burden on this prong of his *prima facie* case. Therefore, the Court concludes that the Plaintiff <u>has not</u> set forth sufficient evidence to create a genuine issue of material fact as to whether the individuals with whom he seeks to compare his treatment were similarly situated, with regard to any of his allegations of discrimination. In an abundance of caution, however, the Court will continue its analysis, as to the three claims of discrimination for which the Plaintiff has pointed to a comparable co-worker, to wit: Supervisor Dunn telling the Plaintiff, Plaintiff Clegg, and Plaintiff Smith to go back to work after their break ended, but not ordering white co-worker Allen back to work; unidentified supervisors giving temporarily vacant jobs (caused by employee absences, on any given day) to less senior employees than the Plaintiff, like co-worker Weckesser; and supervisor Gunderson threatening to write up the Plaintiff for production issues when, in fact, Robinson had produced more pieces than white co-worker Sanders, who was not disciplined.

   b. <u>Whether the Alleged Misconduct Constituted Adverse Employment Actions</u>

The third prong of the *prima facie* case of disparate treatment requires a

plaintiff to establish that he suffered an adverse employment action.  "An adverse

employment action is an action by the employer that 'constitutes a significant

change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits.'" White v. Baxter Healthcare Corp., 533 F.3d 381,

402 (6th Cir. 2008) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761,

118 S. Ct. 2257 (1998)), cert. denied, 129 S. Ct. 2380 (2009).  Stated another

way, an adverse employment action is a "materially adverse change in the terms or

conditions of . . . employment because of [the] employer's conduct." Policastro v.

Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted).

Thus, the Court must discern whether each of the Plaintiff's remaining alleged

adverse employment actions constitute materially adverse changes in the terms or

conditions of his employment.

The only case pointed to by the Plaintiff, which is arguably applicable to his

claims is Campbell v. Univ. of Akron, 2006 U.S. App. LEXIS 25876, 211 Fed.

Appx. 333 (6th Cir. Oct. 17, 2006).  The Plaintiff cites Campbell for his

proposition that "[d]iscipline for alleged violation of a break policy can also

constitute adverse employment action." Doc. #92 at 15.  However, in Campbell,

the defendant conceded that the disciplinary measures in question (an oral warning

and a written warning for violating a lunch-break policy) were adverse employment

actions and, thus, the Appellate Court had no reason to resolve the question

26

presently before this Court.[14] <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *3.

As to the breakroom reprimands in the present case, the Court concludes that such do not constitute adverse employment actions. The Plaintiff points to no case wherein a court determined that a supervisor's reprimand of employees for not reporting back to work in a timely fashion (apparently without any formal discipline) was an adverse employment action and the Court has found none. Such a reprimand does not constitute a significant change in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>See</u> <u>White</u>, 533 F.3d at 402 (quotation omitted). Therefore, the Court concludes that the Plaintiff has not pointed to sufficient evidence to support this claim.

Furthermore, as to the Plaintiff's claims pertaining to supervisors giving temporarily vacant jobs (caused by employee absences, on any given day) to less senior employees than the Plaintiff and a supervisor threatening to write up the Plaintiff for production issues (but not actually doing so) when he had produced more pieces than a white co-worker who was not disciplined, the Court similarly concludes that the Plaintiff has not pointed to sufficient evidence to demonstrate

---

[14]As noted by the <u>Campbell</u> Court, "[f]or reasons that are not entirely clear, the University does not contest that the disciplinary actions the PFOC took against Campbell were 'adverse employment actions' actionable under Title VII." <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *21 n.5. Therefore, the Court continued, "we do not decide that issue, and assume for purposes of this opinion that these disciplinary actions do constitute 'adverse employment actions.'" <u>Id.</u>

that these were adverse employment actions.  The Sixth Circuit has held that

"reassignments without salary or work hour changes do not ordinarily constitute

adverse employment decisions in employment discrimination claims." Kocsis v.

Multi-Care Mgmt., 97 F.3d 876, 885 (6th Cir. 1996) (citing Yates v. Avco Corp.,

819 F.2d 630, 638 (6th Cir. 1987)).  Further, mere threats to take adverse

employment actions (assuming, without deciding, that the threatened discipline for

productivity issues would be an adverse employment action) are insufficient to

constitute adverse employment actions themselves. See Hollins v. Atlantic Co.,

188 F.3d 652 (6th Cir. 1999) ("We agree with the district court that the evidence

that Gagel threatened to discharge Hollins is too ambiguous to satisfy the adverse

employment action requirement.").


In sum, the Plaintiff has not set forth sufficient facts to create a genuine

issue of material fact as to any part of his disparate treatment claims.  Thus, the

Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #77), with

regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of

Count II) and Ohio law (Count III).


B.     Hostile Environment, under 42 U.S.C. § 1981 (remaining part of
       Count II) and under Ohio Law (Count V)

Robinson brings hostile work environment claims against all Defendants,

under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am.

28

Compl.).  He submits that he suffered a hostile work environment based on his race, at the hands of co-workers and unknown perpetrators, to wit:  (1) once each in 1984, 2001 and 2006, unknown person(s) wrote the word "nigger", with or without other words, in the bathroom stalls; (2) in approximately 1992, white co-worker Randall called white co-worker Hamlet a "nigger lover", because Hamlet and Robinson were good friends; (3) on two or three occasions, in the summer of 2000, unknown person(s) wrote the word "nigger" in chalk, along with a caricature of a person with big lips, on pallets in the warehouse, and drew a caricature of a person with big lips on a water softener; (4) in 2007, unknown person(s) wrote "XXX" near a public telephone; and (5) on two or three occasions, unknown person(s) drew swastikas on bathroom walls.[15]

---

[15]The Court relies only on the acts of harassment that allegedly happened to the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter, only for those which one or the other of the parties has pointed to admissible evidence in support thereof.  The Court is aware that the Sixth Circuit has instructed that courts must consider the "totality of circumstances" when deciding cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999).

In Jackson v. Quanex Corp., the Appellate Court directed that the "totality of circumstances" approach necessitates aggregating alleged acts of harassment towards minority employees, in cases such as the present one. Id.  In so doing, the Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v. Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)).  Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees.  "Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work

The Sixth Circuit instructs that courts are to use the same standard when evaluating hostile work environment claims under Title VII, § 1981 and Ohio Revised Code Chapter 4112. <u>Noble v. Brinker Int'l, Inc.</u>, 391 F.3d 715, 720 (6th Cir. 2004). To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following:

> (1) [He] is a member of a protected class . . . ; (2) [he] was subjected to harassment, either through words or actions, based on [his protected class]; (3) the harassment had the effect of unreasonably interfering with [his] work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

<u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 270 (6th Cir. 2009)

---

environment at Quanex was objectively hostile to African Americans, <u>and evidence that Jackson learned of these incidents</u> clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." <u>Id.</u> (emphasis added); <u>see also id.</u> ("We have also credited evidence of racial harassment directed at someone other than the plaintiff <u>when the plaintiff knew a derogatory term had been used</u>." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above. Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them. The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3. Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only those facts pertinent to the present Plaintiff, which are set forth above.

(quoting Grace v. USCAR, 521 F.3d 655, 678 (6th Cir. 2008)).[16]  As to the final

prong, whether there is a basis for employer liability, such depends on whether the

plaintiff is alleging harassment by supervisors or co-workers.  Quoting from a

Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses

as follows:

> The Supreme Court has ruled that employers are not automatically
> liable for [] harassment perpetrated by their employees. See Burlington
> Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d
> 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct.
> 2275, 141 L. Ed.2d 662 (1998).  Where an employee is the victim of
> [] harassment, including harassment in the form of a hostile work
> environment, by non-supervisory co-workers, an employer's vicarious
> liability depends on the plaintiff showing that the employer knew (or
> reasonably should have known) about the harassment but failed to
> take appropriate remedial action. See Faragher v. City of Boca Raton,
> 524 U.S. at 789; accord Whidbee v. Garzarelli Food Specialties, Inc.,
> 223 F.3d 62, 72 (2d Cir.2000).  Where the harassment is attributed
> to a supervisor with immediate or successively higher authority over
> the employee, a court looks first to whether the supervisor's behavior
> "culminate[d] in a tangible employment action" against the employee,
> Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; if
> it did, "the employer will, ipso facto, be vicariously liable," Mack v.
> Otis Elevator Co., 326 F.3d at 124 [(2d Cir. 2003)].  In the absence
> of such tangible action, an employer will still be liable for a hostile
> work environment created by its supervisors unless it successfully
> establishes as an affirmative defense that (a) it "exercised reasonable
> care to prevent and correct promptly any sexually harassing behavior,"
> and (b) "the plaintiff employee unreasonably failed to take advantage
> of any preventive or corrective opportunities provided by the employer
> or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524
> U.S. at 765, 118 S. Ct. 2257; accord Faragher v. City of Boca Raton,

---

[16]Gallagher was a hostile work environment case, based on sexual
harassment, as opposed to racial harassment.  The Sixth Circuit applies the same
legal standard to both sorts of claims, however. See Ladd v. Grand Trunk Western
R.R., 552 F.3d 495, 500 (6th Cir. 2009).

> 524 U.S. at 807, 118 S. Ct. 2275; <u>Mack v. Otis Elevator Co.</u>, 326
> F.3d at 125.

<u>Gallagher</u>, 567 F.3d at 275 (quoting <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 225 (2d

Cir. 2004)).

The Defendants, in the present action, do not contest the first prong of the

*prima facie* case. They do, however, assert that Robinson has failed to set forth

sufficient proof as to the second prong, for one of his assertions of harassment,

and for the third and fourth prongs for all of his assertions.[17]


      1.    <u>Whether Robinson was Subjected to Harassment Based on Race</u>

In order to be actionable as a racial harassment claim, a plaintiff must

demonstrate that he was harassed because of his race. <u>Booker v. Budget

Rent-A-Car Sys.</u>, 17 F. Supp. 2d 735, 743 (M.D. Tenn. 1998). SuperValu argues

that the incident involving the letters "XXX" near the public telephone was not

"based on race." The Court agrees. The Court knows of no racial connotation

associated with the letters "XXX" and the Plaintiff has pointed to no legal or other

---

[17]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #77 at 30 n.12. The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did form one continuous hostile work environment, need not consider the Defendants' argument, on this point. Thus, the Court does not reach the statute of limitations issue on the allegations constituting the hostile work environment claims.

source to support his contention of such.[18]  Therefore, the Plaintiff has not pointed

to sufficient evidence to create a genuine issue of material fact, on his hostile work

environment claim, with regard to the incident involving the letters "XXX" near the

public telephone.

       2.     Whether Harassment Had Effect of Unreasonably Interfering with Plaintiff's Work Performance and Creating an Objectively Intimidating, Hostile, or Offensive Work Environment

The Sixth Circuit has identified the governing standard for the third prong of

a plaintiff's *prima facie* case of harassment as follows:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)

(quoting Williams v. GMC, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted Harris

v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295

(1993)).  The Supreme Court states that, in making these assessments, courts must

consider "the frequency of the discriminatory conduct; its severity; whether it is

---

[18]Lest the Court be criticized as not being up on contemporary jargon, it has checked the web site www.urbandictionary.com, for guidance in this matter.  That web site does not include any concepts with racial overtones in its definition of the letters "XXX".

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Further, in order to constitute a "change in the terms and conditions of employment", conduct must be "extreme". Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the incidents that arguably reflect racial animus were not severe and pervasive enough to alter the terms and conditions of Robinson's employment. As to the objective view of the facts, SuperValu argues that the alleged incidents of harassment occurred over a span of more than twenty years, most were not directed at Robinson and none of them was physically threatening. As to the subjective view of the facts, SuperValu asserts that although Robinson generally claims that he suffered distress, humiliation, and anxiety, and that he was unable to perform his job effectively, he admits that this was due to the company's implementation of new forklift standards–not due to race discrimination. Doc. #65-4 (Robinson Dep. at 245-47). Further, Robinson concedes that he did not suffer any damages or expenses because of race discrimination. Id. at 246. In response, Robinson argues that it is the decades-long history of regular harassment that defines his treatment as severe and pervasive. Further, Robinson argues that his filing of the present lawsuit, along with the fact that he recalls the incidents in question years after they happened, is evidence that he subjectively considered his mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit. In <u>Smith v. Leggett Wire Co.</u>, the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment: "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as a 'gorilla'." <u>Smith</u>, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at Smith, over a twenty-year span of time.").

Conversely, in <u>Jackson v. Quanex Corp.</u>, the Appellate Court found the following facts probative of a severe and pervasively hostile work environment: the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males," graffiti in the men's restroom

"depicting lynchings accompanied by the phrase, 'KKK is back'," graffiti on the back door that said "blacks out back," graffiti in the seam grinding area that "depicted the lynching of African-American men," graffiti in the restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of extreme racial misconduct (including calling a new hire "nigger" and "motherfucker", and after he reported these comments, telling him, "Nigger, we want you to quit your job . . . ."; defacing a work shirt with the words "Nigger Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's machine; tampering with acid valves in an attempt to create a safety hazard that would appear to be attributable to a minority worker, and a co-worker calling another co-worker a "nigger bitch" and physically assaulting her). Jackson, 191 F.3d 647, 651-55, 62 (6th Cir. 1999).

SuperValu also points the Court to the Sixth Circuit's unpublished opinion in Kelly v. Senior Centers, Inc., wherein the Court found that the following incidents of misconduct, which occurred over four months, did not amount to actionable harassment: "two staff members' use of the pejorative slur word 'nigger' referring to the foster grandparents; Dangelo's description of a Board Member as a 'token black' and her comments that the foster grandparents were slovenly or were 'pigs' at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes'; and comments about an African-American staff member's bathroom habits." Kelly, 2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8, 2006). In concluding its findings, the Court stated, "[w]hile we believe that a single utterance

36

of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." Id. at *17.

SuperValu also cites Bourini v. Bridgestone/Firestone North American Tire, L.L.C., 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position. In Bourini, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment: (1) a co-worker said, "I don't want to … see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the September 11 attacks, a co-worker attempted to back over him while reversing a forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's voice over the intercom system; (7) someone painted Islamic slurs on the restroom wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For my Muslim Friend;" and (9) the human resources department sent an email relating to plaintiff's immigration status to all employees. Id. at **2-5. The Appellate Court concluded that these incidents "were not sufficiently pervasive to establish an abusive working environment." Id. at *10. Because the incidents were spread out over a five year period, the Court found them to be "relatively infrequent and isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of

employment." Id.

In the present case, Robinson alleges three instances of seeing the word "nigger" on the bathroom walls and one instance of a co-worker using the word "nigger lover", over a twenty year period. Also, about five years before filing suit, he saw the word "nigger" and caricatures of a person with big lips, in the warehouse and on a water softener, on two or three occasions. Finally, he has seen swastikas on the bathroom walls on two or three occasions over the years. While this conduct is reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Robinson's employment. The incidents are closest in severity and pervasiveness to those in Kelly v. Senior Centers, Inc., *supra*, which (although occurring in only a four month period of time) the Sixth Circuit found to be insufficient to constitute discriminatory changes in the terms and conditions of employment, as explained above. Thus, regardless of whether he subjectively found that the alleged incidents created a hostile work environment, Robinson has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based harassment. Given that the Plaintiff has not satisfied the third prong of his *prima facie* case of harassment, the Court finds it unnecessary to determine whether he has pointed to sufficient evidence to satisfy the fourth prong (whether there exists some basis for liability on the part of the employer).

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work environment based on race. Therefore, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #77), as to Robinson's hostile work environment claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

C.     Retaliation, in violation of Title VII and/or Ohio law (Count IV)

As Count IV in his Amended Complaint, Robinson asserts a claim for retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.) ¶¶ 60-64. These claims are limited to allegations of retaliation that occurred after the filing of Robinson's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent direct evidence of retaliatory discrimination, a plaintiff must show the following:

(1) [he] engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to defendant;

(3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see

also <u>Putney v. Contract Bldg. Components</u>, 2009 Ohio App. LEXIS 5634, **30-31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009).  In their memorandum in support of their Motion for Summary Judgment, the Defendants state that they are entitled to summary judgment on this claim, because Robinson admitted that he experienced no retaliation and also because he has set forth no facts to support his retaliation claim. Doc. #77 at 40.

It is true that Robinson conceded that he experienced no retaliation for making complaints to management of discriminatory actions. Doc. #65-4 (Robinson Dep. at 255).  It is also true that Robinson makes no argument nor presents any facts in support of his retaliation claim. <u>See</u> Doc. #92 (Mem. Opp'n).  Because the Plaintiff has pointed to no facts to support his retaliation claim, there is no genuine issue of material fact as to the same and the Defendants' Motion for Summary Judgment (Doc. #77) is SUSTAINED, as to Count IV.


    D.    <u>Respondeat Superior (Count VI)</u>

As Count VI in his Amended Complaint, Robinson alleges that SuperValu is liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77.  In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above

(e.g., employer liability component of hostile work environment claim).  Therefore,

the Defendants' Motion for Summary Judgment (Doc. #77) is SUSTAINED, as to

Count VI.


IV.    Conclusion

The Defendants' Motion for Summary Judgment (Doc. #77) is SUSTAINED,

in its entirety.  Judgment is ultimately to be entered on behalf of Defendants

against Plaintiff Robinson, at the conclusion of this litigation.


March 31, 2010


                                   ___/s/ Walter Herbert Rice_____
                                   WALTER HERBERT RICE, JUDGE
                                   UNITED STATES DISTRICT COURT
Copies to:
Counsel of record