IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                    :

        Plaintiffs,                      :
                                            Case No. 3:05cv169
            vs.                          :
                                            JUDGE WALTER HERBERT RICE
SUPERVALU HOLDINGS, INC., et al.,        :

        Defendants.                      :

---

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF ROOSEVELT LEVERETT
(DOC. #79); JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF
DEFENDANTS AGAINST PLAINTIFF ROOSEVELT LEVERETT

---


        The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13. The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1] Doc. #23. The

---

[1]The Amended Complaints lists the Plaintiffs as follows: Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.). The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name. The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2]The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3]The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Roosevelt Leverett ("Plaintiff"). Doc. #79. In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4. Thus, at this stage of the litigation, the following claims remain: (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI). The Defendants have moved for summary judgment on all of Leverett's claims. Doc. #79.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts. It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

---

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment. Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II. Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

I.    Facts[5]

SuperValu hired Leverett in 1976. Doc. #66-1 (Leverett Dep. at 18).  Since

that time, Leverett has worked in various jobs, including order selector, checker,

utility worker, custodian, loader, stocker, receiver, pallet sorter and recoup worker.

Doc. #79-10 (Schulcz Aff.) ¶ 3.


A.    Collective Bargaining Agreement and Anti Harassment/Discrimination
       Policy

As a member of the local union, Leverett's employment terms are covered

by the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #66-1 (Leverett Dep. at 22); Docs. #66-12, #66-13, #66-14 (CBA).  Some of

the specifics covered by the CBA include the following:

---

[5]Since this case comes before the Court on the Defendants' Motion for
Summary Judgment, the Court sets forth the facts and circumstances giving rise to
such Motion in the manner most favorable to the Plaintiff, as the party against
whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments,
475 F.3d 783, 790 (6th Cir. 2007).
       The Court has spent an inordinate amount of time organizing the facts, in
this case.  Not only did the Defendants file an excessively long memorandum in
support of their Motion for Summary Judgment (46 pages, not including table of
contents or summary of arguments) (Doc. #79), but they also set forth the majority
of their lengthy factual assertions in single-spaced footnotes, in small font.  In
doing so, the Defendants have set forth far more facts than the Plaintiff.  In
drafting the present Opinion, the Court has relied upon those facts pointed to by
the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts
generally set forth in the Amended Complaint (Doc. #3), which have been
expounded upon by the Defendants.  As to the facts raised by the Defendants, but
not relied upon by the Plaintiff in either the Amended Complaint or memorandum in
opposition to the Motion for Summary Judgment, the Court considers those facts
inapplicable to the present case.

4

- <u>Job Bidding</u>.  Bargaining unit jobs are awarded by seniority.  Job openings are posted for five days and are then filled with the qualified employee with the most seniority. Doc. #66-12 (CBA) at 12.

- <u>Overtime Assignments</u>.  Overtime assignments are made to the most senior employee who volunteers and is qualified.  If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #66-13 (CBA) at 1-2.

- <u>Nondiscrimination</u>. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #66-14 at 4.

- <u>Grievance and Arbitration Procedure</u>. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #66-12 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Doc. #79-12.  SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #79-10 (Schulcz Aff.) ¶ 6, Attachs. C-D.

B.     <u>Facts Specific to the Plaintiff's Disparate Treatment Claim</u>

The parties set forth the following facts pertinent to Leverett's disparate treatment claim:

- <u>Alleged Disparate Treatment with Regard to Discipline</u>
  - In 1977, the company terminated Leverett and white co-worker Urton for

5

misconduct during a strike and then rehired both of the men. Doc. #66-5 (Leverett Dep. at 288-29). Leverett alleges that the company waited six weeks to reinstate him, while it reinstated Urton right away. Id. at 289-90.

- In 1995 or 1996, two supervisors gave Leverett verbal warnings for loading products onto the wrong truck, while two years later, white co-worker Konieczny (supervisor unknown) was not disciplined for the same misconduct. Doc. #66-5 (Leverett Dep. at 324-27).

- In June 2003, manager Gunderson gave Leverett a one-day suspension for using the word "nigger". Docs. #56-2 at 81-83; #66-4 at 271. Leverett believes that it was discriminatory for the Company to discipline him for using the word "nigger" while unnamed white employees were not disciplined for using the words "hillbilly" or "redneck". Doc. #66-2 (Leverett Dep. at 96).

- In July 2006, supervisor Brown made Leverett and white co-worker Bowland leave the garage breakroom. Doc. #66-5 (Leverett Dep. at 330-32). Leverett received a verbal reprimand and is unsure whether Bowland received the same. Id. at 332. Leverett did not file a grievance. Id. The following month, white co-worker Morris was also in the garage breakroom, but Leverett does not know if management knew about it or not. Id. at 332-34.

- On three occasions between July and October 2006, various supervisors initially "disciplined" Leverett for sleeping on the job, but then voided the discipline. Doc. #66-2 (Leverett Dep. at 107-15, 131-32); Doc. #66-4 (Leverett Dep. at 247). Leverett alleges that white co-worker Dickens slept on the job without consequences, but does not know if anyone other than him (Leverett) witnessed Dickens's conduct. Doc. #66-2 (Leverett Dep. at 114-17).

- In 2006, supervisor Gunderson and a supervisor named "Chuck" monitored Leverett's work progress regularly, while they did not monitor other workers as closely. Doc. #66-2 (Leverett Dep. at 99-105; 119-20; 123-24). When Leverett asked supervisor Keyes what was going on "with all this changing in attitude and policy", Keyes replied, "[m]aybe they're trying to get you." Id. at 126-27.

- <u>Alleged Disparate Treatment with Regard to Break Times and Socializing</u>
  - Prior to August 1997, supervisor Studley directed some unidentified black employees (not to include Leverett) to go back to work while some unidentified white employees were ignored and not asked to go back to work. Doc. #66-3 (Leverett Dep. at 196-99); Doc. #79-10 (Schulcz Aff.) ¶ 14.
  - On two occasions in 2003-2004, supervisor Keyes came into the

breakroom and seemingly directed her order to go back to work to Leverett and other black employees, while ignoring unnamed white employees whom Keyes also supervised and whom were on the same shift. Doc. #66-3 (Leverett Dep. at 202-06).

- In 2005, supervisor Chamblee stood in the doorway of the breakroom and announced, "you gang of guys need to go back to work." Doc. #66-4 (Leverett Dep. at 222-25). Both black and unnamed white employees were in the breakroom at the time and went back to work after hearing Chamblee's statement, although Leverett feels that Chamblee directed his comment only to the black employees. Id. at 225.

- On several occasions in 2005-2006, supervisor Keyes talked to white co-worker Carr during work time, but did not talk to black employees during work time. Doc. #66-4 (Leverett Dep. at 231-26). Leverett does not know whether Keyes and Carr talked about work issues or non-work issue, during these conversations. Id.

- In 2006, manager Gunderson "made a special effort" of monitoring Leverett when he clocked in and out of breaks. Doc. #66-1 (Leverett Dep. at 59-61).

- Alleged Disparate Treatment in Job Assignments/Overtime
  - From the 1980s until 1994, various supervisors routinely assigned Leverett "heavy orders." Doc. #66-5 (Leverett Dep. at 313-17).
  - From the time he became a checker until approximately 1997, the company did not give Leverett as much help and training as it gave white co-workers Newton and Brown. Doc. #66-5 (Leverett Dep. at 303-08).
  - Between 2004-2005, when Leverett was lower in seniority, management would choose overtime workers off the list of interested persons by seniority and stop just prior to his name. Doc. #66-1 (Leverett Dep. 63-65). On a couple of occasions, the company skipped over Leverett (and other employees, both black and white) and offered overtime to a junior employee, but then paid him for this error when the company learned of the mistake. Id. at 65-69.
  - In 2005, the company did not upgrade Leverett from an order selector position to a forklift position when he came into work on his day off. Doc. #66-5 (Leverett Dep. at 336-37). Leverett admits that the same thing happened to a lot of other employees that day, but he does not know whether the other affected employees were white or black. Id. at 337-38.
  - As recently as 2006, management regularly held up the assignment of temporary jobs, if certain white employees (like Dickens, Brown, Bowland, Carr or Frye) were not present during the job assignment session, in contravention of company policy, but did not do the same for

black employees, including Leverett, if they were not present.[6] Doc. #66-3 (Leverett Dep. at 207-13); Doc. #66-4 (Leverett Dep. at 214-19). Leverett did not grieve or otherwise complain to management about this practice. Doc. #66-4 (Leverett Dep. at 219-20).

- Sometimes supervisors did not assign anyone to perform a particular job at the beginning of a shift, thereby allowing the supervisor to hand-pick a worker after two hours had elapsed. Doc. #66-4 (Leverett Dep. at 277-79). At his deposition, Leverett was not asked for a date of this incident, nor did he volunteer one. See id.

- <u>Alleged Disparate Treatment with Regard to Training</u>.
  - In approximately 1992, Leverett requested checker training, but did not get it. Doc. #66-5 (Leverett Dep. at 302-03).

- <u>Alleged Disparate Treatment with Regard to Drug Testing</u>
  - Between 2002-2005, white co-worker Miller ran over Leverett's toe with a forklift, requiring Leverett to go to the emergency room. Doc. #66-4 (Leverett at 256-60). In accordance with company policy, Leverett was drug-tested, since he had gone to the hospital emergency room. <u>Id.</u> at 258. Leverett does not object to the fact that he was drug-tested, but thinks that Miller should have also been drug-tested, yet does not think that he was. <u>Id.</u> Charles Wright supervised both Miller and Leverett at the time. <u>Id.</u> at 261.

---

[6]The Court assumes that the job assignment to which Leverett is referring is the temporary assignment of jobs (as opposed to a permanent assignment of jobs), which happens on a day-to-day basis, when employees are temporarily reassigned for the day, depending on work load and absenteeism. <u>See</u> Doc. #65-3 (Robinson Dep. at 211-13) (wherein Robinson explains that positions that are open due to daily absences are assigned by seniority at the start of each shift, in the breakroom); <u>see generally</u> Doc. #66-3 (Leverett Dep. at 207-13) (describing what seems to be a similar system). In their memorandum in support of their Motion for Summary Judgment, the Defendants refer to the job assignment in question, as an "occasional reassignment[] and fluctuation[] of job responsibilities that [is] temporary in nature" and the Plaintiff does not correct this perception, in his memorandum in opposition. Doc. #79 at 30; <u>see also</u> Doc. #92.

Further, Leverett states that he subsequently learned how to work the system and called in if he was going to be late to the assignment meeting. Doc. #66-3 (Leverett Dep. at 208-13). While the supervisor on duty would not hold up the job assignment process for Leverett, the supervisor would see that Leverett received the job to which his seniority entitled him, if he had previously called in to say he would be late. <u>Id.</u>

8

- In approximately 2006, Plaintiffs Smith and Hightower were drug-tested after accidents, but white co-workers McIntosh and Bailey were not drug-tested after accidents. Doc. #66-4 (Leverett Dep. at 262-67).

C.   Facts Specific to the Plaintiff's Hostile Work Environment Claim[7]

The parties set forth the following facts pertinent to Leverett's hostile work

environment claim:

- At some point in time, Leverett heard an unnamed white co-worker use the word "coon" in what he perceived to be a racist joke, after which he told an unidentified supervisor that someone had told a joke that he found offensive.[8]

---

[7]Leverett also makes the following allegations, for which he does not provide an exception to the hearsay rule of evidentiary exclusion:

- Co-worker Bird telling Leverett that co-worker Barton said, "nigger, get your hands off me." Doc. #66-2 (Leverett Dep. at 138-40).
- Co-worker Hightower telling Leverett that supervisor Brown had called Hightower a "strong buck." Doc. #66-4 (Leverett Dep. at 250-52).
- An unidentified person telling Leverett that employee Everitt told employee Robinson, "if you want a race war, I'll give you a race war" and "if the company fires me, I will get paid like the monkeys." Doc. #66-4 (Leverett Dep. at 267-71).

The Plaintiff points to no exceptions to the hearsay rule, which would allow the Court to consider these assertions.  Thus, the Court will not consider the same when ruling herein.

The Court recognizes that these statements are not necessarily being offered for the truth of the matter asserted, with regard to the Plaintiff's subjective claim of hostile work environment, thus taking them out of the realm of hearsay statements. Fed. R. Evid. 801(c).  However, since the Court does not reach the issue of whether the Plaintiff subjectively perceived his work environment to be hostile, as explained infra, it need not consider the otherwise inadmissible hearsay statements when ruling herein.

[8]Leverett offers confusing testimony about this incident.  At one point he states that it happened in September or October of 2006. Doc. #66-3 (Leverett Dep. at 155).  Then he states that it happened "at least four years ago." Id. at

9

Doc. #66-3 (Leverett Dep. at 153-55, 157-58). Also, Leverett heard racial jokes regularly between 1986-2007, told in the breakrooms by both white and black employees, or saw racially discriminatory jokes that had been printed off the Internet by unknown co-workers. Id. at 148-51, 155-57. Leverett points to no evidence to indicate whether he reported any jokes other than the "coon" joke. See id. at 148-51, 155-57.

- Prior to March 1996, Leverett found a "dummy" consisting of a stuffed pair of pants and shirt hanging from a rack 18-20 feet from the floor. Doc. #66-3 (Leverett Dep. at 179-83); Doc. #79-10 (Schulcz Aff.) ¶ 30. Next to the dummy was a cardboard sign bearing the name of Strawder Cooper, who was a black supervisor. Doc. #66-3 (Leverett Dep. at 181, 184). The dummy was not removed for three or four days. Id. at 183-84. At some point in time, Leverett reported this to supervisor Caroluss. Id. at 181-83.

- Prior to June 1997, Leverett saw a piece of paper, on company letterhead, with the typed words "you are a nigger lover" sitting on the desk of white co-worker Waggoner. Doc. #66-3 (Leverett Dep. at 185-86); Doc. #79-10 (Schulcz Aff.) ¶ 31. Leverett did not report the incident to management, since Waggoner indicated to him that she wanted to take care of it herself. Id. at 187-89. SuperValu points out that manager Hatton conducted a detailed investigation to see if he could identify the person responsible for leaving the note on Waggoner's desk. Doc. #79-2 (Hatton Aff.) ¶ 10, Attach. C.

- On one occasion prior to August 1997, supervisor Studley addressed Leverett as "Buckwheat." Doc. #66-3 (Leverett Dep. at 191-95); Doc. #79-10 (Schulcz Aff.) ¶ 14. Leverett did not report the incident. Doc. #66-3 (Leverett Dep. at 194-95).

- In 2001 or earlier, white co-worker Hebel came into the breakroom and announced, "I went coon hunting last night." Doc. #66-3 (Leverett Dep. at 161-63);Doc. #79-10 (Schulcz Aff.) ¶ 34. Leverett did not report the incident. Doc. #66-3 (Leverett Dep. at 163-64).

- On one occasion in 2004 or earlier, Leverett saw the word "nigger" written on the bathroom wall, but did not report the same to management. Doc. #66-3 (Leverett Dep. at 167-71). The graffiti was eventually painted over. Id. at 173.

- On one occasion in 2004 or earlier, Leverett saw the word "nigger" written on a rack in the baby food aisle, but did not report the same to management. Doc. #66-3 (Leverett Dep. at 175-77). The graffiti was eventually painted over. Id. at 178.

---

158. He also states that the supervisor to whom he "probably" mentioned the incident was Bob Reibold, but he is not sure about his identity "because it was a little while back." Id. SuperValu offers evidence indicating that Bob Reibold left the company in 1991. Doc. #79-10 (Schulcz Aff.) ¶ 28.

- In 2006, Leverett saw swastikas on the bathroom wall, but did not report it to management. Doc. #66-3 (Leverett Dep. at 174-75)
- Regularly since 2001 or 2002, Leverett has heard unidentified white and black co-workers playing rap music that uses the word "nigger". Doc. #66-3 (Leverett Dep. at 145). Leverett has not report this to anyone, but has mentioned that the music was "a little loud" to the co-workers who were playing it. Id. at 146-47.

II. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical

doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. Legal Analysis

A. Disparate Treatment, under Title VII (Count I), under 42 U.S.C. § 1981 (part of Count II) and under Ohio Law (Count III)

Leverett brings race discrimination claims against SuperValu, based on the theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III). Doc. #3 (Am. Compl.). He also alleges disparate treatment against the individual Defendants, under Ohio law (Count III). Id.

At the onset, the Court notes that both parties have relied upon certain factual allegations, in support of their arguments for and against Leverett's disparate treatment claim, which pertain to the alleged disparate treatment of other employees, rather than to the alleged disparate treatment of Leverett. Because a disparate treatment claim, in a non-class action suit, is an individual claim wherein an employee is alleging that his employer discriminated against <u>him</u> because of his race, rather than that the employer discriminated against <u>another employee</u> because of his or her race, see <u>Upshaw v. Ford Motor Co.</u>, 576 F.3d 576, 584 (6th Cir. 2009) (setting forth *prima facie* case of race discrimination claim, which focuses entirely on alleged disparate treatment of plaintiff), the Court will not consider the following factual allegations, in analyzing Leverett's disparate treatment claim:

- Supervisor Studley directing some unidentified black employees (not to include Leverett) to go back to work while ignoring some unidentified white employees.

- SuperValu requiring Plaintiffs Smith and Hightower to be drug-tested after accidents, but not requiring the same of white co-workers McIntosh and Bailey.

The Court will now proceed with an analysis of the Defendants' Motion, as it pertains to the alleged disparate treatment of Leverett, with the remaining applicable factual assertions.

1.    Whether Certain Claims are Time Barred

SuperValu initially argues that certain of the Plaintiff's disparate treatment claims are time barred.[9]  Initially, the Court notes that the proper starting point for this analysis is the date that each discrete discriminatory act occurred.  See AMTRAK v. Morgan, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  In other words, in a disparate treatment context (as opposed to a hostile work environment context),[10] a plaintiff may not "convert[] related discrete acts

_____

[9]Along with certain outdated claims, SuperValu also argues that two of the Plaintiff's claims are undated and should similarly be time barred. Doc. #79 (Mem. Supp.) at 16-17.  However, the Plaintiff has indicated dates pertinent to one of the allegations (management regularly holding up assignments for absent white employees) and SuperValu did not question the Plaintiff, at his deposition, about the date of the other incident (supervisors not assigning anyone to perform particular jobs at the beginning of shifts, thereby allowing them to hand-pick employees after two hours). See Doc. #66-3 (Leverett Dep. at 207, 211-12) (noting dates pertinent to first allegation); Doc. #66-4 (Leverett Dep. at 277-79) (indicating no question pertaining to date of second allegation).

As the moving party, SuperValu "bears the initial burden of showing the absence of a genuine issue of material fact" on its statute of limitations affirmative defense. Fonseca v. CONRAIL, 246 F.3d 585, 590-91 (6th Cir. 2001) (citing, among others, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).  Because it has not satisfied that burden as to either of the two assertions at issue, its argument pertaining to the same is not well taken.

[10]In contrast, plaintiffs may convert related discrete acts into an unlawful practice, for purposes of timely filing in the hostile work environment context.  As explained by the Supreme Court,

Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct.  The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

15

into a single unlawful practice for the purposes of timely filing." Id. at 111. As to

the extent that discrete acts of discrimination that fall outside the applicable

statute of limitations are helpful or harmful to a plaintiff's case, the Supreme Court

instructs as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even
> when they are related to acts alleged in timely filed charges. Each
> discrete discriminatory act starts a new clock for filing charges
> alleging that act. . . . The existence of past acts and the employee's
> prior knowledge of their occurrence, however, does not bar employees
> from filing charges about related discrete acts so long as the acts are
> independently discriminatory and charges addressing those acts are
> themselves timely filed. Nor does the statute bar an employee from
> using the prior acts as background evidence in support of a timely
> claim.

Id. at 113. Relying on the final sentence quoted above, the Plaintiff correctly

argues that this Court may consider, even if untimely, "prior acts as background

evidence in support of a timely claim." Id. In sum, therefore, although the Court

will not take outdated acts into consideration for purposes of determining whether

those acts constitute disparate treatment, it will take them into consideration as

background evidence in considering timely acts of alleged discrimination. Having

established that the starting point for its statute of limitations analysis is each

discrete act of discrimination, the Court will proceed with its analysis of the proper

time periods within which to examine the allegedly discriminatory conduct.

---

Morgan, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment
Discrimination Law 348-349 (3d ed. 1996); Harris v. Forklift Systems, Inc., 510
U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

As to the Title VII claim, the Defendants correctly point out that Title VII requires complainants to file a claim with the Equal Opportunity Employment Commission ("EEOC") within 300 days after each discrete act of alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S. App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)). In the present case, the Plaintiff filed his EEOC claim on August 25, 2004. Doc. #3-8 (Leverett EEOC Charge). Therefore, as to the Plaintiff's Title VII claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to October 30, 2003 (300 days prior to the filing of the EEOC claim on August 25, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of limitations.[11] 28 U.S.C. § 1658(a); see also Jones v. R.R. Donnelley & Sons Co.,

_____

[11]The Defendants argue that claims arising in Ohio, under § 1981, are subject to a two year statute of limitations. Doc. #79 at 16. Such was the law prior to 2004. See Bd. of Regents v. Tomanio, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980) (noting that when Congress does not establish a statute of limitations, courts typically "borrow" the state law statute of limitations governing analogous causes of action); Nelson v. GE, 2001 U.S. App. LEXIS 1145, **7-8, 2 Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of limitations for such claims). However, in 2004, the Supreme Court decided Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a), establishing a four year statute of limitations period for "civil action[s] arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990]." Id. at 375. The Court further concluded that the

17

541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Thus, for purposes of the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under § 4112 is six years." Harrison v. City of Akron, 2002 U.S. App. LEXIS 16263, *5, 43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code §§ 2305.07, 4112.99; Cosgrove v. Williamsburg of Cincinnati Mgmt. Co., 70 Ohio St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)). Thus, for purposes of the Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 1999 (six years prior to the filing date of May 16, 2005).

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that

---

plaintiff's claims for hostile work environment, wrongful termination, and failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners' causes of action were made possible by that Act," given that the 1991 Act overturned case law precedent that previously held that "racial harassment relating to the conditions of employment is not actionable under § 1981." Id. at 383 (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 171, 105 L Ed 2d 132, 109 S Ct 2363 (1989)). Thus, the current Plaintiff's § 1981 claim for race discrimination (as well as hostile work environment) is covered by the § 1658 four year statute of limitations. See also Dandy v. UPS, 388 F.3d 263, 269 (7th Cir. Wis. 2004) (applying § 1658's four year statute of limitations period to disparate treatment and hostile work environment claims, based on Jones).

occurred from and after October 30, 2003.  With regard to the § 1981 claim, the

Court will only consider allegations of discrete acts of disparate treatment that

occurred from and after May 17, 2001, and with regard to the state law claim,

from and after May 17, 1999.  Thus, the following alleged incidents of disparate

treatment are time barred, for purposes of all disparate treatment claims:

- SuperValu terminating Leverett and Urton for misconduct during a strike and then rehiring both men, but waiting six weeks to rehire Leverett, while it rehired Urton right away (in 1977).

- Supervisors giving Leverett verbal warnings for loading products onto the wrong truck, while not disciplining Konieczny for the same misconduct (in 1995 or 1996).

- Supervisors routinely assigning Leverett "heavy orders" (from the 1980s until 1994).

- SuperValu not giving Leverett as much help and training as it gave Newton and Brown (from the time he became a checker until approximately 1997).

- SuperValu not giving Leverett the training he requested (in approximately 1992).

Based on the remaining factual allegations, all of which are timely, the Court will

now turn to a consideration of whether the Plaintiff has pointed to sufficient

evidence to create a genuine issue of material fact, as to the various elements of

his disparate treatment claim.


2.    Disparate Treatment - Burden Shifting Analysis

Absent direct evidence of discrimination, the Court initially notes that courts

analyze all three of the Plaintiff's disparate treatment claims (under Title VII,

§ 1981 and Ohio law) using the burden shifting framework, as set forth by the

Supreme Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36

L. Ed. 2d 668 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450

U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). <u>E.g.</u>, <u>Upshaw v. Ford Motor</u>

<u>Co.</u>, 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII);

<u>Amini v. Oberlin College</u>, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination

claim under § 1981); <u>Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio</u>

<u>Civil Rights Comm.</u>, 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination

claim under Ohio Revised Code Chapter 4112).  The Sixth Circuit provides the

following summary of that analytical framework:

> First, the plaintiff must make out a prima facie case of race
> discrimination, after which the burden shifts to the employer to proffer
> a legitimate, nondiscriminatory reason for its decision.  If the employer
> carries its burden, the plaintiff must then prove by a preponderance of
> the evidence that the reasons offered by the employer were
> pretextual.  Throughout this burden-shifting process, "the ultimate
> burden of persuading the trier of fact that the defendant intentionally
> discriminated against the plaintiff remains at all times with the
> plaintiff."

<u>Upshaw v. Ford Motor Co.</u>, 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing

<u>DiCarlo v. Potter</u>, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing <u>Dews v. A.B.</u>

<u>Dick Co.</u>, 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not

intended to be onerous." <u>Martin v. Toledo Cardiology Consultants, Inc.</u>, 548 F.3d

405, 412 (6th Cir. 2008) (citation omitted).  The Sixth Circuit instructs that in order to establish a *prima facie* case of disparate treatment, a plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for the position; 3) she was subjected to an adverse employment decision; and 4) she was replaced by a person outside the protected class, or treated differently than similarly situated non-protected employees. Vaughn v. Louisville Water Co., 2008 U.S. App. LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either the first or second prong of his *prima facie* test; rather, they claim that he has not set forth sufficient proof to create a genuine issue of material fact as to the third and fourth prongs.  The Court will begin with a consideration of the fourth prong (whether the Plaintiff was treated differently than similarly situated non-protected employees) and then turn to the third prong.

a.     Whether Plaintiff was Treated Differently than Similarly Situated Non-Protected Employees

The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is "similarly situated", he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (quoting Pierce v. Commonwealth

Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original). Further-more, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

The following sets forth the ways in which the Plaintiff contends that SuperValu discriminated against him, as well as the individuals with whom the Plaintiff seeks to compare his treatment (if any), for each alleged instance of discrimination:[12]

> (1)   Manager Gunderson giving Leverett a one-day suspension for
>         using the word "nigger", but not disciplining unnamed white
>         employees for using the words "hillbilly" or "redneck".[13] *The*

---

[12]The Plaintiff also attempts to argue that he has satisfied the fourth prong of his disparate treatment *prima facie* case, because of the casual attitude of the supervisors toward the alleged racial harassment.

> The supervisors' casual attitude toward harassment, and their own
> use of racial slurs[] is indicative of the atmosphere of the warehouse.
> A general working environment that tolerates this sort of harassment
> is evidence that implies a discriminatory reason for the adverse
> employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a disparate treatment claim, the Court will consider the same when assessing the Plaintiff's hostile work environment claim below.

[13]As this incident allegedly occurred in June 2003, this claim is cognizable only under § 1981 and state law.

*Plaintiff does not identify any similarly situated white employees, as to this incident.*

(2)   Supervisor Brown making both Leverett and white co-worker Bowland leave the garage breakroom and giving Leverett a verbal reprimand (unsure whether Bowland received the same).  The following month, white co-worker Morris was also in the garage breakroom, but Leverett does not know if management knew about it or not.  *The Plaintiff points to Bowland, who was apparently also supervised by Brown, but the Plaintiff points to no other evidence to indicate if Bowland had been subject to the same standards (to include facts demonstrating whether he did or did not receive discipline for the alleged incident) and had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it.  Likewise, the Plaintiff points to Morris, but does not indicate if Morris had the same supervisor, nor does he points to any evidence to indicate if Morris had been subject to the same standards (to include facts demonstrating whether he did or did not receive discipline for the alleged incident) and had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it.*

(3)   Supervisors initially disciplining Leverett for sleeping on the job and then voiding the discipline.  White co-worker Dickens allegedly slept on the job without consequences, but there is no evidence as to whether anyone other than Leverett witnessed Dickens's conduct.  *The Plaintiff points to Dickens as a comparable employee, but does not indicate if Dickens had the same supervisor as he nor does he point to any evidence to indicate if Dickens had been subject to the same standards and had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it (particularly since there are no facts to indicate that a supervisor was even aware of Dickens's conduct).*

(4)   Supervisor Gunderson and a supervisor named "Chuck" monitoring Leverett's work progress more closely than other workers.  *The Plaintiff seeks to compare his treatment with the treatment of all other employees who were supervised by*

*Gunderson and "Chuck".*

(5)  Supervisor Keyes coming into the breakroom and directing her orders to go back to work to Leverett and other black employees, while ignoring unnamed white employees whom Keyes also supervised and whom were on the same shift. *The Plaintiff seeks to compare his treatment with the treatment of white employees in the breakroom, whom Keyes supervised and were on the same shift as Leverett.*

(6)  Supervisor Chamblee standing in the doorway of the breakroom and announcing, "you gang of guys need to go back to work." Despite Leverett's subjective feeling that Chamblee directed his comment at the black employees, both the black and white employees who were in the breakroom went back to work. *The Plaintiff seeks to compare his treatment with the other employees in the breakroom (some of which were black and some white).*

(7)  Supervisor Keyes talking to white co-worker Carr during work time, but not talking to black employees during work time. *The Plaintiff seeks to compare his treatment to that of Carr, who was apparently also supervised by Keyes and worked on the same shift.*

(8)  Manager Gunderson making "a special effort" of monitoring Leverett when he clocked in and out of breaks. *The Plaintiff is seemingly comparing his treatment with the treatment of all other employees who were supervised by Gunderson.*

(9)  Management choosing overtime workers off the list of interested persons and stopping just prior to Leverett's name. Also, on a couple of occasions, the company skipping over Leverett (and other employees, both black and white) and offering overtime to junior employees, but then paying Leverett for this error when the company learned of the mistake. *As to the first allegation, the Plaintiff seems to be comparing himself to all employees on the overtime list who were more senior than he. It is unclear whether these persons were all white or of mixed races. As to the second allegation, the Plaintiff compares himself to other employees who were skipped over for overtime slots, some black and some white.*

(10) Not upgrading Leverett (and other employees) from an order selector position to a forklift position when he came into work on his day off. *The Plaintiff seeks to compare himself to the employees who were properly upgraded when they came in on their days off, but has not identified any details about the comparable employees (including their races).*

(11) Regularly holding up the assignment of temporary jobs, if certain white employees (like Dickens, Brown, Bowland, Carr or Frye) were not present during the job assignment session, in contravention of company policy, but not doing the same for black employees, including Leverett, if they were not present. *The Plaintiff seeks to compare himself to white employees who were apparently supervised by the same person, for whom supervisors held up the process of assigning temporary jobs.*

(12) Unnamed supervisors not assigning anyone to perform a particular job at the beginning of a shift, thereby allowing the supervisors to hand-pick workers after two hours had elapsed. *The Plaintiff points to no similarly situated employees, as to this alleged incident.*

(13) Requiring Leverett to be drug-tested after having visited the emergency room, but not requiring Miller to be drug-tested for causing the accident that sent Leverett to the emergency room. *The Plaintiff seeks to compare himself to white co-worker Miller who had the same supervisor. Leverett was drug-tested in accordance with company policy about emergency room visits, but the Plaintiff points to nothing to demonstrate that company policy required drug-testing in situations such as Miller's.*

As noted in the italicized text above, except in three instances (as summarized below), the Plaintiff has either not identified an allegedly similarly situated non-protected co-worker or has not demonstrated that all of the relevant aspects of his employment situation were "nearly identical" to those of the non-protected co-worker's employment situation, as required in order to carry his burden on this prong of his *prima facie* case. Therefore, the Court concludes that

the Plaintiff <u>has not</u> set forth sufficient evidence to create a genuine issue of

material fact as to whether the individuals with whom he seeks to compare his

treatment were similarly situated, with regard to any of his allegations of

discrimination, except the following:  supervisor Keyes directing black employees

to get back to work, but ignoring white employees; supervisor Keyes talking to

white co-worker Carr during work time, but did not talking to black employees

during work time; and regularly holding up the assignment of temporary jobs for

certain white employees who were not present, but not for black employees.  The

Court will now proceed with an analysis of the third prong of the *prima facie* case

(whether the alleged actions constituted adverse employment actions), with regard

to these remaining disparate treatment allegations.

> b. <u>Whether the Alleged Misconduct Constituted an Adverse</u>
> <u>Employment Action</u>

The third prong of the *prima facie* case of disparate treatment requires a

plaintiff to establish that he suffered an adverse employment action.  "An adverse

employment action is an action by the employer that 'constitutes a significant

change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits.'" <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381,

402 (6th Cir. 2008) (quoting <u>Burlington Industries v. Ellerth</u>, 524 U.S. 742, 761,

118 S. Ct. 2257 (1998)), <u>cert. denied</u>, 129 S. Ct. 2380 (2009).  Stated another

26

way, an adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." <u>Policastro v. Northwest Airlines, Inc.</u>, 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted). Thus, the Court must discern whether the Plaintiff's remaining alleged adverse employment actions (supervisor Keyes directing black employees to get back to work, but ignoring white employees; supervisor Keyes talking to white co-worker Carr during work time, but did not talking to black employees during work time; and regularly holding up the assignment of temporary jobs for certain white employees who were not present, but not for black employees) constitute materially adverse changes in the terms or conditions of his employment.

The only case pointed to by the Plaintiff, which is arguably applicable to his claim is <u>Campbell v. Univ. of Akron</u>, 2006 U.S. App. LEXIS 25876, 211 Fed. Appx. 333 (6th Cir. Oct. 17, 2006). The Plaintiff cites <u>Campbell</u> for his proposition that "[d]iscipline for alleged violation of a break policy can also constitute adverse employment action." Doc. #92 at 15. However, in <u>Campbell</u>, the defendant conceded that the disciplinary measures in question (an oral warning and a written warning for violating a lunch-break policy) were adverse employment actions and, thus, the Appellate Court had no reason to resolve the question presently before this Court.[14] <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *3.

---

[14]As noted by the <u>Campbell</u> Court, "[f]or reasons that are not entirely clear, the University does not contest that the disciplinary actions the PFOC took against Campbell were 'adverse employment actions' actionable under Title VII." <u>Campbell</u>,

27

As to the breakroom reprimands in the present case, the Court concludes that such do not constitute adverse employment actions. The Plaintiff points to no case wherein a court determined that a supervisor's reprimand of employees for not reporting back to work in a timely fashion (apparently without any formal discipline) was an adverse employment action and the Court has found none. Such a reprimand does not constitute a significant change in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See White, 533 F.3d at 402 (quotation omitted). Therefore, the Court concludes that the Plaintiff has not pointed to sufficient evidence to support this claim.

As to the Plaintiff's claim pertaining to the supervisors' holding open temporary jobs for white employees who were not present at the job assignment meeting, the Court concludes that the Plaintiff has not pointed to sufficient evidence to demonstrate that this was an adverse employment action. The Plaintiff has pointed to no evidence to indicate that the temporary reassignment (which presumably would have been offered to the Plaintiff had the supervisors not held the job for the absent white employees) would have included a salary or work hour change and the Sixth Circuit has held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in

_____

2006 U.S. App. LEXIS 25876 at *21 n.5. Therefore, the Court continued, "we do not decide that issue, and assume for purposes of this opinion that these disciplinary actions do constitute 'adverse employment actions.'" Id.

28

employment discrimination claims." <u>Kocsis v. Multi-Care Mgmt.</u>, 97 F.3d 876, 885 (6th Cir. 1996) (citing <u>Yates v. Avco Corp.</u>, 819 F.2d 630, 638 (6th Cir. 1987)).

With regard to the allegation pertaining to supervisor Keyes talking to white co-worker Carr during work time, but not talking to black employees during work time, it goes without saying that the same does not "constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," as required by the Sixth Circuit, <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 402 (6th Cir. 2008), and thus, does not constitute an adverse employment action.

In sum, the Plaintiff has not set forth sufficient facts to create a genuine issue of material fact as to any part of his disparate treatment claims.  Thus, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #79), with regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III).

　　　B.　　<u>Hostile Environment, under 42 U.S.C. § 1981 (remaining part of Count II) and under Ohio Law (Count V)</u>

Leverett  brings hostile work environment claims against all Defendants, under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am. Compl.).  He submits that he suffered a hostile work environment based on his

race, at the hands of supervisors, co-workers and unknown perpetrators, to wit:
regularly for 20 years, hearing or reading racially disparaging jokes (co-worker
harassment); prior to 1996, seeing a "dummy" of a black supervisor hanging in the
work area (harassment by unknown perpetrator); prior to June 1997, seeing a note
saying "you are a nigger lover" on a co-worker's desk (harassment by unknown
perpetrator); prior to August 1997, supervisor Studley addressing Leverett as
"Buckwheat" (supervisor harassment); in 2001 or earlier, white co-worker Hebel
coming into the breakroom and announcing, "I went coon hunting last night" (co-
worker harassment); on one occasion in 2004 or earlier, seeing the word "nigger"
written on the bathroom wall (harassment by unknown perpetrator); on one
occasion in 2004 or earlier, seeing the word "nigger" written on a rack in the baby
food aisle (harassment by unknown perpetrator); in 2006, seeing swastikas on the
bathroom wall (harassment by unknown perpetrator); regularly since 2001 or
2002, hearing rap music using the word "nigger" played by unidentified white and
black co-workers (co-worker harassment).[15]

---

[15]The Court relies only on the acts of harassment that allegedly happened to
the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter,
only for those which one or the other of the parties has pointed to admissible
evidence in support thereof.  The Court is aware that the Sixth Circuit has
instructed that courts must consider the "totality of circumstances" when deciding
cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir.
1999).
In Jackson v. Quanex Corp., the Appellate Court directed that the "totality
of circumstances" approach necessitates aggregating alleged acts of harassment
towards minority employees, in cases such as the present one. Id.  In so doing, the
Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v.

The Sixth Circuit instructs that courts are to use the same standard when evaluating hostile work environment claims under Title VII, § 1981 and Ohio Revised Code Chapter 4112. Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004). To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following:

(1) [He] is a member of a protected class . . . ; (2) [he] was subjected

_____

Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)). Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees. "Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." Id. (emphasis added); see also id. ("We have also credited evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above. Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them. The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3. Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only those facts pertinent to the present Plaintiff, which are set forth above.

to harassment, either through words or actions, based on [his protected class]; (3) the harassment had the effect of unreasonably interfering with [his] work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009)

(quoting Grace v. USCAR, 521 F.3d 655, 678 (6th Cir. 2008)).[16]  As to the final

prong, whether there is a basis for employer liability, such depends on whether the

plaintiff is alleging harassment by supervisors or co-workers.  Quoting from a

Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses

as follows:

> The Supreme Court has ruled that employers are not automatically liable for [] harassment perpetrated by their employees. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L. Ed.2d 662 (1998).  Where an employee is the victim of [] harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. See Faragher v. City of Boca Raton, 524 U.S. at 789; accord Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir.2000).  Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; if it did, "the employer will, ipso facto, be vicariously liable," Mack v. Otis Elevator Co., 326 F.3d at 124 [(2d Cir. 2003)].  In the absence

---

[16]Gallagher was a hostile work environment case, based on sexual harassment, as opposed to racial harassment.  The Sixth Circuit applies the same legal standard to both sorts of claims, however. See Ladd v. Grand Trunk Western R.R., 552 F.3d 495, 500 (6th Cir. 2009).

of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; accord Faragher v. City of Boca Raton, 524 U.S. at 807, 118 S. Ct. 2275; Mack v. Otis Elevator Co., 326 F.3d at 125.

Gallagher, 567 F.3d at 275 (quoting Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004)).

The Defendants, in the present action, do not contest the first prong of the *prima facie* case. They do, however, assert that Leverett has failed to set forth sufficient proof as to the second prong, for one of his assertions of harassment, and for the third and fourth prongs for all of his assertions.[17]

1. Whether the Plaintiff was Subjected to Harassment Based on Race

In order to be actionable as a racial harassment claim, a plaintiff must demonstrate that he was harassed because of his race. Booker v. Budget

---

[17]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #79 at 40 n.20. The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did form one continuous hostile work environment, need not consider the Defendants' argument, on this point. Thus, the Court does not reach the statute of limitations issue on the allegations constituting the hostile work environment claims.

Rent-A-Car Sys., 17 F. Supp. 2d 735, 743 (M.D. Tenn. 1998). SuperValu argues

that the incident involving white co-worker Hebel coming into the breakroom and

announcing, "I went coon hunting last night"[18] and the incident involving the rap

music containing the word "nigger" were not based on race. The Court disagrees.

Other courts have concluded that the use of decidedly racial epithets (such as the

word "nigger") and arguably racial epithets (such as the word "coon") were

sufficient to at least create a genuine issue of material fact on the question of

whether an employee endured harassment that was based on race. E.g., id.

(alleging that supervisor referred to black employees as "niggers" and to one black

employee as his "whipping boy"). Therefore, the Court will proceed with an

analysis of the remaining prongs of the Plaintiff's *prima facie* case.


    2.     <u>Whether Harassment Had Effect of Unreasonably Interfering
    with Plaintiff's Work Performance and Creating an Objectively
    Intimidating, Hostile, or Offensive Work Environment</u>

The Sixth Circuit has identified the governing standard for the third prong of

a plaintiff's *prima facie* case of harassment as follows:

---

[18]The Defendants attempt to argue that this statement is not racially based, because "'coon hunting' is a very popular sport with hunters in Ohio." Doc. #79 at 43 n.24 (citing Google search for "coon hunting" and "coon hunting and Ohio"). While this may be true, given the other assertions made by the Plaintiff in this case, regarding the seemingly common use of the word "coon" in a racially derogatory sense, and viewing the facts in the light most favorable to the Plaintiff, the Court concludes that there is at least a genuine issue of material fact on this point.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)

(quoting Williams v. GMC, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed.

2d 295 (1993)).  The Supreme Court states that, in making these assessments,

courts must consider "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."

Harris, 510 U.S. at 23.  Further, in order to constitute a "change in the terms and

conditions of employment", conduct must be "extreme".  Faragher v. City of Boca

Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the incidents that arguably

reflect racial animus were not severe and pervasive enough to alter the terms and

conditions of Leverett's employment.  As to the objective view of the facts,

SuperValu argues that the alleged incidents of harassment occurred over a span of

many years, most were not directed at Leverett and none of them was physically

threatening.  As to the subjective view of the facts, SuperValu asserts that

Leverett did not regard the workplace as hostile or abusive, as evidenced by his

concession that none of the allegations of harassment hindered his ability to perform his job effectively.[19] Doc. #66-5 (Leverett Dep. at 343-45).  In response, Leverett argues that it is the decades-long history of regular harassment that defines his treatment as severe and pervasive.  Further, Leverett argues that his filing of the present lawsuit, along with the fact that he recalls the incidents in question years after they happened, is evidence that he subjectively considered his mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit.  In Smith v. Leggett Wire Co., the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment:  "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as a 'gorilla'." Smith, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed

_____

[19]When asked at his deposition what facts he could point to to support his contention that he was unable to effectively perform his job duties, Leverett only pointed to the fact he previously asserted (in his disparate treatment claim) regarding Gunderson constantly "looking over [his] shoulder," which is not an allegation he made pertaining to his hostile work environment claim. Doc. #66-5 (Leverett Dep. at 343-45).

at Smith, over a twenty-year span of time.").

Conversely, in <u>Jackson v. Quanex Corp.</u>, the Appellate Court found the following facts probative of a severe and pervasively hostile work environment: the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males," graffiti in the men's restroom "depicting lynchings accompanied by the phrase, 'KKK is back'," graffiti on the back door that said "blacks out back," graffiti in the seam grinding area that "depicted the lynching of African-American men," graffiti in the restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of extreme racial misconduct (including calling a new hire "nigger" and "motherfucker", and after he reported these comments, telling him, "Nigger, we want you to quit your job . . . ."; defacing a work shirt with the words "Nigger Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's machine; tampering with acid valves in an attempt to create a safety hazard that would appear to be attributable to a minority worker, and a co-worker calling

another co-worker a "nigger bitch" and physically assaulting her). <u>Jackson</u>,191 F.3d 647, 651-55, 62 (6th Cir. 1999).

SuperValu also points the Court to the Sixth Circuit's unpublished opinion in <u>Kelly v. Senior Centers, Inc.</u>, wherein the Court found that the following incidents of misconduct, which occurred over four months, did not amount to actionable harassment: "two staff members' use of the pejorative slur word 'nigger' referring to the foster grandparents; Dangelo's description of a Board Member as a 'token black' and her comments that the foster grandparents were slovenly or were 'pigs' at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes'; and comments about an African-American staff member's bathroom habits." <u>Kelly</u>, 2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8, 2006). In concluding its findings, the Court stated, "[w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." <u>Id.</u> at *17.

SuperValu also cites <u>Bourini v. Bridgestone/Firestone North American Tire, L.L.C.</u>, 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position. In <u>Bourini</u>, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment: (1) a co-worker said, "I don't want to … see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the

September 11 attacks, a co-worker attempted to back over him while reversing a

forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in

a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the

sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's

voice over the intercom system; (7) someone painted Islamic slurs on the restroom

wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For

my Muslim Friend;" and (9) the human resources department sent an email relating

to plaintiff's immigration status to all employees. Id. at **2-5. The Appellate

Court concluded that these incidents "were not sufficiently pervasive to establish

an abusive working environment." Id. at *10. Because the incidents were spread

out over a five year period, the Court found them to be "relatively infrequent and

isolated incidents" that were "insufficient to constitute discriminatory changes in

the terms and conditions of employment." Id.

In the present case, Leverett alleges nine incidents of misconduct, three of

which occurred prior to August 1997 (seeing the "dummy" of the black supervisor,

seeing the "you are a nigger lover" note and supervisor Studley calling him

"Buckwheat"), five of which occurred in approximately a six year span preceding

his deposition (hearing the "I went coon hunting" statement, seeing the word

"nigger" in the bathroom, seeing the word "nigger" on a rack, seeing swastikas in

the bathroom and hearing offensive rap music) and one of which occurred regularly

for twenty years (hearing or reading racially offensive jokes). While this conduct is

reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Leverett's employment. The incidents are closest in severity and pervasiveness to those in <u>Bourini v. Bridgestone/ Firestone North American Tire, L.L.C.</u>, *supra*, which were spread out over only a five year period, and which the Sixth Circuit found to be insufficient to constitute discriminatory changes in the terms and conditions of employment, as explained above. Thus, regardless of whether he subjectively found that the alleged incidents created a hostile work environment, Leverett has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based harassment. Nevertheless, in an abundance of deference to the Plaintiff, as the non-moving party in this case, the Court will proceed to an analysis of the fourth prong of the *prima facie* case, whether there exists some basis for liability on the part of the employer.

        3.    <u>Whether There Exists Some Basis for Liability on the Part of the Employer</u>

As noted above, if the alleged harassment was at the hands of non-supervisors, an employer will not be liable unless a plaintiff sets forth evidence to demonstrate that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 275 (6th Cir. 2009) (quoting, among

others, Faragher v. City of Boca Raton, 524 U.S. 775, 789, 118 S.Ct. 2275, 141 L. Ed.2d 662 (1998)). If, however, the harassment is attributed to a supervisor and the supervisor's behavior "'culminate[d] in a tangible employment action' against the employee . . . 'the employer will, ipso facto, be vicariously liable.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; Mack v. Otis Elevator Co., 326 F.3d at 124 (2d Cir. 2003); other citations omitted). Conversely, if the harassment is attributed to a supervisor, but the supervisor's behavior did not culminate in a tangible employment action, the employer will still be liable for the hostile work environment created by its supervisor unless it demonstrates that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; other citations omitted).

In the present case, eight of the nine alleged acts of harassment are attributable to other than a supervisor. The only allegation of harassment attributable to a supervisor is the assertion that supervisor Studley called Leverett "Buckwheat", on one occasion.

With regard to the non-supervisor claims, there are facts on the record to indicate that the company knew or should have known about only three of the same, to wit: one of the racially disparaging jokes (given that Leverett informed an

unnamed supervisor of the same), the "dummy" of the black supervisor (given that Leverett reported it to supervisor Caroluss) and the "you are a nigger lover" note (given that the company investigated the incident, but was unable to identify the perpetrator). The Plaintiff has not, however, fulfilled his burden to point to evidence to demonstrate that SuperValu failed to take appropriate remedial action about the same (e.g., showing that the company did not discipline the co-worker who told the offensive joke). Because the Plaintiff has failed to set forth a genuine issue of material fact as to whether SuperValu should be held liable for any of the co-worker harassment allegations, his hostile work environment claims must fail, as to the same.

Turning to the remaining claim (that supervisor Studley called Leverett "Buckwheat"), since the alleged harassment did not culminate in a tangible employment action, SuperValu must demonstrate that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior and that the Plaintiff unreasonably failed to take advantage of any such preventive or corrective opportunities provided or to otherwise avoid harm. Gallagher, 567 F.3d at 275. SuperValu argues that it has fulfilled its burden, as evidenced by the existence of its Anti Harassment/Discrimination Policy and the grievance procedures contained in the Bargaining Agreement, and given that Leverett did not take advantage of either to report the allegation of harassment by Studley.

In response, the Plaintiff argues that the Sixth Circuit has held that a

harassment policy can only fulfill the affirmative defense if it is actually effective in practice.  The Plaintiff correctly summarizes Sixth Circuit law, on this point.

> While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, the duty does not end there.  Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.

Clark v. UPS, 400 F.3d 341, 349 (6th Cir. 2005).  The Plaintiff goes on to state that SuperValu's policy "has proven to be ineffective," in the present case, given that the alleged harassment has continued over such a long span of time. Doc. #92 (Mem. Opp'n) at 11.  Further, "[b]ecause of the extended period during which the harassment took place in the case at bar, and the fact that no action taken by the Defendants has had any effect on either preventing or correcting such behavior, a genuine issue of material fact exists as to whether SuperValu's harassment policy constituted the exercise of reasonable care to prevent and correct harassment." Id. In response, SuperValu asserts that it took reasonable steps to address the complaints of which it was aware, as demonstrated by the incidents set forth in this Opinion (e.g., investigating the "you are a nigger lover" note, removing the dummy).

In determining whether a harassment policy is effective, the Sixth Circuit directs that courts consider "the effectiveness of those who are designated to implement it." Clark, 400 F.3d at 350.  In the present case, the Anti Harassment/ Discrimination Policy provides that the supervisor or manager who receives a

43

complaint is responsible for reporting the same to upper level management and that "[o]nce a complaint is made, the Company will promptly investigate the situation and will take any appropriate corrective action." Doc. #79-12 at 3. In the present case, Leverett only reported three of the alleged instances of harassment. As to the first incident, he testifies vaguely that he gave an unidentified supervisor a report that someone had told a joke, which he found offensive. Given the vagueness of this allegation, the company cannot be penalized for failing to demonstrate that it took corrective action as to the same. With regard to the incident involving the dummy, the only fact on the record is that the dummy was removed. It is unclear whether the company investigated the incident or identified and punished the perpetrator of the same, but the Court surmises that the incident was not repeated, as no such allegations have been made. Finally, as to the offensive note on the co-worker's desk, SuperValu has pointed to evidence indicating that it conducted a thorough investigation in attempting to find the author of the same. Based on these facts, the Court concludes that SuperValu's Anti Harassment/Discrimination Policy was effective in practice, in that it reasonably prevented and/or corrected the alleged harassment.

Returning now to the sole remaining allegation of harassment, the claim that supervisor Studley called Leverett "Buckwheat", the Court concludes that SuperValu has adequately demonstrated that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, given its Anti

Harassment/Discrimination Policy, and has also demonstrated that the Plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities, given that he did not report Studley's alleged harassment.

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work environment based on race. Therefore, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #79), as to Leverett's hostile work environment claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

C.  Retaliation, in violation of Title VII and/or Ohio law (Count IV)

As Count IV in his Amended Complaint, Leverett asserts a claim for retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.) ¶¶ 60-64. These claims are limited to allegations of retaliation that occurred after the filing of Leverett's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent direct evidence of retaliatory discrimination, a plaintiff must show the following:

(1) [he] engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to defendant;

(3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see

also Putney v. Contract Bldg. Components, 2009 Ohio App. LEXIS 5634, **30-

31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009).

In the Amended Complaint, the Plaintiff alleges that he was retaliated

against "for making complaints to management of discriminatory action taken

against [him]." Doc. #3 (Am. Compl.) ¶62.  At his deposition, the Plaintiff was

asked to provide facts to support this allegation.   The following discussion ensued:

Q. [The Amended Complaint] says Plaintiffs have been discriminated against by Defendants on the basis of retaliation for making complaints to management of discriminatory action.  Were you retaliated against?

A. Yes.

Q. Okay. And by whom?

A. I think Peter Gunderson.

Q. Okay.  And when was that?

A. When he would follow me around. I think that's a form of retaliation.

Q. Retaliation for what?

A. For I don't know what.

46

Q. Well, you say here for making complaints to management of discriminatory action against you.

A. Right.

Q. So what complaint of discriminatory action did you complain about that caused Mr. Gunderson to start following you around?

A. Because I think he was doing it because he was picking on me as an individual, and I voiced my opinion to my other -- the other people in the warehouse.

Q. Voiced your opinion about what?

A. What he was doing.

Q. About following you around?

A. Yes.

Q. But he had already started following you around. So are you saying because you voiced your opinion, he started following you around more?

A. Yes.

Q. And what was your opinion about?  What did you say to these other people?

A. That he was being discriminatory about doing that, and the original incident [about an incident in the breakroom] was an act of discrimination.

Doc. # 66-5 (Leverett Dep. at 355-56).  Among other things, SuperValu argues that the Plaintiff seems to be alleging that he was retaliated against for voicing his opinion to "other people in the warehouse," yet the Plaintiff has pointed to no evidence to demonstrate that SuperValu knew that he participated in this conduct, thus failing the second prong of his *prima facie* case of retaliation.  The Plaintiff

provides no response.

SuperValu's argument is well taken. The Plaintiff has pointed to no facts to indicate that Gunderson or any other supervisor knew that he (Leverett) had voiced his opinion to other people in the warehouse (which may or may not have been conduct protected by Title VII). Because the Plaintiff has failed to demonstrate a genuine issue of material fact as to the second prong of his *prima facie* case of retaliation, the Defendants' Motion for Summary Judgment (Doc. #79) is SUSTAINED, as to Count IV.

### D. Respondeat Superior (Count VI)

As Count VI in his Amended Complaint, Leverett alleges that SuperValu is liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77. In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above (e.g., employer liability component of hostile work environment claim). Therefore, the Defendants' Motion for Summary Judgment (Doc. #79) is SUSTAINED, as to Count VI.

### IV. Conclusion

48

The Defendants' Motion for Summary Judgment (Doc. #79) is SUSTAINED, in its entirety. Judgment is ultimately to be entered on behalf of Defendants against Plaintiff Leverett, at the conclusion of this litigation.

March 31, 2010

       /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record