IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                    :

    Plaintiffs,                          :
                                       Case No. 3:05cv169

        vs.                              :
                                         JUDGE WALTER HERBERT RICE

SUPERVALU HOLDINGS, INC., et al.,        :

    Defendants.                          :


---

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF LEMENZO CLEGG (DOC.
#81); JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF
DEFENDANTS AGAINST PLAINTIFF LEMENZO CLEGG**

---


The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13. The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1] Doc. #23. The

---

[1]The Amended Complaints lists the Plaintiffs as follows: Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.). The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name. The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2]The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3]The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

2

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Lemenzo Clegg ("Plaintiff"). Doc. #81. In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4. Thus, at this stage of the litigation, the following claims remain: (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI). The Defendants have moved for summary judgment on all of Clegg's claims. Doc. #81.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts. It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

---

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment. Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II. Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

I.    <u>Facts</u>[5]

SuperValu hired Clegg in 1989. Doc. #72-1 (Clegg Dep. at 18).  Since that

time, Clegg has worked as an order selector and a forklift operator. <u>Id.</u> at 18-19.


A.    <u>Collective Bargaining Agreement and Anti Harassment/Discrimination
      Policy</u>

As a member of the local union, Clegg's employment terms are covered by

the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #72-1 (Clegg Dep. at 19); Ex. #2 (CBA).  Some of the specifics covered by

the CBA include the following:

- <u>Job Bidding</u>.  Bargaining unit jobs are awarded by seniority.  Job openings are posted for five days and are then filled with the qualified employee with the most seniority. Doc. #72-7 (CBA) at 12.

---

[5]Since this case comes before the Court on the Defendants' Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiff, as the party against whom the Motion is directed. <u>Servo Kinetics, Inc. v. Tokyo Precision Instruments</u>, 475 F.3d 783, 790 (6th Cir. 2007).

The Court has spent an inordinate amount of time organizing the facts, in this case.  Not only did the Defendants file an excessively long memorandum in support of their Motion for Summary Judgment (35 pages, not including table of contents or summary of arguments) (Doc. #81), but they also set forth the majority of their lengthy factual assertions in single-spaced footnotes, in small font.  In doing so, the Defendants have set forth far more facts than the Plaintiff.  In drafting the present Opinion, the Court has relied upon those facts pointed to by the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts generally set forth in the Amended Complaint (Doc. #3), which have been expounded upon by the Defendants.  As to the facts raised by the Defendants, but not relied upon by the Plaintiff in either the Amended Complaint or memorandum in opposition to the Motion for Summary Judgment, the Court considers those facts inapplicable to the present case.

4

- Overtime Assignments. Overtime assignments are made to the most senior employee who volunteers and is qualified. If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #72-8 (CBA) at 1-2.

- Nondiscrimination. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #72-4 at 4.

- Grievance and Arbitration Procedure. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #72-7 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Doc. #81-7. SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #81-5 (Schulcz Aff.) ¶ 4, Attachs. C-D.

B.     Facts Specific to the Plaintiff's Disparate Treatment Claim

The parties set forth the following facts pertinent to Clegg's disparate treatment claim:

- Alleged Disparate Treatment with Regard to Breaks and Socializing
  - On one occasion in 2003 or 2004, supervisor Keyes came into the breakroom and directed her comment to "go back to work" to Clegg and other black employees, while ignoring unidentified white employees. Doc. #72-2 (Clegg Dep. at 100-04). Clegg did not report this misconduct. Id. at 110-11.

- In April 2004, supervisor Keyes came into the breakroom and told Clegg and two black co-workers to "go back to work," while ignoring the only other person in the breakroom, white co-worker Allen. Doc. #72-2 (Clegg Dep. at 111-12). Clegg does not know of any of the circumstances of why Allen was in the break room at that time. Id. at 112. Clegg did not report this misconduct. Id. at 113.
- Once or twice in 2005, supervisor Brown came into the breakroom and ordered Clegg and two black co-workers back to work, while ignoring unidentified white employees whose break ended at the same time. Doc. #72-2 (Clegg Dep. at 100-01, 104). Clegg does not know whether Brown supervised the others in the breakroom and he did not report this misconduct. Id. at 109-10.
- In 2005, supervisor Keyes ordered Clegg and a black co-worker to get back to their work area when they were already in their work area, while Clegg does not think (but does not know for sure) that she told white co-workers to get back to their work area, who were on the same shift and in the breakroom during work hours. Doc. #72-1 (Clegg Dep. at 65-70). Clegg identifies one of the white co-workers as someone named "Steve", but cannot identify the others. Id. at 69. Clegg did not report this misconduct. Id. at 67.

- Alleged Disparate Treatment in Job Assignments
  - On five or six occasions since 1989, supervisors have passed over Clegg when assigning temporary job upgrades, if he was not present during the job assignment session, while they waited for unidentified white employees, if they were not present during the session.[6] Doc. #72-2 (Clegg Dep. at 138-41). Clegg admits that, over the years, supervisors have also held up job assignments for black employees who were not

---

[6]The Court assumes that the job assignment to which Clegg is referring is the temporary assignment of jobs (as opposed to a permanent assignment of jobs), which happens on a day-to-day basis, when employees are temporarily reassigned for the day, depending on work load and absenteeism. See Doc. #65-3 (Robinson Dep. at 211-13) (wherein Robinson explains that positions that are open due to daily absences are assigned by seniority at the start of each shift, in the breakroom); see also Doc. #72-2 at 140-41 (wherein Clegg explains that the assignments are handed out in the breakroom on a periodic basis). In their memorandum in support of their Motion for Summary Judgment, the Defendants refer to the job assignment in question, as an "occasional reassignment[] and fluctuation[] of job responsibilities that [is] temporary in nature" and the Plaintiff does not correct this perception, in his memorandum in opposition. Doc. #81 at 24; see also Doc. #92.

present, including himself. Id. at 143.

- Clegg complains that, on an on-going basis since 1992, he does not get temporarily upgraded from ticket worker to other jobs, as quickly as unidentified white workers who are of comparable seniority on different shifts. Doc. #72-2 (Clegg Dep. at 126-33). Clegg has complained of this disparity to supervisors Doran and Schulcz, as well as to other unidentified supervisors, but has not filed a grievance about the same. Id. at 132, 137.

- Since 2003 or 2004, Clegg believes that the automated ticket assignment system has purposely assigned him "heavy" order tickets more often than other employees. Doc. #72-3 (Clegg Dep. at 163-64). Clegg admits that the automated system assigns heavy orders to other employees, and white employees have also complained about getting heavy orders. Id. at 165, 169. Clegg complained about his heavy orders to supervisors Keyes, Chamblee and Brown, who told him the orders were randomly assigned by the system. Id. at 166-67. On March 21, 2005, warehouse superintendent Crawford met with Clegg and his union representative to discuss Clegg's concern that the automated system had somehow been rigged to assign him what he perceived to be undesirable tickets. Doc. #81-1 (Crawford Aff.) ¶ 3. In order to investigate Clegg's concern, Crawford reviewed a 30-day history of Clegg's daily tickets, which did not appear unusual to the superintendent. Id. ¶ 4. Crawford then provided a copy of this thirty-day history to Clegg and asked him to identify which orders he felt had been "stacked," at which time Clegg admitted to Crawford that, based on his own review of the thirty-day history, his perception that he had received a disproportionate number of undesirable tickets had not been accurate. Id. ¶¶ 5-6. Clegg did not file a grievance about this issue. Doc. #72-3 (Clegg Dep. at 165).

- <u>Alleged Disparate Treatment with Regard to Discipline</u>
  - Clegg has been written up several times for loud "outbursts", by supervisors Doran and Keyes and other unnamed supervisors, as recently as in 2007. Docs. #72-2, #72-3 (Clegg Dep. at 148-49, 152-57). Clegg believes that white co-workers, to include Chenoweth (who cursed at supervisor Brown, at an unknown time), Miller (who cursed at supervisor Doran, "about six years ago") and Mangan (who cursed at supervisor Brown, "about a year, two years ago"), have not been written up for cursing. Id. at 148, 155, 194-201. SuperValu points to evidence that shows that it has disciplined both Chenoweth and Mangan for using inappropriate language to supervisors. Doc. #81-15.

C.   Facts Specific to the Plaintiff's Hostile Work Environment Claim

The parties set forth the following facts pertinent to Clegg's hostile work environment claim:

- In 1990, co-worker Wynn called Clegg a "nigger". Doc. #72-1 (Clegg Dep. at 26-28).  Clegg reported this incident to supervisor Studley and does not think that Wynn ever received discipline for the same. Id. at 28.  However, SuperValu points to undisputed evidence that indicates that, as a result of this misconduct (and one other unrelated incident), SuperValu suspended Wynn for thirty days and postponed his offer of full-time employment. Doc. #81-5 (Schulcz Aff.) ¶ 15; Attach. M.  Clegg admits that Wynn never called him a "nigger" after this one incident. Doc. #72-1 (Clegg Dep. at 26).
- In 1993, someone wrote the words "punk nigger" on a Chicago Bulls sticker that Clegg keeps on his locker. Doc. #72-2 (Clegg Dep. at 90-93).  Clegg did not report the same to management. Id. at 93-94.
- In 1993, Clegg saw drawings on the wall of a black man and a white man accompanied by writing containing the phrase "nigger this". Doc. #72-1 (Clegg Dep. at 10-11); Doc. #92-1 at 3.  Clegg did not report this incident. Doc. #72-3 (Clegg Dep. at 206).
- On one occasion between 1993-1997, Clegg saw the word "nigger" written in black marker on a pallet. Doc. #72-1 (Clegg Dep. at 70-72).  Clegg did not report this incident, but the graffiti was removed. Id. at 76.
- Sometime between 2002-2003, black co-worker White called Clegg a "stupid ass nigger." Doc. #72-1 (Clegg Dep. at 57-58, 64-65).  Clegg reported this to Schulcz, who investigated the incident. Id. at 59-64.  As a result of the incident, SuperValu gave Clegg the day off to calm down and suspended White for two days. Id. at 64-65; Doc. #64-1 (Schulcz Dep.) at 21-22; Doc. #92-1 at 3.
- In 2003, Clegg saw the word "nigger" written on a bathroom stall. Doc. #72-2 (Clegg Dep. at 95-96).  He did not report the graffiti, but it was removed the same day he saw it. Id.
- In approximately 2003-2004, Clegg saw the words "go back home, boy" written on a machine he used. Doc. #72-2 (Clegg Dep. at 116-18).  He did not report the graffiti, but it was eventually removed. Id. at 119.
- In 2004, Clegg saw the words "nigger" and "niggers don't belong here" written on the wall of a restroom stall. Docs. #72-1, #72-2 (Clegg Dep. at 77-79).  He did not report the graffiti, but it was removed the same day he saw it. Id. at 79-80.
- Since 1989, Clegg has seen the word "nigger" written on the racks in the

8

warehouse on three occasions, but has not reported any of the incidents. Docs. #72-2, #72-3 (Clegg Dep. at 81-90, 206).

- On an unknown date, co-worker Wynn called Clegg "bubba", which Clegg believed to be a reference to his race. Doc. #72-2 (Clegg Dep. at 113-15). Clegg asked Wynn not to call him that anymore and Wynn has complied. Id. Clegg did not report the incident to management. Id. at 115.


II.     Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991). "Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." Mich. Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining

10

whether there is a genuine issue of material fact), "[a] district court is not . . .

obligated to wade through and search the entire record for some specific facts that

might support the nonmoving party's claim." <u>InterRoyal Corp. v. Sponseller</u>, 889

F.2d 108, 111 (6th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1091 (1990); <u>see also</u> <u>L.S.

Heath & Son, Inc. v. AT&T Info. Sys., Inc.</u>, 9 F.3d 561 (7th Cir. 1993); <u>Skotak v.

Tenneco Resins, Inc.</u>, 953 F.2d 909, 915 n.7 (5th Cir. 1992), <u>cert. denied</u>, 506

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . .").  Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

attention by the parties.


III.     <u>Legal Analysis</u>

     A.     <u>Disparate Treatment, under Title VII (Count I), under 42 U.S.C.
            § 1981 (part of Count II) and under Ohio Law (Count III)</u>

        Clegg brings race discrimination claims against SuperValu, based on the

theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II)

and Ohio law (Count III). Doc. #3 (Am. Compl.).  He also alleges disparate

treatment against the individual Defendants, under Ohio law (Count III). <u>Id.</u>

1.   <u>Whether Certain Claims are Time Barred</u>

SuperValu initially argues that certain of the Plaintiff's disparate treatment claims are time barred.  Initially, the Court notes that the proper starting point for this analysis is the date that each discrete discriminatory act occurred. <u>See</u> <u>AMTRAK v. Morgan</u>, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  In other words, in a disparate treatment context (as opposed to a hostile work environment context),[7] a plaintiff may not "convert[] related discrete acts into a single unlawful practice for the purposes of timely filing." <u>Id.</u> at 111.  As to the extent that discrete acts of discrimination that fall outside the applicable statute of limitations are helpful or harmful to a plaintiff's case, the Supreme Court instructs as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act. . . .   The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees

---

[7]In contrast, plaintiffs may convert related discrete acts into an unlawful practice, for purposes of timely filing in the <u>hostile work environment</u> context.  As explained by the Supreme Court,

> Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct.  The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

<u>Morgan</u>, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed. 1996); <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id. at 113. Relying on the final sentence quoted above, the Plaintiff correctly argues that this Court may consider, even if untimely, "prior acts as background evidence in support of a timely claim." Id. In sum, therefore, although the Court will not take outdated acts into consideration for purposes of determining whether those acts constitute disparate treatment, it will take them into consideration as background evidence in considering timely acts of alleged discrimination. Having established that the starting point for its statute of limitations analysis is each discrete act of discrimination, the Court will proceed with its analysis of the proper time periods within which to examine the allegedly discriminatory conduct.

As to the Title VII claim, the Defendants correctly point out that Title VII requires complainants to file a claim with the Equal Opportunity Employment Commission ("EEOC") within 300 days after each discrete act of alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S. App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)). In the present case, the Plaintiff filed his EEOC claim on August 20, 2004. Doc. #3-3 (Clegg EEOC Charge).

Therefore, as to the Plaintiff's Title VII claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to October 25, 2003 (300 days prior to the filing of the EEOC claim on August 20, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of limitations.[8] 28 U.S.C. § 1658(a); see also Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Thus, for purposes of the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

---

[8]The Defendants argue that claims arising in Ohio, under § 1981, are subject to a two year statute of limitations. Doc. #81 at 14-15. Such was the law prior to 2004. See Bd. of Regents v. Tomanio, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980) (noting that when Congress does not establish a statute of limitations, courts typically "borrow" the state law statute of limitations governing analogous causes of action); Nelson v. GE, 2001 U.S. App. LEXIS 1145, **7-8, 2 Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of limitations for such claims). However, in 2004, the Supreme Court decided Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a), establishing a four year statute of limitations period for "civil action[s] arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990]." Id. at 375. The Court further concluded that the plaintiff's claims for hostile work environment, wrongful termination, and failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners' causes of action were made possible by that Act," given that the 1991 Act overturned case law precedent that previously held that "racial harassment relating to the conditions of employment is not actionable under § 1981." Id. at 383 (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 171, 105 L Ed 2d 132, 109 S Ct 2363 (1989)). Thus, the current Plaintiff's § 1981 claim for race discrimination (as well as hostile work environment) is covered by the § 1658 four year statute of limitations. See also Dandy v. UPS, 388 F.3d 263, 269 (7th Cir. Wis. 2004) (applying § 1658's four year statute of limitations period to disparate treatment and hostile work environment claims, based on Jones).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under § 4112 is six years." Harrison v. City of Akron, 2002 U.S. App. LEXIS 16263, *5, 43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code §§ 2305.07, 4112.99; Cosgrove v. Williamsburg of Cincinnati Mgmt. Co., 70 Ohio St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)). Thus, for purposes of the Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 1999 (six years prior to the filing date of May 16, 2005).

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after October 25, 2003. With regard to the § 1981 claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after May 17, 2001, and with regard to the state law claim, from and after May 17, 1999. Thus, the following alleged incidents of disparate treatment are time barred, for purposes of all disparate treatment claims:

- Those occasions between 1989 and May 17, 1999, when supervisors passed over Clegg when assigning temporary job upgrades, while they waited for unidentified, absent white employees.

- Those occasions between 1992 and May 17, 1999, when Clegg did not get temporarily upgraded from ticket worker to other jobs, as quickly as unidentified white workers who were of comparable seniority on different shifts.

15

● Those occasions prior to May 17, 1999, when supervisors wrote up Clegg for loud "outbursts", while various white co-workers were not written up for similar or worse misconduct.

Based on the remaining factual allegations, all of which are timely, the Court will now turn to a consideration of whether the Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact, as to the various elements of his disparate treatment claim.

2.    Disparate Treatment - Burden Shifting Analysis

Absent direct evidence of discrimination, the Court initially notes that courts analyze all three of the Plaintiff's disparate treatment claims (under Title VII, § 1981 and Ohio law) using the burden shifting framework, as set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). E.g., Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII); Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination claim under § 1981); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm., 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination claim under Ohio Revised Code Chapter 4112).  The Sixth Circuit provides the following summary of that analytical framework:

First, the plaintiff must make out a prima facie case of race discrimination, after which the burden shifts to the employer to proffer

a legitimate, nondiscriminatory reason for its decision.  If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual.  Throughout this burden-shifting process, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing

DiCarlo v. Potter, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing Dews v. A.B.

Dick Co., 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not intended to be onerous." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008) (citation omitted).  The Sixth Circuit instructs that in order to establish a *prima facie* case of disparate treatment, a plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for the position; 3) she was subjected to an adverse employment decision; and 4) she was replaced by a person outside the protected class, or treated differently than similarly situated non-protected employees. Vaughn v. Louisville Water Co., 2008 U.S. App. LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either the first or second prong of his *prima facie* test; rather, they claim that he has not set forth sufficient proof to create a genuine issue of material fact as to the third and fourth prongs.  The Court will begin with a consideration of the fourth prong

17

(whether the Plaintiff was treated differently than similarly situated non-protected employees) and then turn to the third prong.

<blockquote>a.      Whether Plaintiff was Treated Differently than Similarly Situated Non-Protected Employees</blockquote>

The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is "similarly situated", he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original). Further-more, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

The following sets forth the ways in which the Plaintiff contends that SuperValu discriminated against him, as well as the individuals with whom he seeks to compare his treatment (if any), for each alleged instance of

discrimination:[9]

(1) Supervisor Keyes coming into breakroom and directing her comment to "go back to work" to Clegg and other black employees, while ignoring unidentified white employees. *Clegg attempts to compare his treatment with that of the unidentified white employees who were also in the breakroom and presumably also supervised by Keyes.*

(2) Supervisor Keyes coming into breakroom and telling Clegg and two black co-workers to "go back to work," while ignoring the only other person in the breakroom, white co-worker Allen. *Although Allen was presumably also supervised by Keyes, Clegg does not know of the circumstances of why Allen was in the break room at that time.*

(3) Supervisor Brown coming into the breakroom and ordering Clegg and two black co-workers back to work, while ignoring unidentified white employees whose break ended at the same time. *Clegg does not identify the allegedly similarly situated white employees, nor does he know whether Brown supervised them.*

(4) Supervisor Keyes ordering Clegg and a black co-worker to get back to their work area when they were already in their work area, while Clegg does not think (but does not know for sure) that she told white co-workers (one of whom was named "Steve") to get back to their work area who were on the same shift and in the breakroom during work hours. *While the white co-workers were presumably also supervised by Keyes, Clegg does not does not know whether Keyes ordered them back*

---

[9]The Plaintiff also attempts to argue that he has satisfied the fourth prong of his disparate treatment *prima facie* case, because of the casual attitude of the supervisors toward the alleged racial harassment.

> The supervisors' casual attitude toward harassment, and their own use of racial slurs[] is indicative of the atmosphere of the warehouse. A general working environment that tolerates this sort of harassment is evidence that implies a discriminatory reason for the adverse employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a disparate treatment claim, the Court will consider the same when assessing the Plaintiff's hostile work environment claim below.

*to work.*

(5)     Supervisors passing over Clegg when assigning temporary job upgrades, if he was not present during the job assignment session, while they waited for unidentified white employees, if they were not present during the session.[10]  *The Plaintiff attempts to compare his situation with that of the unidentified white co-workers for whom temporary positions were held open, who were apparently on the same shift and supervised by the same supervisor(s).*

(6)     Supervisors not temporarily upgrading Clegg from ticket worker to other jobs, as quickly as unidentified white workers who were of comparable seniority on different shifts.[11]  *The Plaintiff attempts to compare his situation with that of unidentified white co-workers who were on different shifts and, thus, presumably had different supervisors.*

(7)     Receiving more "heavy" order tickets than other employees.  *The Plaintiff is seemingly comparing his situation with that of all other ticket workers, both black and white.*

(8)     Being written up for loud "outbursts" by supervisors Doran and Keyes, as well as by other unnamed supervisors, while white co-workers (to include Chenoweth (who was supervised by Brown), Miller (who was supervised by Doran) and Mangan (who was supervised by Brown)) were not written up for cursing.[12]  *The Plaintiff attempts to compare his situation with that*

---

[10]As previously noted, these instances of misconduct alleged to have happened prior to May 17, 1999, are time barred for all of the Plaintiff's disparate treatment claims.  Further, any allegations of misconduct occurring before October 25, 2003, are barred under Title VII, and those occurring before May 17, 2001, are barred under § 1981.

[11]As previously noted, these instances of misconduct alleged to have happened prior to May 17, 1999, are time barred for all of the Plaintiff's disparate treatment claims.  Further, any allegations of misconduct occurring before October 25, 2003, are barred under Title VII, and those occurring before May 17, 2001, are barred under § 1981.

[12]As previously noted, these instances of misconduct alleged to have happened prior to May 17, 1999, are time barred for all of the Plaintiff's disparate treatment claims.  Further, any allegations of misconduct occurring before October 25, 2003, are barred under Title VII, and those occurring before May 17, 2001,

*of white co-workers Chenoweth, Miller and Mangan, as well as other unidentified white co-workers, but only indicates that Miller was supervised by the same supervisor (Doran) who wrote up the Plaintiff.*

As noted in the italicized passages above, the Court concludes that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact, as to whether the individuals with whom he seeks to compare his treatment were similarly situated, with regard to any of his claims except the following: Keyes inconsistently telling workers to go back to work from the breakroom; supervisors passing over Clegg when assigning temporary job upgrades, while holding open jobs for absent white co-workers; and Doran writing up Clegg for loud "outbursts", while not writing up white co-worker Miller for cursing. The Court will, therefore, proceed to an analysis of the third prong of the *prima facie* case (whether the alleged actions constituted adverse employment actions), with regard to these remaining disparate treatment allegations.

b.     Whether the Alleged Misconduct Constituted an Adverse Employment Action

The third prong of the *prima facie* case of disparate treatment requires a plaintiff to establish that he suffered an adverse employment action. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote,

_____

are barred under § 1981.

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257 (1998)), cert. denied, 129 S. Ct. 2380 (2009). Stated another way, an adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted). Thus, the Court must discern whether the Plaintiff's remaining alleged adverse employment actions (Keyes inconsistently telling workers to go back to work from the breakroom, improper holding open of jobs for absent white co-workers and Doran failing to write up Miller for inappropriate language) constitute materially adverse changes in the terms or conditions of his employment.

The only case pointed to by the Plaintiff, which is arguably applicable to his claim is Campbell v. Univ. of Akron, 2006 U.S. App. LEXIS 25876, 211 Fed. Appx. 333 (6th Cir. Oct. 17, 2006). The Plaintiff cites Campbell for his proposition that "[d]iscipline for alleged violation of a break policy can also constitute adverse employment action." Doc. #92 at 15. However, in Campbell, the defendant conceded that the disciplinary measures in question (an oral warning and a written warning for violating a lunch-break policy) were adverse employment actions and, thus, the Appellate Court had no reason to resolve the question

presently before this Court.[13] <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *3.

As to the breakroom reprimands in the present case, the Court concludes that such do not constitute adverse employment actions. The Plaintiff points to no case wherein a court determined that a supervisor's reprimand of employees for not reporting back to work in a timely fashion (apparently without any formal discipline) was an adverse employment action and the Court has found none. Such a reprimand does not constitute a significant change in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>See</u> <u>White</u>, 533 F.3d at 402 (quotation omitted). Therefore, the Court concludes that the Plaintiff has not pointed to sufficient evidence to support this claim.

With regard to the Plaintiff's claims pertaining to supervisors holding open temporarily vacant jobs for absent employees with more seniority than the Plaintiff and supervisor Doran writing up the Plaintiff for loud outbursts, but not writing up white co-worker Miller for cursing, the Court similarly concludes that the Plaintiff has not pointed to sufficient evidence to demonstrate that these are adverse employment actions. The Sixth Circuit has held that "reassignments without salary

---

[13]As noted by the <u>Campbell</u> Court, "[f]or reasons that are not entirely clear, the University does not contest that the disciplinary actions the PFOC took against Campbell were 'adverse employment actions' actionable under Title VII." <u>Campbell</u>, 2006 U.S. App. LEXIS 25876 at *21 n.5. Therefore, the Court continued, "we do not decide that issue, and assume for purposes of this opinion that these disciplinary actions do constitute 'adverse employment actions.'" <u>Id.</u>

or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 885 (6th Cir. 1996) (citing Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir. 1987)). Further, disciplinary "write-ups", without evidence that the same included a firing, failing to promote, reassignment with significantly different responsibilities, or a significant change in benefits, is insufficient to constitute an adverse employment action. See Allen v. Michigan Dep't of Corrections, 165 F.3d 405, 409-10 (6th Cir. 1999) (finding that "disciplinary actions in the form of counseling memoranda" did not constitute adverse employment actions).

In sum, the Plaintiff has not set forth sufficient facts to create a genuine issue of material fact as to any part of his disparate treatment claims. Thus, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #81), with regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III).

     B.    Hostile Environment, under 42 U.S.C. § 1981 (remaining part of Count II) and under Ohio Law (Count V)

Clegg brings hostile work environment claims against all Defendants, under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am. Compl.). He submits that he suffered a hostile work environment based on his race, at the hands of co-workers and unknown perpetrators, to wit: in 1990, co-

worker Wynn calling him a "nigger" (co-worker harassment); in 1993, someone

writing the words "punk nigger" on a sticker on his locker (harassment by

unknown perpetrator); on seven occasions between 1989-2004, seeing racially

offensive drawings and words on work space surfaces (harassment by unknown

perpetrator(s)); on one occasion between 2002-2003, black co-worker White called

Clegg a "stupid ass nigger" (co-worker harassment); in approximately 2003-2004,

seeing the words "go back home, boy" written on a machine Clegg used

(harassment by unknown perpetrator); and on an unknown date, co-worker Wynn

calling Clegg "bubba" (co-worker harassment).[14]

---

[14]The Court relies only on the acts of harassment that allegedly happened to the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter, only for those which one or the other of the parties has pointed to admissible evidence in support thereof.  The Court is aware that the Sixth Circuit has instructed that courts must consider the "totality of circumstances" when deciding cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999).

In Jackson v. Quanex Corp., the Appellate Court directed that the "totality of circumstances" approach necessitates aggregating alleged acts of harassment towards minority employees, in cases such as the present one. Id.  In so doing, the Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v. Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)).  Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees.  "Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." Id. (emphasis added); see also id. ("We have also credited evidence of racial

The Sixth Circuit instructs that courts are to use the same standard when evaluating hostile work environment claims under Title VII, § 1981 and Ohio Revised Code Chapter 4112. Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004). To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following:

> (1) [He] is a member of a protected class . . . ; (2) [he] was subjected to harassment, either through words or actions, based on [his protected class]; (3) the harassment had the effect of unreasonably interfering with [his] work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009) (quoting Grace v. USCAR, 521 F.3d 655, 678 (6th Cir. 2008)).[15] As to the final

_____

harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above. Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them. The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3. Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only those facts pertinent to the present Plaintiff, which are set forth above.

[15]Gallagher was a hostile work environment case, based on sexual harassment, as opposed to racial harassment. The Sixth Circuit applies the same legal standard to both sorts of claims, however. See Ladd v. Grand Trunk Western

prong, whether there is a basis for employer liability, such depends on whether the plaintiff is alleging harassment by supervisors or co-workers.  Quoting from a Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses as follows:

> The Supreme Court has ruled that employers are not automatically liable for [] harassment perpetrated by their employees.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L. Ed.2d 662 (1998).  Where an employee is the victim of [] harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.  See Faragher v. City of Boca Raton, 524 U.S. at 789; accord Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir.2000).  Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; if it did, "the employer will, ipso facto, be vicariously liable," Mack v. Otis Elevator Co., 326 F.3d at 124 [(2d Cir. 2003)].  In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; accord Faragher v. City of Boca Raton, 524 U.S. at 807, 118 S. Ct. 2275; Mack v. Otis Elevator Co., 326 F.3d at 125.

Gallagher, 567 F.3d at 275 (quoting Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d

R.R., 552 F.3d 495, 500 (6th Cir. 2009).

Cir. 2004)).

The Defendants, in the present action, do not contest the first prong of the *prima facie* case. They do, however, assert that Clegg has failed to set forth sufficient proof as to the second prong, for certain of his assertions of harassment, and for the third and fourth prongs for all of his assertions.[16]

      1.    <u>Whether the Plaintiff was Subjected to Harassment Based on Race</u>

In order to be actionable as a racial harassment claim, a plaintiff must demonstrate that he was harassed because of his race. <u>Booker v. Budget Rent-A-Car Sys.</u>, 17 F. Supp. 2d 735, 743 (M.D. Tenn. 1998). SuperValu argues that the incident involving co-worker White calling Clegg a "stupid ass nigger",[17] finding the words "go back home, boy" written on Clegg's work machine and co-

---

[16]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #81 at 31 n.17. The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did form one continuous hostile work environment, need not consider the Defendants' argument, on this point. Thus, the Court does not reach the statute of limitations issue on the allegations constituting the hostile work environment claims.

[17]Although the Defendants do not generally assert that the use of the word "nigger" is not "based on race", in this case, they argue that it should not be considered as such, given that Clegg testified that co-worker White made this statement because he was "crazy". Doc. #81 at 34 n. 20 (citing Doc. #72-1 (Clegg Dep. at 61-62)). While it is true that Clegg testified that he thought White was "crazy", the Court determines that the use of such a word is undoubtedly based on race, whether the speaker is allegedly crazy or not.

worker Wynn calling Clegg "bubba" were not based on race.  In construing the

evidence most strongly in favor of the Plaintiff, as it must do at this stage of the

litigation, the Court disagrees.  Other courts have concluded that decidedly racial

epithets (such as the word "nigger") and arguably racial epithets (such as the

phrase "go back home, boy" and "bubba") were sufficient to at least create a

genuine issue of material fact on the question of whether an employee endured

harassment that was based on race. E.g., id. (alleging that supervisor referred to

black employees as "niggers" and to one black employee as his "whipping boy").

Therefore, the Court will proceed with an analysis of the remaining prongs of the

Plaintiff's *prima facie* case.


2.     Whether Harassment Had Effect of Unreasonably Interfering
       with Plaintiff's Work Performance and Creating an Objectively
       Intimidating, Hostile, or Offensive Work Environment

The Sixth Circuit has identified the governing standard for the third prong of

a plaintiff's *prima facie* case of harassment as follows:

> Conduct that is not severe or pervasive enough to create an
> objectively hostile or abusive work environment--an environment that
> a reasonable person would find hostile or abusive--is beyond Title VII's
> purview.  Likewise, if the victim does not subjectively perceive the
> environment to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no Title VII
> violation.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)

(quoting Williams v. GMC, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).  The Supreme Court states that, in making these assessments, courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.  Further, in order to constitute a "change in the terms and conditions of employment", conduct must be "extreme".  Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the incidents that arguably reflect racial animus were not severe and pervasive enough to alter the terms and conditions of Clegg's employment.  As to the objective view of the facts, SuperValu argues that the alleged incidents of harassment occurred over a span of many years, most were not directed at Clegg and none of them was physically threatening.  As to the subjective view of the facts, SuperValu asserts that Clegg did not regard the workplace as hostile or abusive, as evidenced by his concession that he has always been able to effectively perform his job. Doc. #72-3 (Clegg Dep. at 188).  In response, Clegg argues that it is the decades-long history of regular harassment that defines his treatment as severe and pervasive.  Further, Clegg argues that his filing of the present lawsuit, along with the fact that he recalls the incidents in question years after they happened, is evidence that he subjectively considered his mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit.  In <u>Smith v. Leggett Wire Co.</u>, the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment:  "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as a 'gorilla'." <u>Smith</u>, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at Smith, over a twenty-year span of time.").

Conversely, in <u>Jackson v. Quanex Corp.</u>, the Appellate Court found the following facts probative of a severe and pervasively hostile work environment: the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males," graffiti in the

men's restroom "depicting lynchings accompanied by the phrase, 'KKK is back',"
graffiti on the back door that said "blacks out back," graffiti in the seam grinding
area that "depicted the lynching of African-American men," graffiti in the
restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of
extreme racial misconduct (including calling a new hire "nigger" and
"motherfucker", and after he reported these comments, telling him, "Nigger, we
want you to quit your job . . . ."; defacing a work shirt with the words "Nigger
Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's
machine; tampering with acid valves in an attempt to create a safety hazard that
would appear to be attributable to a minority worker, and a co-worker calling
another co-worker a "nigger bitch" and physically assaulting her). <u>Jackson</u>,191
F.3d 647, 651-55, 62 (6th Cir. 1999).

SuperValu also points the Court to the Sixth Circuit's unpublished opinion in
<u>Kelly v. Senior Centers, Inc.</u>, wherein the Court found that the following incidents
of misconduct, which occurred over four months, did not amount to actionable
harassment: "two staff members' use of the pejorative slur word 'nigger' referring
to the foster grandparents; Dangelo's description of a Board Member as a 'token
black' and her comments that the foster grandparents were slovenly or were 'pigs'
at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes';
and comments about an African-American staff member's bathroom habits." <u>Kelly</u>,
2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8,

2006).  In concluding its findings, the Court stated, "[w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." Id. at *17.

SuperValu also cites Bourini v. Bridgestone/Firestone North American Tire, L.L.C., 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position.  In Bourini, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment:  (1) a co-worker said, "I don't want to … see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the September 11 attacks, a co-worker attempted to back over him while reversing a forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's voice over the intercom system; (7) someone painted Islamic slurs on the restroom wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For my Muslim Friend;" and (9) the human resources department sent an email relating to plaintiff's immigration status to all employees. Id. at **2-5.  The Appellate Court concluded that these incidents "were not sufficiently pervasive to establish an abusive working environment." Id. at *10.  Because the incidents were spread out over a five year period, the Court found them to be "relatively infrequent and

isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of employment." Id.

In the present case, Clegg alleges three instances of co-workers calling him offensive names (in 1990, between 2002-2003, and at one unstated time), two instances of unknown persons writing offensive words on his work property (in 1990 and between 2003-2004) and seven instances of seeing racially offensive drawings and words on work space surfaces (between 1989-2004). While this conduct is reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Clegg's employment. The incidents are closest in severity and pervasiveness to those in Bourini v. Bridgestone/Firestone North American Tire, L.L.C., *supra*, which the Sixth Circuit found to be insufficient to constitute discriminatory changes in the terms and conditions of employment, as explained above. Thus, regardless of whether he subjectively found that the alleged incidents created a hostile work environment, Clegg has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based harassment. Nevertheless, in an abundance of deference to the Plaintiff, as the non-moving party in this case, the Court will proceed to an analysis of the fourth prong of the *prima facie* case, whether there exists some basis for liability on the part of the employer.

### 3. Whether There Exists Some Basis for Liability on the Part of the Employer

As noted above, in order to satisfy the fourth prong of a *prima facie* case of hostile work environment, a plaintiff must point to evidence demonstrating that there exists some basis for liability on the part of the employer. Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009). If the alleged harassment was at the hands of non-supervisors (such as the allegations of harassment in the present case), the employer will not be liable unless the plaintiff points to evidence, which demonstrates that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Id. at 275.

In the present case, Clegg only reported two of the seven alleged acts of harassment, to wit: co-worker Wynn calling him a "nigger" (Clegg reported this incident to supervisor Studley; although Clegg did not think Wynn had received discipline for the misconduct, SuperValu points to undisputed evidence indicating that it suspended Wynn for thirty days and postponed his offer of full-time employment, partially as a result of this misconduct) and black co-worker White calling him a "stupid ass nigger" (Clegg reported this to Schulcz, and White was suspended for two days, as a result). Although Clegg has set forth evidence indicating that SuperValu knew of the alleged harassment, he has pointed to no evidence to indicate that SuperValu failed to take appropriate remedial action. In fact, SuperValu has set forth evidence to indicate that it did take appropriate

remedial action as to these two incidents, as noted above. Because the Plaintiff has not satisfied his burden to set forth evidence indicating that the employer failed to take appropriate remedial action for any of the harassment about which it knew or should have known, SuperValu cannot be held liable for the same.

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work environment based on race. Therefore, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #81), as to Clegg's hostile work environment claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

C.     <u>Retaliation, in violation of Title VII and/or Ohio law (Count IV)</u>

As Count IV in his Amended Complaint, Clegg asserts a claim for retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.) ¶¶ 60-64. These claims are limited to allegations of retaliation that occurred after the filing of Clegg's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent direct evidence of retaliatory discrimination, a plaintiff must show the following:

(1) [he] engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to defendant;

(3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see

also Putney v. Contract Bldg. Components, 2009 Ohio App. LEXIS 5634, **30-31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009).  In their memorandum in

support of their Motion for Summary Judgment, the Defendants state that they are

entitled to summary judgment on this claim, because Clegg admitted that he

experienced no retaliation and also because he has set forth no facts to support his

retaliation claim. Doc. #81 at 40.

It is true that Clegg conceded that he experienced no retaliation for engaging

in activity protected by Title VII. Doc. #72-3 (Clegg Dep. at 204).  It is also true

that Clegg makes no argument nor presents any facts in support of his retaliation

claim. See Doc. #92 (Mem. Opp'n).  Because the Plaintiff has pointed to no facts

to support his retaliation claim, there is no genuine issue of material fact as to the

same and the Defendants' Motion for Summary Judgment (Doc. #81) is

SUSTAINED, as to Count IV.


D.    Respondeat Superior (Count VI)

As Count VI in his Amended Complaint, Clegg alleges that SuperValu is

liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77.  In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above (e.g., employer liability component of hostile work environment claim).  Therefore, the Defendants' Motion for Summary Judgment (Doc. #81) is SUSTAINED, as to Count VI.

IV.    Conclusion

The Defendants' Motion for Summary Judgment (Doc. #81) is SUSTAINED, in its entirety.  Judgment is ultimately to be entered on behalf of Defendants against Plaintiff Clegg, at the conclusion of this litigation.

March 31, 2010

         /s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record