IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                  :

    Plaintiffs,                            :
                                                     Case No. 3:05cv169

       vs.                              :
                                                     JUDGE WALTER HERBERT RICE

SUPERVALU HOLDINGS, INC., et al.,      :

    Defendants.                            :


---

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF KEVIN HUFF (DOC. #83);
JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF DEFENDANTS
AGAINST PLAINTIFF KEVIN HUFF**

---


The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13. The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1] Doc. #23. The

---

[1] The Amended Complaints lists the Plaintiffs as follows: Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.). The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name. The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2] The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3] The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

2

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Kevin Huff ("Plaintiff"). Doc. #83. In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4. Thus, at this stage of the litigation, the following claims remain: (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI). The Defendants have moved for summary judgment on all of Huff's claims. Doc. #83.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts. It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

---

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment. Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II. Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

3

I.    Facts[5]

SuperValu hired Huff as a full-time employee in 1990. Doc. #75-1 (Huff

Dep. at 31-32). Since that time, Huff has worked continuously as an order

selector. Id. at 15-16.


A.    Collective Bargaining Agreement and Anti Harassment/Discrimination
      Policy

As a member of the local union, Huff's employment terms are covered by

the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #75-1 (Huff Dep. at 17); Ex. #2 (CBA). Some of the specifics covered by the

CBA include the following:

- **Job Bidding**. Bargaining unit jobs are awarded by seniority. Job
  openings are posted for five days and are then filled with the

---

[5]Since this case comes before the Court on the Defendants' Motion for
Summary Judgment, the Court sets forth the facts and circumstances giving rise to
such Motion in the manner most favorable to the Plaintiff, as the party against
whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments,
475 F.3d 783, 790 (6th Cir. 2007).

The Court has spent an inordinate amount of time organizing the facts, in
this case. Not only did the Defendants file an excessively long memorandum in
support of their Motion for Summary Judgment (35 pages, not including table of
contents or summary of arguments) (Doc. #83), but they also set forth the majority
of their lengthy factual assertions in single-spaced footnotes, in small font. In
doing so, the Defendants have set forth far more facts than the Plaintiff. In
drafting the present Opinion, the Court has relied upon those facts pointed to by
the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts
generally set forth in the Amended Complaint (Doc. #3), which have been
expounded upon by the Defendants. As to the facts raised by the Defendants, but
not relied upon by the Plaintiff in either the Amended Complaint or memorandum in
opposition to the Motion for Summary Judgment, the Court considers those facts
inapplicable to the present case.

qualified employee with the most seniority. Doc. #75-8 (CBA) at 12.

- Overtime Assignments. Overtime assignments are made to the most senior employee who volunteers and is qualified. If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #75-9 (CBA) at 1-2.

- Nondiscrimination. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #75-10 at 4.

- Grievance and Arbitration Procedure. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #75-8 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Doc. #83-5. SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #83-3 (Schulcz Aff.) ¶ 4, Attachs. C-D.


B.    Facts Specific to the Plaintiff's Disparate Treatment Claim

The parties set forth the following facts pertinent to Huff's disparate treatment claim:

- Alleged Disparate Treatment with Regard to Break Time and Socializing
  - In 2003, supervisor Keyes came into the breakroom five minutes before Huff's break ended and suggested that he not open his cupcake, because his break was almost over, but did not make a similar comment to white

5

co-worker Walker who was already eating a plate of noodles. Doc. #75-2 (Huff Dep. at 114-16).

- Two or three times in 2003-2004, supervisor Keyes came into the breakroom and directed her comment to "go back to work" to Huff and black co-workers, while ignoring the white co-workers who were in the breakroom. Doc. #75-1 (Huff Dep. at 48-53).

- In April 2004, Huff saw Keyes go into the breakroom and order three black co-workers back to work after their break ended, but she did not order white co-worker Allen back to work. Doc. #75-1 at 73-74. Allen worked on the "cold side" of the warehouse, and was apparently not supervised by Keyes, whereas the black co-workers worked on the "grocery side" and were apparently supervised by Keyes. Id. at 73-76 (noting that Keyes inquired as to whether Allen had permission to be in the breakroom).

- In June 2004, there were five employees in the breakroom 30 minutes prior to the end of the shift. Manager Gunderson ordered the three black employees, including Huff, back to work, but not the two white employees, Begin and Moore. Doc. #75-2 (Huff Dep. at 87-89). When Huff questioned Gunderson about why he did not send the other two workers back to work, Gunderson returned to the breakroom and ordered Begin and Moore to return to work. Id. at 88-90.

- In January 2005, Huff was working on a job moving freight, with white co-workers Uhrig and Miller. Doc. #75-2 at 107. Uhrig and Miller disappeared and while Huff was waiting on them, he talked to a co-worker for about five minutes. Id. at 108-10. When supervisor Zoll witnessed Huff talking to the co-worker, he ordered Huff back to work, despite the fact that Huff indicated that his help had disappeared. Id. at 110.

- On a few occasions in 2007, Huff was standing in one of the warehouse aisles talking to co-worker Coates when a supervisor told both of them to get back to work. Doc. #75-1 (Huff Dep. at 10-11).

- In August 2007, supervisor Brown ordered Huff and black co-worker Smith back to work when they were talking by the water station during work hours, yet supervisor Brown regularly did not order unidentified white employees back to work when they were talking during work hours. Doc. #75-3 (Huff Dep. at 169-73).

- <u>Alleged Disparate Treatment in Job Assignments and Overtime</u>
  - Before the automated ticket assignment system was implemented in 2001, Huff complains that he was routinely assigned heavy orders for his first assignment of the day. Doc. #75-3 (Huff Dep. at 202-03). After the automated ticket assignment system was implemented, Huff thinks the

system, which was supposed to randomly assign tickets, was rigged by either a supervisor or clerk in order to routinely give him heavy orders. Id. at 202-06.

- In January 2007, Huff was on a forklift upgrade assignment when he was told by an unknown supervisor to go back to "picking tickets" so that an unknown employee with more seniority could work the forklift instead. Doc. #75-2 (Huff Dep. at 124-27). However, Huff admits that upgrade assignments are made by seniority and that the more senior employee had a right to the forklift upgrade under the Bargaining Agreement. Id. at 126- 27.

- On January 24, 2007, supervisor Keyes offered overtime hours to co-worker Bailey, who was immediately senior to Huff, but Bailey turned it down. Doc. #75-2 (Huff Dep. at 81-83). Bailey informed Huff of this three to four minutes prior to the end of the shift. Id. SuperValu did not offer Huff the overtime, nor did it keep a person junior to Huff on overtime that day. Id. at 83-84. When Huff asked supervisor Keyes the next day why he was not offered the overtime hours when Bailey turned them down, Keyes said, "because you were already gone."[6] Id. at 83.

- "Every day" unidentified supervisors assign Huff duties that should be assigned to more junior, unidentified white employees. Doc. #75-2 (Huff Dep. at 128-31).

- <u>Alleged Disparate Treatment with Regard to Discipline</u>
  - Sometime prior to December 1998, supervisor Cooper suspended Huff for insubordination, during which time he did not receive back pay. Doc. #75-1 (Huff Dep. at 64-69); Doc. # 83-3 (Schulcz Aff.) ¶ 11. About the same time, Cooper also suspended white co-worker Mangan for insubordination, but Mangan eventually received his back pay. Id. at 69.
  - In 2006, manager Gunderson threatened Huff with discipline (but did not actually discipline him), when Gunderson was not aware of all of the details of a situation involving the unloading of pallets. Doc. #75-2 (Huff Dep. at 90-95). A couple of months later, white co-worker Dresch had a confrontation with Gunderson and was not disciplined. Id. at 96-99.

- <u>Alleged Disparate Treatment with Regard To Drug Testing</u>
  - SuperValu sent black co-worker Smith for drug testing after a work accident, but did not send white co-worker Chamblee for drug testing

---

[6]Huff complains that, as soon as Bailey indicated he did not want the overtime hours, "the first thing you do is you page me up to the office and then you ask me if I want to stay because Dale Bailey said no." Doc. #75-2 (Huff Dep. at 84).

after an accident. Doc. #75-3 (Huff Dep. at 212-14).

- Alleged Disparate Treatment with Regard to Training
  - Black co-worker Walker did not receive as much training as an unidentified white co-worker. Doc. #75-3 (Huff Dep. at 215-19).

C.    Facts Specific to the Plaintiff's Hostile Work Environment Claim

The parties set forth the following facts pertinent to Huff's hostile work

environment claim:

- In approximately 1991-1992, co-worker Feltner told Huff a racially offensive joke. Doc. #75-1 (Huff Dep. at 33-35).  Huff did not report the incident to management. Id. at 35.
- In approximately 1995-1997, co-worker McIntosh said to Huff, "I can't believe the girl Terry is dating used to date niggers." Doc. #75-1 (Huff Dep. at 35-38).  Eventually McIntosh said to Huff, "I'm sorry, but I didn't know that you were black." Id. at 37.  Huff complained to supervisor Doran about the statement and Doran said, "What do you want me to do about it?" Id. at 36. Huff is unsure whether Doran or anyone else in management spoke to McIntosh about the incident. Id. at 42-43.
- In approximately 1997-1999, Huff heard co-worker Holmes say to black co-worker Bush, "Do you know that black people are a curse on this earth?  It's in the Bible."  Doc. #75-1 (Huff Dep. at 44-47).  Huff did not report the incident to management. Id. at 47-48.
- In 1998, Huff saw the words "go tell this, you nigger" written on a pallet.[7]

---

[7]In his deposition, Huff states that this incident happened in approximately 2000-2001. Doc. #75-1 (Huff Dep. at 54-55).  He also identifies the supervisor that was involved as Cooper. Id. at 56-57.  However, Cooper left the company in December 1998. Doc. # 83-3 (Schulcz Aff.) ¶ 11.  To add further confusion, both the Defendants and the Plaintiff, in their memoranda in support of and in opposition to the Motion for Summary Judgment, cite the noted deposition pages and state that the involved supervisor was Doran. Doc. #83 at 34 n.7; Doc. #92-1 at 2.  The Defendants also cite an affidavit and attachment from Doran, which indicate that he was involved with this incident or a similar incident, in 1998. Doc. #83-1 (Doran Aff.) ¶ 8; Doc. #83-2 (Doran's investigation notes).  Given that the Plaintiff seems to be agreeing that Doran was the supervisor involved in the incident, in his memorandum in opposition, the Court has adopted the parties' characterization of

Doc. #75-1 (Huff Dep. at 54-57); Doc. #83-1 (Doran Aff.) ¶ 8; Doc. #83-2. Huff reported the incident to supervisor Doran, who had the graffiti removed that day and instructed Huff to let him know if he saw similar graffiti in the future. Doc. #83-1 (Doran Aff.) ¶ 8; Doc. #83-2 (Doran's investigation notes).

- In approximately 1999-2000, former SuperValu supervisor Cooper showed Huff a photo of a picture of a monkey with his (Cooper's) name next to it, which was presumably taken while Cooper was employed by SuperValu. Docs. #75-1, #75-3 (Huff Dep. at 59, 196-97). Cooper left the company in December 1998. Doc. # 83-3 (Schulcz Aff.) ¶ 11.
- In approximately 1999-2000, Huff heard white co-worker Moneypenny use the term "nigger" in an argument with black co-worker White. Doc. #75-2 (Huff Dep.) at 119-21. Huff did not report the incident to management. Id. at 121.
- In 2004, Huff heard white co-worker Miller state, "I wish all the niggers would leave here, or quit." Docs. #75-1, #75-2 (Huff Dep. at 76-79). Huff did not report the incident to management. Id. at 79.
- In 2004, Huff heard white co-worker Everett state that if he were fired, he would "get paid like those four monkeys did." Doc. #75-2 (Huff Dep.) at 85-87. Huff did not report the incident to management. Id. at 87.
- In 2005, white co-worker Moniz said, "that's just another way to keep a white man down," in response to Huff's statement that he was not going to give up his seat at a card game to Moniz. Doc. #75-2 (Huff Dep. at 99-102). Huff reported this incident to Schulcz. Id. at 103. Schulcz told Huff he would get back to him, but he did not. Id. at 103-04.
- Three or four times in 2007, co-worker Suttles said to Huff, "we don't allow your kind here," then claimed it was a reference to Huff's height. Doc. #75-2 (Huff Dep. at 116-19). Huff did not report this incident. Id. at 118-19

## II.  Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

---

the specifics of this incident.

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1245 (6th Cir. 1995); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." Mich. Prot. & Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that

10

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th

Cir. 1992) (citation omitted). In determining whether a genuine issue of material

fact exists, a court must assume as true the evidence of the nonmoving party and

draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255.

If the parties present conflicting evidence, a court may not decide which evidence

to believe, by determining which parties' affiants are more credible; rather,

credibility determinations must be left to the fact-finder. 10A Wright, Miller &

Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining

whether there is a genuine issue of material fact), "[a] district court is not . . .

obligated to wade through and search the entire record for some specific facts that

might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889

F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S.

Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v.

Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . ."). Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III.   Legal Analysis

A.   Disparate Treatment, under Title VII (Count I), under 42 U.S.C. § 1981 (part of Count II) and under Ohio Law (Count III)

Huff brings race discrimination claims against SuperValu, based on the theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III). Doc. #3 (Am. Compl.).  He also alleges disparate treatment against the individual Defendants, under Ohio law (Count III). Id.

At the onset, the Court notes that both parties have relied upon certain factual allegations, in support of their arguments for and against Huff's disparate treatment claim, which pertain to the alleged disparate treatment of other employees, rather than to the alleged disparate treatment of Huff.  Because a disparate treatment claim, in a non-class action suit, is an individual claim wherein an employee is alleging that his employer discriminated against him because of his race, rather than that the employer discriminated against another employee because of his or her race, see Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (setting forth *prima facie* case of race discrimination claim, which focuses entirely on alleged disparate treatment of plaintiff), the Court will not

consider the following factual allegations, in analyzing Huff's disparate treatment

claim:

- Supervisor Keyes ordering three black co-workers (not to include Huff) to go back to work after their break ended, but not ordering white co-worker Allen back to work.

- SuperValu sending black co-worker Smith for drug testing after a work accident, but not sending white co-worker Chamblee for drug testing after an accident.

- Not training black co-worker Walker as much as an unidentified white co-worker.

The Court will now proceed with an analysis of the Defendants' Motion, as it

pertains to the alleged disparate treatment of Huff, with the remaining applicable

factual assertions.


1.    Whether Certain Claims are Time Barred

SuperValu initially argues that certain of the Plaintiff's disparate treatment

claims are time barred.  Initially, the Court notes that the proper starting point for

this analysis is the date that each discrete discriminatory act occurred. See

AMTRAK v. Morgan, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106

(2002).  In other words, in a disparate treatment context (as opposed to a hostile

work environment context),[8] a plaintiff may not "convert[] related discrete acts into

---

[8]In contrast, plaintiffs may convert related discrete acts into an unlawful practice, for purposes of timely filing in the hostile work environment context.  As explained by the Supreme Court,

Hostile environment claims are different in kind from discrete acts.

13

a single unlawful practice for the purposes of timely filing." Id. at 111. As to the

extent that discrete acts of discrimination that fall outside the applicable statute of

limitations are helpful or harmful to a plaintiff's case, the Supreme Court instructs

as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even
> when they are related to acts alleged in timely filed charges. Each
> discrete discriminatory act starts a new clock for filing charges
> alleging that act. . . . The existence of past acts and the employee's
> prior knowledge of their occurrence, however, does not bar employees
> from filing charges about related discrete acts so long as the acts are
> independently discriminatory and charges addressing those acts are
> themselves timely filed. Nor does the statute bar an employee from
> using the prior acts as background evidence in support of a timely
> claim.

Id. at 113. Relying on the final sentence quoted above, the Plaintiff correctly

argues that this Court may consider, even if untimely, "prior acts as background

evidence in support of a timely claim." Id. In sum, therefore, although the Court

will not take outdated acts into consideration for purposes of determining whether

those acts constitute disparate treatment, it will take them into consideration as

background evidence in considering timely acts of alleged discrimination. Having

established that the starting point for its statute of limitations analysis is each

---

> Their very nature involves repeated conduct. The "unlawful
> employment practice" therefore cannot be said to occur on any
> particular day. It occurs over a series of days or perhaps years and, in
> direct contrast to discrete acts, a single act of harassment may not be
> actionable on its own.

Morgan, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment
Discrimination Law 348-349 (3d ed. 1996); Harris v. Forklift Systems, Inc., 510
U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

discrete act of discrimination, the Court will proceed with its analysis of the proper time periods within which to examine the allegedly discriminatory conduct.

As to the Title VII claim, the Defendants correctly point out that Title VII requires complainants to file a claim with the Equal Opportunity Employment Commission ("EEOC") within 300 days after each discrete act of alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S. App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)).  In the present case, the Plaintiff filed his EEOC claim on August 20, 2004. Doc. #3-5 (Huff EEOC Charge). Therefore, as to the Plaintiff's Title VII claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to October 25, 2003 (300 days prior to the filing of the EEOC claim on August 20, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of limitations.[9] 28 U.S.C. § 1658(a); see also Jones v. R.R. Donnelley & Sons Co.,

---

[9]The Defendants argue that claims arising in Ohio, under § 1981, are subject to a two year statute of limitations. Doc. #83 at 15.  Such was the law prior to 2004. See Bd. of Regents v. Tomanio, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440  (1980) (noting that when Congress does not establish a statute of limitations, courts typically "borrow" the state law statute of limitations governing analogous causes of action); Nelson v. GE, 2001 U.S. App. LEXIS 1145, **7-8, 2 Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of limitations for such claims).  However, in 2004, the Supreme Court decided Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a),

15

541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004).  Thus, for purposes of the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under § 4112 is six years." Harrison v. City of Akron, 2002 U.S. App. LEXIS 16263, *5, 43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code §§ 2305.07, 4112.99; Cosgrove v. Williamsburg of Cincinnati Mgmt. Co., 70 Ohio St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)).  Thus, for purposes of the Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 1999 (six years prior to the filing date of May 16, 2005).

---

establishing a four year statute of limitations period for "civil action[s] arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990]." Id. at 375.  The Court further concluded that the plaintiff's claims for hostile work environment, wrongful termination, and failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners' causes of action were made possible by that Act," given that the 1991 Act overturned case law precedent that previously held that "racial harassment relating to the conditions of employment is not actionable under § 1981." Id. at 383 (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 171, 105 L Ed 2d 132, 109 S Ct 2363  (1989)).  Thus, the current Plaintiff's § 1981 claim for race discrimination (as well as hostile work environment) is covered by the § 1658 four year statute of limitations. See also Dandy v. UPS, 388 F.3d 263, 269 (7th Cir. Wis. 2004) (applying § 1658's four year statute of limitations period to disparate treatment and hostile work environment claims, based on Jones).

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after October 25, 2003. With regard to the § 1981 claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after May 17, 2001, and with regard to the state law claim, from and after May 17, 1999. Thus, the following alleged incident of disparate treatment is time barred, for purposes of all disparate treatment claims:

- Prior to December 1998, supervisor Cooper suspending Huff for insubordination, during which time he did not receive back pay, while Cooper also suspended white co-worker Mangan for insubordination, but Mangan eventually received his back pay.

Based on the remaining factual allegations, all of which are timely, the Court will now turn to a consideration of whether the Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact, as to the various elements of his disparate treatment claim.

2.    Disparate Treatment - Burden Shifting Analysis

Absent direct evidence of discrimination, the Court initially notes that courts analyze all three of the Plaintiff's disparate treatment claims (under Title VII, § 1981 and Ohio law) using the burden shifting framework, as set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). E.g., Upshaw v. Ford Motor

17

Co., 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII);

Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination

claim under § 1981); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio

Civil Rights Comm., 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination

claim under Ohio Revised Code Chapter 4112).  The Sixth Circuit provides the

following summary of that analytical framework:

> First, the plaintiff must make out a prima facie case of race
> discrimination, after which the burden shifts to the employer to proffer
> a legitimate, nondiscriminatory reason for its decision.  If the employer
> carries its burden, the plaintiff must then prove by a preponderance of
> the evidence that the reasons offered by the employer were
> pretextual.  Throughout this burden-shifting process, "the ultimate
> burden of persuading the trier of fact that the defendant intentionally
> discriminated against the plaintiff remains at all times with the
> plaintiff."

Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing

DiCarlo v. Potter, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing Dews v. A.B.

Dick Co., 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not

intended to be onerous." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d

405, 412 (6th Cir. 2008) (citation omitted).  The Sixth Circuit instructs that in

order to establish a *prima facie* case of disparate treatment, a plaintiff must show

that 1) she is a member of a protected class; 2) she was qualified for the position;

3) she was subjected to an adverse employment decision; and 4) she was replaced

by a person outside the protected class, or treated differently than similarly

situated non-protected employees. <u>Vaughn v. Louisville Water Co.</u>, 2008 U.S. App. LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing <u>Vincent v. Brewer Co.</u>, 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either the first or second prong of his *prima facie* test; rather, they claim that he has not set forth sufficient proof to create a genuine issue of material fact as to the third and fourth prongs.  The Court will begin with a consideration of the fourth prong (whether the Plaintiff was treated differently than similarly situated non-protected employees) and then turn to the third prong.

a.    <u>Whether Plaintiff was Treated Differently than Similarly Situated Non-Protected Employees</u>

The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is "similarly situated", he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998) (quoting <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original).  Further-more, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." Id. (quoting

Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

The following sets forth the ways in which the Plaintiff contends that
SuperValu discriminated against him, as well as the individuals with whom the
Plaintiff seeks to compare his treatment (if any), for each alleged instance of
discrimination:[10]

> (1) Supervisor Keyes telling Huff five minutes before his break ended that
> he should not open his cupcake, because his break was almost over,
> but not making a similar comment to white co-worker Walker, who was
> already eating a plate of noodles.[11] *The Plaintiff attempts to compare
> his situation with that of white co-worker Walker, who was presumably
> also supervised by Keyes and on the same shift. As the Defendants
> point out, however, the two employees' situations were not "nearly
> identical", given that Huff had not started eating his cupcake, while
> Walker had already started eating his noodles.[12]*

---

[10]The Plaintiff also attempts to argue that he has satisfied the fourth prong
of his disparate treatment *prima facie* case, because of the casual attitude of the
supervisors toward the alleged racial harassment.

> The supervisors' casual attitude toward harassment, and their own
> use of racial slurs[] is indicative of the atmosphere of the warehouse.
> A general working environment that tolerates this sort of harassment
> is evidence that implies a discriminatory reason for the adverse
> employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a
disparate treatment claim, the Court will consider the same when assessing the
Plaintiff's hostile work environment claim below.

[11]The Plaintiff alleges that this incident happened in 2003. If it happened
prior to October 25, 2003, it is cognizable only under § 1981 and state law.

[12]Furthermore, it goes without saying that telling an employee that he should
not open a cupcake is not an "adverse employment action."

(2)     Supervisor Keyes coming into the breakroom and directing her comment to "go back to work" to Huff and black co-workers, while ignoring the white co-workers who were in the breakroom. *The Plaintiff seeks to compare his situation with that of the white co-workers who were in the breakroom and presumably also supervised by Keyes and on the same shift.*

(3)     Manager Gunderson ordering three black employees, including Huff, back to work from the breakroom, but not ordering two white employees (Begin and Moore) back to work. *The Plaintiff seeks to compare his situation with that of white co-workers Begin and Moore, who were presumably also supervised by Gunderson and on the same shift.*

(4)     Supervisor Zoll directing Huff to get back to work while he was conversing with a co-worker during work time, despite the fact that white co-workers Uhrig and Miller had gone missing. *The Plaintiff seeks to compare his situation with that of white co-workers Uhrig and Miller, who were presumably also supervised by Zoll and on the same shift.*

(5)     A supervisor directing Huff and co-worker Coates to get back to work when they were conversing during work hours. Doc. #75-1 (Huff Dep. at 10-11). *It is unclear to whom the Plaintiff seeks to compare his situation, since the supervisor treated Huff and Coates identically and the Plaintiff points to no other employees.*

(6)     Supervisor Brown ordering Huff and black co-worker Smith back to work when they were talking by the water station during work hours, yet not ordering unidentified white employees back to work when they talked during work hours, on a regular basis. *The Plaintiff does not identify any similarly situated, non-protected employees, as to this situation.*

(7)     Being routinely assigned heavy ticket orders.[13] *The Plaintiff is seemingly comparing his situation to that of all other order selectors, both black and white.*

---

[13]This claim is not cognizable under Title VII, as to those events that occurred prior to October 25, 2003, and is not cognizable under § 1981 for those events that occurred prior to May 17, 2001.

(8)     An unknown supervisor telling Huff to return to "picking tickets", because an unidentified employee with more seniority was being upgraded to forklift duty (which was in accordance with the terms of the Bargaining Agreement). *The Plaintiff does not identify any similarly situated, non-protected employees, as to this situation.*

(9)     Supervisor Keyes offering overtime to Bailey (who was senior to Huff), but not offering the same to Huff or anyone junior to Huff, when Bailey turned down the overtime offer. *The Plaintiff seems to be comparing his situation with that of other employees who would be offered overtime when the person above them on the seniority list turned it down, but does not point to any such persons as comparables.*[14]

(10)    Supervisors assigning Huff duties that should be assigned to more junior, unidentified white employees. *The Plaintiff does not identify any similarly situated, non-protected employees, as to this situation.*

---

[14]As the Plaintiff correctly argues, the Sixth Circuit has recognized that the denial of overtime can be an adverse employment action, for purposes of a disparate treatment case such as the one presently before this Court. E.g., Broska v. Henderson, 2003 U.S. App. LEXIS 13450, **13-15, 70 Fed. Appx. 262 (6th Cir. June 30, 2003); Montgomery v. Honda of Am. Mfg., 2002 U.S. App. LEXIS 20441, **20-21, 47 Fed. Appx. 342 (6th Cir. Sept. 24, 2002).  However, a plaintiff must not only point to sufficient evidence to show that his employer denied him overtime opportunities, but must also demonstrate that similarly situated non-protected employees were given overtime opportunities that he was denied. Montgomery, 2002 U.S. App. LEXIS at *19-21 (affirming district court's grant of summary judgment in favor of employer, because plaintiff "[had] not produced evidence sufficient to raise a genuine issue of material fact as to whether he was denied overtime opportunities, or whether similarly situated [w]hite associates were given overtime opportunities that Montgomery was denied").

Presently, the Plaintiff has not pointed to evidence to indicate that a non-protected employee was offered the overtime hours, which Bailey turned down and which the company did not subsequently offer to the Plaintiff.  Nor has he pointed to any evidence to indicate that SuperValu was required to offer overtime hours to him, once an immediately more senior employee turned down the offer of the same (i.e., that SuperValu was somehow obligated to continue offering overtime until it found an agreeable employee, once it initially made an overtime offer to one employee).  In sum, therefore, the Plaintiff has failed to carry his burden on the fourth prong of his *prima facie* case, as to this disparate treatment allegation.

(11)	Manager Gunderson threatening Huff with discipline (but not actually disciplining him) when Gunderson was not aware of all of the details of a situation involving the unloading of pallets.  Later, Gunderson did not discipline white co-worker Dresch after a seemingly similar confrontation.  *The Plaintiff is comparing his situation to that of white co-worker Dresch.  Although Gunderson did not discipline either of the employees, he threatened Huff with discipline, but did not threaten Dresch.*

As noted in the italicized text above, except in four instances (as summarized below), the Plaintiff has either not identified an allegedly similarly situated non-protected co-worker or has not demonstrated that all of the relevant aspects of his employment situation were "nearly identical" to those of the non-protected co-worker's employment situation, as required in order to carry his burden on this prong of his *prima facie* case.  Therefore, the Court concludes that the Plaintiff <u>has not</u> set forth sufficient evidence to create a genuine issue of material fact as to whether the individuals with whom he seeks to compare his treatment were similarly situated, with regard to any of his allegations of discrimination, except the following:  supervisor Keyes directing her comment to "go back to work" to Huff and black co-workers, while ignoring white co-workers; manager Gunderson ordering three black employees, including Huff, back to work, but not ordering two white employees (Begin and Moore) back to work; supervisor Zoll directing Huff to get back to work while he was conversing with a co-worker during work time, despite the fact that white co-workers Uhrig and Miller had gone missing; and Gunderson threatening Huff with discipline (but not actually disciplining him), but not threatening to discipline white co-worker Dresch after a

similar confrontation. The Court will now proceed with an analysis of the third prong of the *prima facie* case (whether the alleged actions constituted adverse employment actions), with regard to these remaining disparate treatment allegations.

> b.   Whether the Alleged Misconduct Constituted an Adverse Employment Action

The third prong of the *prima facie* case of disparate treatment requires a plaintiff to establish that he suffered an adverse employment action. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257 (1998)), cert. denied, 129 S. Ct. 2380 (2009). Stated another way, an adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted). Thus, the Court must discern whether the Plaintiff's remaining alleged adverse employment actions (supervisor Keyes directing her comment to "go back to work" to Huff and black co-workers, while ignoring white co-workers; manager Gunderson ordering three black employees, including Huff, back to work, but not

24

ordering two white employees (Begin and Moore) back to work; supervisor Zoll directing Huff to get back to work while he was conversing with a co-worker during work time, despite the fact that white co-workers Uhrig and Miller had gone missing; and Gunderson threatening Huff with discipline (but not actually disciplining him), but not threatening to discipline white co-worker Dresch after a similar confrontation) constitute materially adverse changes in the terms or conditions of his employment.

The only case pointed to by the Plaintiff, which is arguably applicable to his claim is <u>Campbell v. Univ. of Akron</u>, 2006 U.S. App. LEXIS 25876, 211 Fed. Appx. 333 (6th Cir. Oct. 17, 2006).[15]  The Plaintiff cites <u>Campbell</u> for his proposition that "[d]iscipline for alleged violation of a break policy can also constitute adverse employment action." Doc. #92 at 15.  However, in <u>Campbell</u>, the defendant conceded that the disciplinary measures in question (an oral warning and a written warning for violating a lunch-break policy) were adverse employment actions and, thus, the Appellate Court had no reason to resolve the question

_____

[15]The Plaintiff also cites <u>Broska v. Henderson</u>, 2003 U.S. App. LEXIS 13450, 70 Fed. Appx. 262 (6th Cir. June 30, 2003), in support of his argument that denial of overtime can be an adverse employment action. Doc. #92 at 15.  As noted *supra*, note 14, while the Sixth Circuit has indeed recognized that denial of overtime can be an actionable adverse employment action in certain situations, to be successful on a disparate treatment claim, a plaintiff must also set forth evidence demonstrating that similarly situated non-protected employees were given overtime opportunities that he was denied. <u>Id.</u> at **13-15 (finding that plaintiff "[had] not presented evidence showing that he has been denied overtime opportunities that others have received").  As previously explained, the Plaintiff has not done so.

presently before this Court.[16] Campbell, 2006 U.S. App. LEXIS 25876 at *3.

As to the three instances of supervisors reprimanding the Plaintiff with regard to break times in the present case, the Court concludes that such do not constitute adverse employment actions. The Plaintiff points to no case wherein a court determined that a supervisor's reprimand of employees either for not reporting back to work in a timely fashion after a break or for taking an unauthorized break during work hours (apparently without any formal discipline) was an adverse employment action and the Court has found none. Such reprimands do not constitute significant changes in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See White, 533 F.3d at 402 (quotation omitted). Therefore, the Court concludes that the Plaintiff has not pointed to sufficient evidence to support these claims.

Furthermore, as to the Plaintiff's remaining claim pertaining to Gunderson threatening Huff with discipline (but not actually disciplining him), but not threatening to discipline white co-worker Dresch, the Court similarly concludes that the Plaintiff has not pointed to sufficient evidence to demonstrate that this was an

---

[16]As noted by the Campbell Court, "[f]or reasons that are not entirely clear, the University does not contest that the disciplinary actions the PFOC took against Campbell were 'adverse employment actions' actionable under Title VII." Campbell, 2006 U.S. App. LEXIS 25876 at *21 n.5. Therefore, the Court continued, "we do not decide that issue, and assume for purposes of this opinion that these disciplinary actions do constitute 'adverse employment actions.'" Id.

adverse employment action. Mere threats to take adverse employment actions (assuming, without deciding, that the threatened discipline would have been an adverse employment action) are insufficient to constitute adverse employment actions themselves. See Hollins v. Atlantic Co., 188 F.3d 652 (6th Cir. 1999) ("We agree with the district court that the evidence that Gagel threatened to discharge Hollins is too ambiguous to satisfy the adverse employment action requirement.").

In sum, the Plaintiff has not set forth sufficient facts to create a genuine issue of material fact as to any part of his disparate treatment claims. Thus, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #83), with regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III).

B.    Hostile Environment, under 42 U.S.C. § 1981 (remaining part of Count II) and under Ohio Law (Count V)

Huff brings hostile work environment claims against all Defendants, under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am. Compl.). He submits that he suffered a hostile work environment based on his race, at the hands of co-workers and unknown perpetrators, to wit:[17]

_____

[17]The Court relies only on the acts of harassment that allegedly happened to the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter,

- In 1991-1992, co-worker Feltner telling Huff a racially offensive joke (co-worker harassment);

---

only for those which one or the other of the parties has pointed to admissible evidence in support thereof. The Court is aware that the Sixth Circuit has instructed that courts must consider the "totality of circumstances" when deciding cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999).

In Jackson v. Quanex Corp., the Appellate Court directed that the "totality of circumstances" approach necessitates aggregating alleged acts of harassment towards minority employees, in cases such as the present one. Id. In so doing, the Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v. Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)). Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees. "Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." Id. (emphasis added); see also id. ("We have also credited evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above. Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them. The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3. Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only those facts pertinent to the present Plaintiff, which are set forth above.

- In 1995-1997, co-worker McIntosh saying to Huff, "I can't believe the girl Terry is dating used to date niggers" (co-worker harassment);

- In 1997-1999, co-worker Holmes stating that the Bible said that "black people are a curse on this earth" (co-worker harassment);

- In 1998, seeing the words "go tell this, you nigger" on a pallet (harassment by unknown perpetrator);

- In 1999-2000, former SuperValu supervisor Cooper showing Huff a photo of a picture of a monkey with his (Cooper's) name next to it (harassment by unknown perpetrator);

- In 1999-2000, hearing white co-worker Moneypenny use the term "nigger" in an argument with a black co-worker (co-worker harassment);

- In 2004, hearing white co-worker Miller state, "I wish all the niggers would leave here, or quit" (co-worker harassment);

- In 2004, hearing white co-worker Everett state that if he were fired, he would "get paid like those four monkeys did" (co-worker harassment);

- In 2005, hearing white co-worker Moniz say, "that's just another way to keep a white man down" (co-worker harassment); and

- Three or four times in 2007, hearing co-worker Suttles say, "we don't allow your kind here" (co-worker harassment).

The Sixth Circuit instructs that courts are to use the same standard when evaluating hostile work environment claims under Title VII, § 1981 and Ohio Revised Code Chapter 4112. Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004). To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following:

(1) [He] is a member of a protected class . . . ; (2) [he] was subjected to harassment, either through words or actions, based on [his protected class]; (3) the harassment had the effect of unreasonably

interfering with [his] work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009) (quoting Grace v. USCAR, 521 F.3d 655, 678 (6th Cir. 2008)).[18]  As to the final prong, whether there is a basis for employer liability, such depends on whether the plaintiff is alleging harassment by supervisors or co-workers.  Quoting from a Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses as follows:

> The Supreme Court has ruled that employers are not automatically liable for [] harassment perpetrated by their employees. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L. Ed.2d 662 (1998).  Where an employee is the victim of [] harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. See Faragher v. City of Boca Raton, 524 U.S. at 789; accord Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir.2000).  Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; if it did, "the employer will, ipso facto, be vicariously liable," Mack v. Otis Elevator Co., 326 F.3d at 124 [(2d Cir. 2003)].  In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully

---

[18]Gallagher was a hostile work environment case, based on sexual harassment, as opposed to racial harassment.  The Sixth Circuit applies the same legal standard to both sorts of claims, however. See Ladd v. Grand Trunk Western R.R., 552 F.3d 495, 500 (6th Cir. 2009).

establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; accord Faragher v. City of Boca Raton, 524 U.S. at 807, 118 S. Ct. 2275; Mack v. Otis Elevator Co., 326 F.3d at 125.

Gallagher, 567 F.3d at 275 (quoting Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004)).

The Defendants, in the present action, do not contest the first prong of the *prima facie* case. They do, however, assert that Huff has failed to set forth sufficient proof as to the second prong, for certain of his assertions of harassment, and for the third and fourth prongs for all of his assertions.[19]

1. Whether the Plaintiff was Subjected to Harassment Based on Race

In order to be actionable as a racial harassment claim, a plaintiff must demonstrate that he was harassed because of his race. Booker v. Budget Rent-A-Car Sys., 17 F. Supp. 2d 735, 743 (M.D. Tenn. 1998). SuperValu argues

───────────────

[19]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #83 at 32 n.19. The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did form one continuous hostile work environment, need not consider the Defendants' argument, on this point. Thus, the Court does not reach the statute of limitations issue on the allegations constituting the hostile work environment claims.

that the incident involving Moniz saying, "that's just another way to keep a white man down" and the incidents where Suttles said (on three or four occasions), "we don't allow your kind here" were not based on race. The Court agrees with the first of SuperValu's contentions, but disagrees with the second. The Plaintiff points to nothing to indicate that a statement such as "that's just another way to keep a white man down" is racially discriminatory towards a black employee and the Court knows of no reason for considering it so. As to Suttles's repeated comments regarding not wanting the Plaintiff's "kind" here, however, the Court concludes that (regardless of whether Suttles said he was referring to the Plaintiff's height) there were clearly racial innuendos to such comments and, therefore, the same is sufficient to at least create a genuine issue of material fact on the question of whether the Plaintiff endured harassment that was based on race, as a result of the same. Therefore, the Court will proceed with an analysis of the remaining prongs of the Plaintiff's *prima facie* case.

> 2.   Whether Harassment Had Effect of Unreasonably Interfering with Plaintiff's Work Performance and Creating an Objectively Intimidating, Hostile, or Offensive Work Environment

The Sixth Circuit has identified the governing standard for the third prong of a plaintiff's *prima facie* case of harassment as follows:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the

environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)

(quoting Williams v. GMC, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed.

2d 295 (1993)). The Supreme Court states that, in making these assessments,

courts must consider "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."

Harris, 510 U.S. at 23. Further, in order to constitute a "change in the terms and

conditions of employment", conduct must be "extreme". Faragher v. City of Boca

Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the incidents that arguably

reflect racial animus were not severe and pervasive enough to alter the terms and

conditions of Huff's employment. As to the objective view of the facts, SuperValu

argues that the alleged incidents of harassment occurred over a span of many

years, many were not directed at Huff and none was physically threatening. As to

the subjective view of the facts, SuperValu asserts that, although Huff claims that

the alleged harassment made it "kind of hard to focus," he admits that he "just

perform[ed] [his job]" and "tr[ied] not to let it bother [him]." Doc. #83 at 38 (citing

Doc. #75-3 (Huff Dep. at 225-26)). Further, Huff cannot remember any specific

time or manner that his performance suffered due to the alleged harassment. Id.  In response, Huff argues that it is the decades-long history of regular harassment that defines his treatment as severe and pervasive.  Further, Huff argues that his filing of the present lawsuit, along with the fact that he recalls the incidents in question years after they happened, is evidence that he subjectively considered his mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit.  In Smith v. Leggett Wire Co., the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment:  "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as 'gorilla'." Smith, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at Smith, over a twenty-year span of time.").

Conversely, in Jackson v. Quanex Corp., the Appellate Court found the following facts probative of a severe and pervasively hostile work environment: the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the

34

company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males," graffiti in the men's restroom "depicting lynchings accompanied by the phrase, 'KKK is back',", graffiti on the back door that said "blacks out back," graffiti in the seam grinding area that "depicted the lynching of African-American men," graffiti in the restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of extreme racial misconduct (including calling a new hire "nigger" and "motherfucker", and after he reported these comments, telling him, "Nigger, we want you to quit your job . . . ."; defacing a work shirt with the words "Nigger Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's machine; tampering with acid valves in an attempt to create a safety hazard that would appear to be attributable to a minority worker, and a co-worker calling another co-worker a "nigger bitch" and physically assaulting her). <u>Jackson</u>,191 F.3d 647, 651-55, 62 (6th Cir. 1999).

SuperValu also points the Court to the Sixth Circuit's unpublished opinion in <u>Kelly v. Senior Centers, Inc.</u>, wherein the Court found that the following incidents of misconduct, which occurred over four months, did not amount to actionable

harassment: "two staff members' use of the pejorative slur word 'nigger' referring to the foster grandparents; Dangelo's description of a Board Member as a 'token black' and her comments that the foster grandparents were slovenly or were 'pigs' at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes'; and comments about an African-American staff member's bathroom habits." Kelly, 2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8, 2006). In concluding its findings, the Court stated, "[w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." Id. at *17.

SuperValu also cites Bourini v. Bridgestone/Firestone North American Tire, L.L.C., 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position. In Bourini, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment: (1) a co-worker said, "I don't want to … see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the September 11 attacks, a co-worker attempted to back over him while reversing a forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's voice over the intercom system; (7) someone painted Islamic slurs on the restroom

wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For my Muslim Friend;" and (9) the human resources department sent an email relating to plaintiff's immigration status to all employees. Id. at **2-5. The Appellate Court concluded that these incidents "were not sufficiently pervasive to establish an abusive working environment." Id. at *10. Because the incidents were spread out over a five year period, the Court found them to be "relatively infrequent and isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of employment." Id.

In the present case, Huff alleges hearing racially offensive jokes or comments on 9-10 occasions over a 16-year period of time, as well as seeing a racially offensive word and a racially offensive picture, at the end of the 1990s. While this conduct is reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Huff's employment. The incidents are closest in severity and pervasiveness to those in Bourini v. Bridgestone/Firestone North American Tire, L.L.C., *supra*, which occurred over only a 5-year period of time and which the Sixth Circuit found to be insufficient to constitute discriminatory changes in the terms and conditions of employment, as explained above. Thus, regardless of whether he subjectively found that the alleged incidents created a hostile work environment, Huff has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based

37

harassment. Nevertheless, in an abundance of deference to the Plaintiff, as the non-moving party in this case, the Court will proceed to an analysis of the fourth prong of the *prima facie* case, whether there exists some basis for liability on the part of the employer.

### 3. Whether There Exists Some Basis for Liability on the Part of the Employer

As noted above, in order to satisfy the fourth prong of a *prima facie* case of hostile work environment, a plaintiff must point to evidence demonstrating that there exists some basis for liability on the part of the employer. <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 270 (6th Cir. 2009). If the alleged harassment was at the hands of non-supervisors (such as the allegations of harassment in the present case), the employer will not be liable unless the plaintiff points to evidence, which demonstrates that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." <u>Id.</u> at 275.

In the present case, Huff reported two of the alleged acts of harassment, to wit: seeing the words "go tell this, you nigger" on a pallet, and McIntosh saying to Huff, "I can't believe the girl Terry is dating used to date niggers." As to the first allegation, SuperValu has pointed to evidence (although it is not its burden to do so) that indicates that it took appropriate remedial action, as noted *supra*. As to the second allegation, although the Plaintiff has set forth evidence indicating that

38

SuperValu knew of the alleged harassment, he has pointed to no evidence to indicate that SuperValu failed to take appropriate remedial action (i.e., testimony from supervisor Doran as to whether he disciplined McIntosh for allegedly making the discriminatory comment). Because the Plaintiff has not satisfied his burden to set forth evidence indicating that the employer knew about the harassment but failed to take appropriate remedial action, SuperValu cannot be held liable for the same.

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work environment based on race. Therefore, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #83), as to Huff's hostile work environment claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

C.    <u>Retaliation, in violation of Title VII and/or Ohio law (Count IV)</u>

As Count IV in his Amended Complaint, Huff asserts a claim for retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.) ¶¶ 60-64. These claims are limited to allegations of retaliation that occurred after the filing of Huff's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent

direct evidence of retaliatory discrimination, a plaintiff must show the following:

(1) [he] engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to defendant;

(3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity and the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see

also Putney v. Contract Bldg. Components, 2009 Ohio App. LEXIS 5634, **30-

31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009).  In their memorandum in

support of their Motion for Summary Judgment, the Defendants state that they are

entitled to summary judgment on this claim, because Huff admitted that he

experienced no retaliation and also because he has set forth no facts to support his

retaliation claim. Doc. #83 at 41.

It is true that Huff conceded that he experienced no retaliation for engaging

in activity protected by Title VII. Doc. #75-4 (Huff Dep. at 236).  It is also true that

Huff makes no argument nor presents any facts in support of his retaliation claim.

See Doc. #92 (Mem. Opp'n).  Because the Plaintiff has pointed to no facts to

support his retaliation claim, there is no genuine issue of material fact as to the

same and the Defendants' Motion for Summary Judgment (Doc. #83) is

SUSTAINED, as to Count IV.

D.    Respondeat Superior (Count VI)

As Count VI in his Amended Complaint, Huff alleges that SuperValu is liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77.  In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above (e.g., employer liability component of hostile work environment claim).  Therefore, the Defendants' Motion for Summary Judgment (Doc. #83) is SUSTAINED, as to Count VI.


IV.    Conclusion

The Defendants' Motion for Summary Judgment (Doc. #83) is SUSTAINED, in its entirety.  Judgment is ultimately to be entered on behalf of Defendants against Plaintiff Huff, at the conclusion of this litigation.


March 31, 2010


　　　/s/ Walter Herbert Rice　　　　
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:
Counsel of record