IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                    :

    Plaintiffs,                          :
                                        Case No. 3:05cv169

       vs.                             :
                                          JUDGE WALTER HERBERT RICE

SUPERVALU HOLDINGS, INC., et al.,        :

    Defendants.                          :


DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF DION BERRYMAN (DOC.
#84); JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF
DEFENDANTS AGAINST PLAINTIFF DION BERRYMAN


The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13. The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1] Doc. #23. The

_____

[1]The Amended Complaints lists the Plaintiffs as follows: Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.). The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name. The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2]The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3]The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

2

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Dion Berryman ("Plaintiff"). Doc. #84. In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4. Thus, at this stage of the litigation, the following claims remain: (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI). The Defendants have moved for summary judgment on all of Berryman's claims. Doc. #84.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts. It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

---

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment. Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II. Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

3

I.    Facts[5]

SuperValu hired Berryman in 1989. Doc. #74-1 (Berryman Dep. at 31).

Since that time, Berryman has worked continually as an order selector, except for

at such times as he has received temporary upgrade assignments. Id. at 31-33.


A.    Collective Bargaining Agreement and Anti Harassment/Discrimination
      Policy

As a member of the local union, Berryman's employment terms are covered

by the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #74-1 (Berryman Dep. at 33-5); Ex. #2 (CBA).  Some of the specifics covered

by the CBA include the following:

- Job Bidding.  Bargaining unit jobs are awarded by seniority.  Job
  openings are posted for five days and are then filled with the

---

[5]Since this case comes before the Court on the Defendants' Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to such Motion in the manner most favorable to the Plaintiff, as the party against whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783, 790 (6th Cir. 2007).

The Court has spent an inordinate amount of time organizing the facts, in this case.  Not only did the Defendants file an excessively long memorandum in support of their Motion for Summary Judgment (40 pages, not including table of contents or summary of arguments) (Doc. #84), but they also set forth the majority of their lengthy factual assertions in single-spaced footnotes, in small font.  In doing so, the Defendants have set forth far more facts than the Plaintiff.  In drafting the present Opinion, the Court has relied upon those facts pointed to by the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts generally set forth in the Amended Complaint (Doc. #3), which have been expounded upon by the Defendants.  As to the facts raised by the Defendants, but not relied upon by the Plaintiff in either the Amended Complaint or memorandum in opposition to the Motion for Summary Judgment, the Court considers those facts inapplicable to the present case.

qualified employee with the most seniority. Doc. #74-10 (CBA) at 12.

- Overtime Assignments.  Overtime assignments are made to the most senior employee who volunteers and is qualified.  If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #74-11 (CBA) at 1-2.

- Nondiscrimination. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #74-12 at 4.

- Grievance and Arbitration Procedure. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #74-10 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Doc. #84-9.  SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #84-7 (Schulcz Aff.) ¶ 4, Attachs. C-D.


B.    Facts Specific to the Plaintiff's Disparate Treatment Claim

The parties set forth the following facts pertinent to Berryman's disparate treatment claim:

- Alleged Disparate Treatment with Regard to Break Times and Socializing
  - At an unknown time, supervisor Zoll told Berryman and black co-worker Smith to "get back to work," while they were talking during work hours, but did not tell two unidentified white employees, who were also talking

during work hours, to get back to work. Doc. #74-3 (Berryman Dep. at 145-47).

- In August 2000, supervisor Davis disciplined Berryman for not returning to work as instructed, after his shift had ended, yet Davis did not instruct any other workers (either black or white) to return to work after their shifts had ended. Doc. #74-3 (Berryman Dep. at 160-61, 181-82).

- <u>Alleged Disparate Treatment in Job Assignment and Overtime</u>
  - On more than ten occasions prior to September 1999, Berryman was assigned "heavy orders", despite assurances that the assignments were randomly made. Doc. #74-4 (Berryman Dep. at 260-63). Berryman alleges that other unidentified employees would "dig" into the ticket pile and get smaller orders. <u>Id.</u> at 261.
  - At unknown times, temporary upgrade assignments have been held open for white employees (i.e., Carr, Chenoweth, Michael and Stewart) who were not present during the job assignment session, while Berryman has been automatically skipped over if he was not present.[6] Doc. # 74-3 (Berryman Dep. at 168-70).
  - At unknown times, Berryman states that it seems as if some temporary upgrade assignments that are supposed to be offered by seniority are given on a first-come, first serve basis. Doc. #74-3 (Berryman Dep. at 187-90).
  - At unknown times, Berryman was given a larger amount of work to do alone, while white co-workers Michael and Stewart, who were more senior than he, were given a smaller amount of work to do together. Doc. #74-2 (Berryman Dep. at 94-99).
  - On unknown dates, unidentified employees, who were junior to Berryman, were asked to work additional hours after he had left work for the day. Doc. #74-4 (Berryman Dep. at 272-74).

---

[6]The Court assumes that the job assignment to which Berryman is referring is the temporary assignment of jobs (as opposed to a permanent assignment of jobs), which happens on a day-to-day basis, when employees are temporarily reassigned for the day, depending on work load and absenteeism. <u>See</u> Doc. #74-3 at 168-70 (wherein Berryman indicates that the assignments are made for temporary work reassignments). In their memorandum in support of their Motion for Summary Judgment, the Defendants refer to the job assignment in question, as an "occasional reassignment[] and fluctuation[] of job responsibilities that [is] temporary in nature" and the Plaintiff does not correct this perception, in his memorandum in opposition. Doc. #84 at 24; <u>see also</u> Doc. #92.

- <u>Alleged Disparate Treatment with Regard to Discipline</u>
  - In 1989, an unidentified supervisor terminated Berryman for "building a bad board" and then rehired him four days later. Doc. #74-3 (Berryman Dep. at 206-07). Berryman feels his termination was discriminatory, because the supervisor did not inform him of the reason for his termination at that time. Doc. #74-4 (Berryman Dep. at 218-20).
  - In approximately 2000, supervisor Davis wrote up Berryman for being out of his work area when he (Berryman) was actually on his lunch break, while white co-worker Chenoweth (who was also supervised by Davis) was not written up. Doc. #74-1 (Berryman Dep. at 18-21): Doc. #74-2 (Berryman Dep. at 73-75). SuperValu points to evidence, which Berryman does not refute, that indicates that Berryman's discipline was removed, as a result of a grievance he filed regarding this incident. Doc. #84-31 (Grievance Form).
  - In 2000-2001, Berryman said "ain't that a bitch" in the presence of white co-worker Tackett. Doc. #74-3 (Berryman Dep. at 154-55). Tackett, who apparently thought Berryman was speaking to him, responded, "take [your] black ass back to work." <u>Id.</u> at 156. Berryman was written up for his comment, and although he reported Tackett's comment to an unknown supervisor, does not know whether the supervisor wrote up Tackett. <u>Id.</u> at 158-59. SuperValu points to undisputed evidence indicating that Tackett received a written reprimand for the comment in question. Doc. #84-7 (Schulcz Aff.) ¶ 13; Attach. N.
  - Sometime between 2002-2004, an unidentified supervisor wrote up Berryman for forgetting to put a pallet on a truck. Doc. #74-4 (Berryman Dep. at 268-69). Berryman alleges vaguely that white employees were treated differently, with respect to this type of misconduct. <u>Id.</u> at 269-70.
  - In February 2007, a supervisor suspended Berryman for three days for a break violation. Doc. #74-4 (Berryman Dep. at 221-23, 234-38). It was later determined that his suspension should have only been for one day, and the company reimbursed him for two of the suspended days. <u>Id.</u>
  - In 2007, manager Gunderson wrote up Berryman when he (Berryman) refused to go back to work, while reading a bulletin board during work hours, when instructed to do so. Doc. #74-1 (Berryman Dep. at 22-24, 43-35). Gunderson did not write up any other employees, although no other employees were reading the bulletin board or apparently ignored an instruction to go back to work, as did Berryman. <u>Id.</u> at 22-24. Further, it is unclear whether the other members of Berryman's shift included any non-minority employees and whether they were in the breakroom or out of the breakroom, at the time of the incident in question. <u>Id.</u>
  - In 2007, supervisor Keyes wrote up Berryman for being in the breakroom

at 8:13 a.m., when his shift started at 8:00 a.m. Doc. #74-1 (Berryman Dep. at 48-50, 53-54). Berryman complains that other people on his shift (to include Shaw, Washburn "George", Michael and Stewart (races not identified) were still in the breakroom, at this time, yet did not get written up. Id. at 48. He also complains that people from the night shift (to include Hoppel, Hughley and Miller (Hughley is black; races of Hoppel and Miller not identified) were in the breakroom and also were not written up. Id. at 59-62. Berryman did not file a grievance to challenge his discipline, but he asked human resources manager Schulcz to "get to the bottom of [it]." Id. at 49-50. Schulcz said that he would "get back with" Berryman, but never did. Id. at 50.

- In 2007, supervisor Vannucci was "peeking around" a corner at Berryman. Doc. #74-1 (Berryman Dep. at 50-51). Berryman asked Vannucci what he was doing, and Vannucci said he was checking on him. Id. at 51. Berryman does not feel that supervisors should "check up on anybody," because employees know their jobs. Id. at 52. Berryman does not know whether Vannucci checked up on other employees. Id.

- <u>Alleged Disparate Treatment with Regard to Training</u>
  - In March 2004, when Berryman arrived for Vocollect training, manager Schulcz asked him to leave, while allowing employees junior to him (like McClure, whose race is unknown) to remain. Doc. #74-2 (Schulcz Dep. at 87-93). Berryman testifies that he cannot remember if he ever received the training in question. Id. at 91-93. SuperVlu points to evidence that indicates that Berryman was asked to leave, because he arrived to the training in question (which was really an appointment to make his Vocollect voice template) before his scheduled time. Doc. #84-4 (Crawford Aff.) ¶ 5. Berryman returned at his scheduled appointment time. Id.

- <u>Alleged Disparate Treatment with Regard to Company Sponsorship of Employee Softball Teams</u>
  - SuperValu denied Berryman's request to sponsor a softball team (which was to be composed of both black and white employees), when it had already sponsored two other teams and then subsequently agreed to sponsor a third team after it denied his request. Doc. #74-3 (Berryman Dep. at 162-66). At his deposition, Berryman was not asked for a date of this incident, nor did he volunteer one. <u>See id.</u>

C. <u>Facts Specific to the Plaintiff's Hostile Work Environment Claim</u>[7]

The parties set forth the following facts pertinent to Berryman's hostile work

environment claim:

- In 1989, white co-worker Pigg called Berryman a "dumb nigger". Doc. #74-3 (Berryman Dep. at 142-44). Berryman reported the incident to manager Cowan, but does not know if Pigg was disciplined. <u>Id.</u> at 143-44. Pigg never repeated the misconduct. Doc. #74-5 (Berryman Dep. at 297).
- In 1990-1991, white co-worker Randall called Berryman a "nigger". Doc. #74-2 (Berryman Dep. at 134-35). Berryman reported the incident to manager Schulcz, and Randall was written up for the same. <u>Id.</u> at 134-35, 141.
- In approximately 2000, Berryman saw the words, "[y]ou're not wanted here, you nigger" written on a bathroom wall. Doc. #74-2 (Berryman Dep. at 100-02). He reported the graffiti to management and it was removed a day or two later. <u>Id.</u> at 101-02.
- In approximately 2004, Berryman saw graffiti in the bathroom that included the words "nigger monkeys". Doc. #74-2 (Berryman Dep. at 103-04). Berryman does not know if he reported this graffiti or if it was removed. <u>Id.</u>
- On four to six occasions between 2000-2002, Berryman saw the word "nigger" written on pallets in the warehouse, but did not report the same. Doc. #74-2 (Berryman Dep. at 105-13).
- On one occasion in 2005, Berryman saw the word "nigger" written on his

---

[7]Berryman also makes the following allegation, for which he does not provide an exception to the hearsay rule of evidentiary exclusion:

- In 2006, co-worker Hamlet told Berryman about graffiti he (Hamlet) had seen on the bathroom wall using the words "black cock". Doc. #74-2 (Berryman Dep. at 76-80).

The Plaintiff points to no exceptions to the hearsay rule, which would allow the Court to consider this assertion. Thus, the Court will not consider the same when ruling herein.

The Court recognizes that this statement is not necessarily being offered for the truth of the matter asserted, with regard to the Plaintiff's <u>subjective</u> claim of hostile work environment, thus taking them out of the realm of hearsay statements. Fed. R. Evid. 801(c). However, since the Court does not reach the issue of whether the Plaintiff <u>subjectively</u> perceived his work environment to be hostile, as explained <i>infra</i>, it need not consider the otherwise inadmissible hearsay statement when ruling herein.

work machine. Doc. #74-2 (Berryman Dep. at 111-13).

- In approximately 2002-2003, supervisor Pelfrey told Berryman that other employees asked him, "why [do] you give them niggers easy jobs?" Doc. #74-3 (Berryman Dep. at 201-02). Berryman asked Pelfrey why he did not do something about this and Pelfrey did not reply. Id. at 202.

- In 2004, Berryman believed that a computer generated voice said the word "nigger" over his computerized Vocollect system. Doc. #74-2 (Berryman Dep. at 127-28). Berryman played the recorded message for supervisor Dunwoodie who said, "what did that say?" Id. at 128-31

- In 2005, Berryman saw graffiti in the bathroom regarding a female co-worker and using the word "nigger", but did not report the same. Doc. #74-2 (Berryman Dep. at 83-84).

- On unknown dates, Berryman saw one or two pictures of monkeys, a picture of police cars chasing O.J. Simpson and a picture of "dark people" drawn on boxes and on poles. Doc. #74-2 (Berryman Dep. at 113-23). Berryman reported the O.J. Simpson picture to Schulcz, who removed it. Id. at 121; Doc. #64-1 (Schulcz Dep.) at 29-30.


II.  Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).  The moving party,

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." <u>Talley v. Bravo Pitino Rest., Ltd.</u>, 61 F.3d 1241, 1245 (6th Cir. 1995); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and

draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255.

If the parties present conflicting evidence, a court may not decide which evidence

to believe, by determining which parties' affiants are more credible; rather,

credibility determinations must be left to the fact-finder. 10A Wright, Miller &

Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining

whether there is a genuine issue of material fact), "[a] district court is not . . .

obligated to wade through and search the entire record for some specific facts that

might support the nonmoving party's claim." <u>InterRoyal Corp. v. Sponseller</u>, 889

F.2d 108, 111 (6th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1091 (1990); <u>see also</u> <u>L.S.</u>

<u>Heath & Son, Inc. v. AT&T Info. Sys., Inc.</u>, 9 F.3d 561 (7th Cir. 1993); <u>Skotak v.</u>

<u>Tenneco Resins, Inc.</u>, 953 F.2d 909, 915 n.7 (5th Cir. 1992), <u>cert. denied</u>, 506

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . ."). Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

attention by the parties.

III.  Legal Analysis

A.  Disparate Treatment, under Title VII (Count I), under 42 U.S.C.
§ 1981 (part of Count II) and under Ohio Law (Count III)

Berryman brings race discrimination claims against SuperValu, based on the

theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II)

and Ohio law (Count III). Doc. #3 (Am. Compl.).  He also alleges disparate

treatment against the individual Defendants, under Ohio law (Count III). Id.


1.  Whether Certain Claims are Time Barred

SuperValu initially argues that certain of the Plaintiff's disparate treatment

claims are time barred.  Initially, the Court notes that the proper starting point for

this analysis is the date that each discrete discriminatory act occurred. See

AMTRAK v. Morgan, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106

(2002).  In other words, in a disparate treatment context (as opposed to a hostile

work environment context),[8] a plaintiff may not "convert[] related discrete acts into

_____

[8]In contrast, plaintiffs may convert related discrete acts into an unlawful
practice, for purposes of timely filing in the hostile work environment context.  As
explained by the Supreme Court,

Hostile environment claims are different in kind from discrete acts.
Their very nature involves repeated conduct.  The "unlawful
employment practice" therefore cannot be said to occur on any
particular day.  It occurs over a series of days or perhaps years and, in
direct contrast to discrete acts, a single act of harassment may not be
actionable on its own.

Morgan, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment
Discrimination Law 348-349 (3d ed. 1996); Harris v. Forklift Systems, Inc., 510

13

a single unlawful practice for the purposes of timely filing." Id. at 111.  As to the

extent that discrete acts of discrimination that fall outside the applicable statute of

limitations are helpful or harmful to a plaintiff's case, the Supreme Court instructs

as follows:

> [D]iscrete discriminatory acts are not actionable if time barred, even
> when they are related to acts alleged in timely filed charges.  Each
> discrete discriminatory act starts a new clock for filing charges
> alleging that act. . . .  The existence of past acts and the employee's
> prior knowledge of their occurrence, however, does not bar employees
> from filing charges about related discrete acts so long as the acts are
> independently discriminatory and charges addressing those acts are
> themselves timely filed.  Nor does the statute bar an employee from
> using the prior acts as background evidence in support of a timely
> claim.

Id. at 113.  Relying on the final sentence quoted above, the Plaintiff correctly

argues that this Court may consider, even if untimely, "prior acts as background

evidence in support of a timely claim." Id.  In sum, therefore, although the Court

will not take outdated acts into consideration for purposes of determining whether

those acts constitute disparate treatment, it will take them into consideration as

background evidence in considering timely acts of alleged discrimination.  Having

established that the starting point for its statute of limitations analysis is each

discrete act of discrimination, the Court will proceed with its analysis of the proper

time periods within which to examine the allegedly discriminatory conduct.

As to the Title VII claim, the Defendants correctly point out that Title VII

requires complainants to file a claim with the Equal Opportunity Employment

_____

U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

Commission ("EEOC") within 300 days after each discrete act of alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S. App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v. Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)). In the present case, the Plaintiff filed his EEOC claim on August 20, 2004. Doc. #3-1 (Berryman EEOC Charge). Therefore, as to the Plaintiff's Title VII claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to October 25, 2003 (300 days prior to the filing of the EEOC claim on August 20, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of limitations.[9] 28 U.S.C. § 1658(a); see also Jones v. R.R. Donnelley & Sons Co.,

_____

[9]The Defendants argue that claims arising in Ohio, under § 1981, are subject to a two year statute of limitations. Doc. #84 at 15. Such was the law prior to 2004. See Bd. of Regents v. Tomanio, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L. Ed. 2d 440 (1980) (noting that when Congress does not establish a statute of limitations, courts typically "borrow" the state law statute of limitations governing analogous causes of action); Nelson v. GE, 2001 U.S. App. LEXIS 1145, **7-8, 2 Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of limitations for such claims). However, in 2004, the Supreme Court decided Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a), establishing a four year statute of limitations period for "civil action[s] arising under an Act of Congress enacted after the date of the enactment of this section [enacted Dec. 1, 1990]." Id. at 375. The Court further concluded that the plaintiff's claims for hostile work environment, wrongful termination, and failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners' causes of action were made possible by that Act," given that the 1991 Act overturned case law precedent that previously held that "racial harassment relating to the conditions of employment is not actionable under § 1981." Id. at 383

15

541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). Thus, for purposes of the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under § 4112 is six years." Harrison v. City of Akron, 2002 U.S. App. LEXIS 16263, *5, 43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code §§ 2305.07, 4112.99; Cosgrove v. Williamsburg of Cincinnati Mgmt. Co., 70 Ohio St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)). Thus, for purposes of the Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 1999 (six years prior to the filing date of May 16, 2005).

With regard to the claims that are undated, the Defendants urge the Court to consider the same as time barred. In support of this argument, they point to a Southern District of Indiana case, which holds as follows:

> [The plaintiff] cannot avoid the 300 day statute of limitations merely by failing to provide the dates on which the alleged acts occurred.

---

(quoting Patterson v. McLean Credit Union, 491 U.S. 164, 171, 105 L Ed 2d 132, 109 S Ct 2363 (1989)). Thus, the current Plaintiff's § 1981 claim for race discrimination (as well as hostile work environment) is covered by the § 1658 four year statute of limitations. See also Dandy v. UPS, 388 F.3d 263, 269 (7th Cir. Wis. 2004) (applying § 1658's four year statute of limitations period to disparate treatment and hostile work environment claims, based on Jones).

> Baker's obligation as the plaintiff is to "set forth specific facts
> showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).
> To create a "genuine issue" Baker must present evidence such that a
> reasonable jury could find in his favor. We find that Baker has failed
> to present such evidence.

Baker v. Ind. Family & Soc. Servs. Admin., 2004 U.S. Dist. LEXIS 25838, *13

n.10 (S.D. Ind. Dec. 10, 2004) (one citation omitted); see also French v. Potter,

2005 U.S. Dist. LEXIS 44605, *7 (S.D. Ohio July 12, 2005) (pointing out that a

court "is unable to determine whether plaintiff has complied with the statutory

prerequisites to bringing suit under Title VII" if the plaintiff does not provide dates

on which the alleged violations occurred). Although the Court agrees with the

ultimate conclusion urged by the Defendants, it finds the approach used by the

Southern District of Indiana to be inconsistent with Sixth Circuit case law, as to

the burdens the parties carry in cases such as the one presently before this Court.

In speaking of which party carries the burden of establishing an affirmative

defense, such as the statute of limitations, the Sixth Circuit instructs as follows:

> A party who moves for summary judgment "bears the initial burden of
> showing the absence of a genuine issue of material fact."
> Furthermore, [the defendant] has the burden of proof on all affirmative
> defenses, such as the statute of limitations. Thus, if [the defendant]
> failed to meet its burden of proof, [the plaintiff] had no obligation to
> proffer any additional evidence in order to rebut the statute of
> limitations defense.

Fonseca v. CONRAIL, 246 F.3d 585, 590-91 (6th Cir. 2001) (citing, among

others, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202,

106 S. Ct. 2505 (1986)). Further, in Arnett v. Myers, 281 F.2d 552 (6th Cir.

2002), the Sixth Circuit discussed what the moving party must show to be entitled to summary judgment on an issue upon which it will bear the burden of persuasion at trial.  "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Id. at 561 (quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)).

In the present case, the Court concludes that the Defendants have set forth sufficient evidence to satisfy their burden as to their statute of limitations defense in the instances where they questioned the Plaintiff as to the time period of his various allegations and the Plaintiff provided nothing in response.  Once a defendant takes the initiative to satisfy its affirmative defense burden, by asking the proper question regarding the timing of the alleged wrongdoing, a plaintiff should not be able to impede the application of a statutory time bar simply by refusing to provide the answer.  Thus, to the extent the Defendants questioned the Plaintiff about the timing of the alleged discriminatory acts and the Plaintiff provided no indication of a time period in response, the Court concludes that the Defendants have satisfied their burden, as to this affirmative defense.

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that

occurred from and after October 25, 2003. With regard to the § 1981 claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after May 17, 2001, and with regard to the state law claim, from and after May 17, 1999. Thus, the following alleged incident of disparate treatment is time barred, for purposes of all disparate treatment claims:

- Berryman's "termination for "building a bad board," in 1989.

Furthermore, the Court will not consider the following alleged facts, given that the Defendants questioned the Plaintiff about the timing of the same and the Plaintiff provided no indication of a time period, in response:

- Supervisor Zoll telling Berryman and black co-worker Smith to "get back to work", while they were talking during work hours, but not telling two unidentified white employees, who were also talking during work hours, to get back to work.

- Temporary upgrade assignments being held open for white employees who were not present during the job assignment session, while skipping over Berryman if he was not present.

- Temporary upgrade assignments being given out on a first-come, first serve basis, rather than by seniority.

- Berryman being given a larger amount of work to do alone, while white co-workers Michael and Stewart, were given a smaller amount of work to do together.

- Unidentified employees, who were junior to Berryman, being asked to work additional hours after Berryman had left work for the day.

Based on the remaining factual allegations, all of which are timely, the Court will now turn to a consideration of whether the Plaintiff has pointed to sufficient

evidence to create a genuine issue of material fact, as to the various elements of his disparate treatment claim.

2.    Disparate Treatment - Burden Shifting Analysis

Absent direct evidence of discrimination, the Court initially notes that courts analyze all three of the Plaintiff's disparate treatment claims (under Title VII, § 1981 and Ohio law) using the burden shifting framework, as set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). E.g., Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII); Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination claim under § 1981); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm., 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination claim under Ohio Revised Code Chapter 4112).  The Sixth Circuit provides the following summary of that analytical framework:

> First, the plaintiff must make out a prima facie case of race discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision.  If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual.  Throughout this burden-shifting process, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."

Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing DiCarlo v. Potter, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing Dews v. A.B. Dick Co., 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not intended to be onerous." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 412 (6th Cir. 2008) (citation omitted). The Sixth Circuit instructs that in order to establish a *prima facie* case of disparate treatment, a plaintiff must show that 1) she is a member of a protected class; 2) she was qualified for the position; 3) she was subjected to an adverse employment decision; and 4) she was replaced by a person outside the protected class, or treated differently than similarly situated non-protected employees. Vaughn v. Louisville Water Co., 2008 U.S. App. LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either the first or second prong of his *prima facie* test; rather, they claim that he has not set forth sufficient proof to create a genuine issue of material fact as to the third and fourth prongs. The Court will begin with a consideration of the fourth prong (whether the Plaintiff was treated differently than similarly situated non-protected employees) and then turn to the third prong.

The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is "similarly situated", he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original). Further-more, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

The following sets forth the ways in which the Plaintiff contends that SuperValu discriminated against him, as well as the individuals with whom the Plaintiff seeks to compare his treatment (if any), for each alleged instance of discrimination:[10]

---

[10]The Plaintiff also attempts to argue that he has satisfied the fourth prong of his disparate treatment *prima facie* case, because of the casual attitude of the supervisors toward the alleged racial harassment.

(1) Supervisor Davis disciplining Berryman for not returning to work as instructed after his shift had ended, yet not instructing other workers to return to work after their shifts had ended.[11] *The Plaintiff is seemingly comparing himself to all other employees on his shift (both protected and non-protected).*

(2) Unidentified persons assigning Berryman "heavy orders", despite assurances that assignments were randomly made.[12] *The Plaintiff is seemingly comparing himself to all other order selectors (both protected and non-protected).*

(3) Supervisor Davis initially writing up Berryman (and then rescinding the same) for being out of his work area when he (Berryman) was actually on his lunch break, while not writing up white co-worker Chenoweth (who was also supervised by Davis).[13] *The Plaintiff compares his situation to that of Chenoweth, who was also supervised by Davis and on the same shift.*

(4) Both Berryman and white co-worker Tackett being written up for exchanging the phrases "ain't that a bitch" and "take [your] black

_____

The supervisors' casual attitude toward harassment, and their own use of racial slurs[] is indicative of the atmosphere of the warehouse. A general working environment that tolerates this sort of harassment is evidence that implies a discriminatory reason for the adverse employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a disparate treatment claim, the Court will consider the same when assessing the Plaintiff's hostile work environment claim below.

[11]As this incident allegedly occurred in August 2000, this claim is cognizable only under state law.

[12]As this incident allegedly occurred prior to September 1999, this claim is cognizable only under state law (and only as to those incidents that happened from and after May 17, 1999).

[13]As this incident allegedly occurred in 2000, this claim is cognizable only under state law.

ass back to work."[14]  *The Plaintiff seems to be comparing his situation with that of Tackett, yet both employees were written up for inappropriate language*.

(5)  An unidentified supervisor writing up Berryman for forgetting to put a pallet on a truck, while unidentified white employees were treating differently, with respect to this type of misconduct.[15]  *The Plaintiff points to no similarly situated, non-protected employees, as to this alleged incident.*

(6)  An unidentified supervisor suspending Berryman for three days for a break violation and the company thereafter reimbursing him for two of the days.  *The Plaintiff points to no similarly situated, non-protected employees, as to this alleged incident.*

(7)  Manager Gunderson writing up Berryman when he (Berryman) refused to go back to work when instructed to do so, while not instructing other employees to go back to work.  *The Plaintiff points to no similarly situated, non-protected employees, as to this alleged incident.*

(8)  Supervisor Keyes writing up Berryman for being in the breakroom at 8:13 a.m., when his shift started at 8:00 a.m., while other employees (some on his shift, some on another shift) were not written up for being in the breakroom, at that time.  *The Plaintiff seeks to compare his situation to other employees who were on his shift and in the breakroom (whose races are not identified) and to other employees who were on a different shift and in the breakroom (at least one of whom was black).*

(9)  Supervisor Vannucci peeking around a corner and checking up on Berryman.  *The Plaintiff points to no similarly situated, non-protected employees, as to this alleged incident.*

---

[14]The Plaintiff alleges that this incident occurred in approximately 2000-2001.  It is, therefore, not cognizable under Title VII, and is cognizable under § 1981 only if it occurred from and after May 17, 2001.

[15]The Plaintiff alleges that this incident occurred in approximately 2002-2004.  It is cognizable under Title VII only if it occurred from and after October 25, 2003.

(10) Manager Schulcz asking Berryman to leave when he arrived early for Vocollect training, while allowing McClure, who was junior to Berryman, to remain. *The Plaintiff seeks to compare his situation to that of McClure (whose race is unknown), but does not point to evidence to indicate whether McClure had been scheduled for an earlier training session (or whether the same was in contradiction to company seniority rules).*

(11) SuperValu denying Berryman's request to sponsor a softball team, when it had already sponsored two other teams and then subsequently agreed to sponsor a third team, after it denied his request. *The Plaintiff points to no similarly situated, non-protected employees, as to this alleged incident.*

As noted in the italicized text above, the Court concludes that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact, as to whether the non-protected individuals with whom he seeks to compare his treatment were similarly situated, with regard to any of his claims except the claim pertaining to Supervisor Davis initially writing up Berryman (and then rescinding the same) for being out of his work area when he (Berryman) was actually on his lunch break, while not writing up white co-worker Chenoweth. The Court will, therefore, proceed to an analysis of the third prong of the *prima facie* case (whether the alleged action constituted an adverse employment action), with regard to this remaining disparate treatment claim.

> b.    <u>Whether the Alleged Misconduct Constituted an Adverse Employment Action</u>

The third prong of the *prima facie* case of disparate treatment requires a plaintiff to establish that he suffered an adverse employment action. "An adverse

employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257 (1998)), cert. denied, 129 S. Ct. 2380 (2009).  Stated another way, an adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted).  Thus, the Court must discern whether the Plaintiff's remaining alleged adverse employment action (being written up for being out of his work area, during a lunch break, and then having the same rescinded) constitutes a materially adverse change in the terms or conditions of his employment.

The Plaintiff points to no case law to support his contention that being written up and then having the write-up rescinded constitutes an adverse employment action and the Court has found none.  Such conduct clearly does not constitute a significant change in employment status, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." See White, 533 F.3d at 402 (quotation omitted).  Therefore, the Court concludes that the Plaintiff has not pointed to sufficient evidence to support this claim.

26

In sum, the Plaintiff has not set forth sufficient facts to create a genuine issue of material fact as to any part of his disparate treatment claims. Thus, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #84), with regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III).

B.  Hostile Environment, under 42 U.S.C. § 1981 (remaining part of Count II) and under Ohio Law (Count V)

Berryman brings hostile work environment claims against all Defendants, under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am. Compl.). He submits that he suffered a hostile work environment based on his race, at the hands of co-workers and unknown perpetrators, to wit:[16]

_____

[16]The Court relies only on the acts of harassment that allegedly happened to the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter, only for those which one or the other of the parties has pointed to admissible evidence in support thereof. The Court is aware that the Sixth Circuit has instructed that courts must consider the "totality of circumstances" when deciding cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999).
     In Jackson v. Quanex Corp., the Appellate Court directed that the "totality of circumstances" approach necessitates aggregating alleged acts of harassment towards minority employees, in cases such as the present one. Id. In so doing, the Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v. Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)). Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees. "Evidence of racist conduct affecting

- In 1989, co-worker Pigg calling Berryman a "dumb nigger" (co-worker harassment);

- In 1990-1991, co-worker Randall calling Berryman a "nigger" (co-worker harassment);

- In 2000, seeing the words, "[y]ou're not wanted here, you nigger" written on a bathroom wall (harassment by unknown perpetrator);

- In 2004, seeing graffiti in the bathroom that included the words "nigger monkeys" (harassment by unknown perpetrator);

- On four to six occasions between 2000-2002, seeing the word "nigger" written on pallets in the warehouse (harassment by unknown perpetrator);

- In 2005, seeing the word "nigger" written on his work machine (harassment by unknown perpetrator);

---

African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." Id. (emphasis added); see also id. ("We have also credited evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above. Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them. The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3. Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only those facts pertinent to the present Plaintiff, which are set forth above.

- In 2002-2003, learning that co-workers had said, "why [do] you give them niggers easy jobs?" to Pelfrey (co-worker harassment);

- In 2004, hearing computer generated voice say the word "nigger" on his computerized Vocollect system (harassment by unknown perpetrator);

- In 2005, seeing graffiti in the bathroom using the word "nigger" (harassment by unknown perpetrator);

- On unknown dates, seeing one or two pictures of monkeys, a picture of police cars chasing O.J. Simpson and a picture of "dark people" drawn on boxes and on poles (harassment by unknown perpetrator).

The Sixth Circuit instructs that courts are to use the same standard when evaluating hostile work environment claims under Title VII, § 1981 and Ohio Revised Code Chapter 4112. Noble v. Brinker Int'l, Inc., 391 F.3d 715, 720 (6th Cir. 2004). To establish a *prima facie* case of hostile work environment, racial harassment, a plaintiff must point to evidence demonstrating the following:

> (1) [He] is a member of a protected class . . . ; (2) [he] was subjected to harassment, either through words or actions, based on [his protected class]; (3) the harassment had the effect of unreasonably interfering with [his] work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009) (quoting Grace v. USCAR, 521 F.3d 655, 678 (6th Cir. 2008)).[17] As to the final prong, whether there is a basis for employer liability, such depends on whether the

---

[17]Gallagher was a hostile work environment case, based on sexual harassment, as opposed to racial harassment. The Sixth Circuit applies the same legal standard to both sorts of claims, however. See Ladd v. Grand Trunk Western R.R., 552 F.3d 495, 500 (6th Cir. 2009).

plaintiff is alleging harassment by supervisors or co-workers.  Quoting from a

Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses

as follows:

> The Supreme Court has ruled that employers are not automatically
> liable for [] harassment perpetrated by their employees. <u>See</u> <u>Burlington</u>
> <u>Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d
> 633 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct.
> 2275, 141 L. Ed.2d 662 (1998).  Where an employee is the victim of
> [] harassment, including harassment in the form of a hostile work
> environment, by non-supervisory co-workers, an employer's vicarious
> liability depends on the plaintiff showing that the employer knew (or
> reasonably should have known) about the harassment but failed to
> take appropriate remedial action. <u>See</u> <u>Faragher v. City of Boca Raton</u>,
> 524 U.S. at 789; <u>accord</u> <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>,
> 223 F.3d 62, 72 (2d Cir.2000).  Where the harassment is attributed
> to a supervisor with immediate or successively higher authority over
> the employee, a court looks first to whether the supervisor's behavior
> "culminate[d] in a tangible employment action" against the employee,
> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. at 765, 118 S. Ct. 2257; if
> it did, "the employer will, ipso facto, be vicariously liable," <u>Mack v.</u>
> <u>Otis Elevator Co.</u>, 326 F.3d at 124 [(2d Cir. 2003)].  In the absence
> of such tangible action, an employer will still be liable for a hostile
> work environment created by its supervisors unless it successfully
> establishes as an affirmative defense that (a) it "exercised reasonable
> care to prevent and correct promptly any sexually harassing behavior,"
> and (b) "the plaintiff employee unreasonably failed to take advantage
> of any preventive or corrective opportunities provided by the employer
> or to avoid harm otherwise." <u>Burlington Indus., Inc. v. Ellerth</u>, 524
> U.S. at 765, 118 S. Ct. 2257; <u>accord</u> <u>Faragher v. City of Boca Raton</u>,
> 524 U.S. at 807, 118 S. Ct. 2275; <u>Mack v. Otis Elevator Co.</u>, 326
> F.3d at 125.

<u>Gallagher</u>, 567 F.3d at 275 (quoting <u>Petrosino v. Bell Atl.</u>, 385 F.3d 210, 225 (2d

Cir. 2004)).

The Defendants, in the present action, do not contest the first or second

prong of the *prima facie* case.[18]  They do, however, assert that Berryman has failed

to set forth sufficient proof as to the third and fourth prongs for all of his

assertions.[19]

      1.    <u>Whether Harassment Had Effect of Unreasonably Interfering</u>
             <u>with Plaintiff's Work Performance and Creating an Objectively</u>
             <u>Intimidating, Hostile, or Offensive Work Environment</u>

The Sixth Circuit has identified the governing standard for the third prong of

a plaintiff's *prima facie* case of harassment as follows:

> Conduct that is not severe or pervasive enough to create an
> objectively hostile or abusive work environment--an environment that
> a reasonable person would find hostile or abusive--is beyond Title VII's
> purview.  Likewise, if the victim does not subjectively perceive the
> environment to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no Title VII
> violation.

<u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 273 (6th Cir. 2009)

---

[18]In their memorandum in support of their Motion for Summary Judgment, the Defendants actually do argue that certain of the Plaintiff's anticipated allegations do not satisfy the second prong of his *prima facie* case (i.e., they are not based on race), but the Plaintiff does not ultimately rely on any of those stated allegations. Doc. #84 at 39; Doc. #92 at 5-13; Doc. #92-1 at 1.

[19]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #84 at 36 n.17.  The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did form one continuous hostile work environment, need not consider the Defendants' argument, on this point.  Thus, the Court does not reach the statute of limitations issue on the allegations constituting the hostile work environment claims.

31

(quoting <u>Williams v. GMC</u>, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted

<u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed.

2d 295 (1993)).  The Supreme Court states that, in making these assessments,

courts must consider "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."

<u>Harris</u>, 510 U.S. at 23.  Further, in order to constitute a "change in the terms and

conditions of employment", conduct must be "extreme".  <u>Faragher v. City of Boca</u>

<u>Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the incidents that arguably

reflect racial animus were not severe and pervasive enough to alter the terms and

conditions of Berryman's employment.  As to the objective view of the facts,

SuperValu argues that the alleged incidents of harassment occurred over a span of

many years, most were not directed at Berryman and none of them was physically

threatening.  As to the subjective view of the facts, SuperValu asserts that

Berryman did not regard the workplace as hostile or abusive, as evidenced by the

fact that, although he generally claims that the occasional racial graffiti distracted

him, he has suffered no anxiety, anguish, humiliation, or other damages due to

race discrimination. Doc. #74-4 (Berryman Dep. at 280-81, 285).  In response,

Berryman argues that it is the decades-long history of regular harassment that

defines his treatment as severe and pervasive.  Further, Berryman argues that his

filing of the present lawsuit, along with the fact that he recalls the incidents in question years after they happened, is evidence that he subjectively considered his mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit.  In Smith v. Leggett Wire Co., the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment:  "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as 'gorilla'." Smith, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at Smith, over a twenty-year span of time.").

Conversely, in Jackson v. Quanex Corp., the Appellate Court found the following facts probative of a severe and pervasively hostile work environment: the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in

33

nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied by comments comparing the penis sizes of white and black males," graffiti in the men's restroom "depicting lynchings accompanied by the phrase, 'KKK is back'," graffiti on the back door that said "blacks out back," graffiti in the seam grinding area that "depicted the lynching of African-American men," graffiti in the restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of extreme racial misconduct (including calling a new hire "nigger" and "motherfucker", and after he reported these comments, telling him, "Nigger, we want you to quit your job . . . ."; defacing a work shirt with the words "Nigger Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's machine; tampering with acid valves in an attempt to create a safety hazard that would appear to be attributable to a minority worker, and a co-worker calling another co-worker a "nigger bitch" and physically assaulting her). <u>Jackson</u>,191 F.3d 647, 651-55, 62 (6th Cir. 1999).

SuperValu also points the Court to the Sixth Circuit's unpublished opinion in <u>Kelly v. Senior Centers, Inc.</u>, wherein the Court found that the following incidents of misconduct, which occurred over four months, did not amount to actionable harassment: "two staff members' use of the pejorative slur word 'nigger' referring to the foster grandparents; Dangelo's description of a Board Member as a 'token black' and her comments that the foster grandparents were slovenly or were 'pigs'

34

at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes'; and comments about an African-American staff member's bathroom habits." Kelly, 2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8, 2006).  In concluding its findings, the Court stated, "[w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." Id. at *17.

SuperValu also cites Bourini v. Bridgestone/Firestone North American Tire, L.L.C., 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position.  In Bourini, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment:  (1) a co-worker said, "I don't want to … see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the September 11 attacks, a co-worker attempted to back over him while reversing a forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's voice over the intercom system; (7) someone painted Islamic slurs on the restroom wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For my Muslim Friend;" and (9) the human resources department sent an email relating to plaintiff's immigration status to all employees. Id. at **2-5.  The Appellate

Court concluded that these incidents "were not sufficiently pervasive to establish an abusive working environment." Id. at *10. Because the incidents were spread out over a five year period, the Court found them to be "relatively infrequent and isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of employment." Id.

In the present case, Berryman alleges being called a racially offensive name on 2 occasions between 1989-1991; seeing racially discriminatory graffiti on approximately 13 occasions between 2000-2005; learning that his coworkers had made a racially offensive statement, in 2002-2003; and hearing a racially discriminatory word over his computerized Vocollect system, in approximately 2004. While this conduct is reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Berryman's employment. The incidents are closest in severity and pervasiveness to those in Bourini v. Bridgestone/Firestone North American Tire, L.L.C., *supra*, which the Sixth Circuit found to be insufficient to constitute discriminatory changes in the terms and conditions of employment, as explained above.

Thus, regardless of whether he subjectively found that the alleged incidents created a hostile work environment, Berryman has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based harassment. Nevertheless, in

36

an abundance of deference to the Plaintiff, as the non-moving party in this case, the Court will proceed to an analysis of the fourth prong of the *prima facie* case, whether there exists some basis for liability on the part of the employer.

     2.    <u>Whether There Exists Some Basis for Liability on the Part of the Employer</u>

As noted above, in order to satisfy the fourth prong of a *prima facie* case of hostile work environment, a plaintiff must point to evidence demonstrating that there exists some basis for liability on the part of the employer. <u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 270 (6th Cir. 2009). If the alleged harassment was at the hands of non-supervisors (such as the allegations of harassment in the present case), the employer will not be liable unless the plaintiff points to evidence, which demonstrates that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." <u>Id.</u> at 275.

In the present case, Berryman reported six of the alleged acts of harassment, to wit: Randall calling Berryman a "nigger"; seeing the words, "[y]ou're not wanted here, you nigger" written on a bathroom wall; seeing a picture of police cars chasing O.J. Simpson; Pigg calling Berryman a "dumb nigger"; co-workers asking Pelfrey, "why [do] you give them niggers easy jobs?"; and hearing Vocollect computer generated voice say the word "nigger". As to the first three allegations, SuperValu has pointed to evidence (although it is not its burden to do so) that

indicates that it took appropriate remedial action, as noted *supra*. As to the final three allegations, although the Plaintiff has set forth evidence indicating that SuperValu knew of the alleged harassment, he has pointed to no evidence to indicate that SuperValu failed to take appropriate remedial action (i.e., testimony from manager Cowan and supervisor Pelfrey as to whether they disciplined the co-workers who allegedly made the racially offensive comments[20]; testimony from supervisor Dunwoodie, as to whether he investigated the origin of the computer generated Vocollect message). Because the Plaintiff has not satisfied his burden to set forth evidence indicating that the employer knew about the harassment but failed to take appropriate remedial action, SuperValu cannot be held liable for the same.

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work environment based on race. Therefore, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #84), as to Berryman's hostile work environment claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

---

[20]The fact that, at the time of the incident, Pelfrey did not respond to Berryman's inquiry as to why he did not do something about the alleged racially discriminatory comment is insufficient to support the Plaintiff's burden to point to evidence demonstrating that SuperValu did not take appropriate remedial action.

C.    Retaliation, in violation of Title VII and/or Ohio law (Count IV)

As Count IV in his Amended Complaint, Berryman asserts a claim for
retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title
VII, and against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.)
¶¶ 60-64.  These claims are limited to allegations of retaliation that occurred after
the filing of Berryman's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent
direct evidence of retaliatory discrimination, a plaintiff must show the following:

(1) [he] engaged in activity protected by Title VII;

(2) this exercise of protected rights was known to defendant;

(3) defendant thereafter took adverse employment action against the
plaintiff, or the plaintiff was subjected to severe or pervasive
retaliatory harassment by a supervisor; and

(4) there was a causal connection between the protected activity and
the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing

Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see

also Putney v. Contract Bldg. Components, 2009 Ohio App. LEXIS 5634, **30-

31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009).  In their memorandum in

support of their Motion for Summary Judgment, the Defendants state that they are

entitled to summary judgment on this claim, because Berryman admitted that he

experienced no retaliation and also because he has set forth no facts to support his

retaliation claim. Doc. #84 at 45.

It is true that Berryman conceded that he experienced no retaliation for engaging in activity protected by Title VII. Doc. #74-5 (Berryman Dep. at 291). It is also true that Berryman makes no argument nor presents any facts in support of his retaliation claim. <u>See</u> Doc. #92 (Mem. Opp'n). Because the Plaintiff has pointed to no facts to support his retaliation claim, there is no genuine issue of material fact as to the same and the Defendants' Motion for Summary Judgment (Doc. #84) is SUSTAINED, as to Count IV.

D.    <u>Respondeat Superior (Count VI)</u>

As Count VI in his Amended Complaint, Berryman alleges that SuperValu is liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77. In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above (e.g., employer liability component of hostile work environment claim). Therefore, the Defendants' Motion for Summary Judgment (Doc. #84) is SUSTAINED, as to Count VI.

IV.    <u>Conclusion</u>

The Defendants' Motion for Summary Judgment (Doc. #84) is SUSTAINED,

in its entirety.  Judgment is ultimately to be entered on behalf of Defendants

against Plaintiff Berryman, at the conclusion of this litigation.


March 31, 2010


                                     ____/s/ Walter Herbert Rice_____
                                     WALTER HERBERT RICE, JUDGE
                                     UNITED STATES DISTRICT COURT
Copies to:
Counsel of record