IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


DION BERRYMAN, et al.                    :

    Plaintiffs,                          :
                                  Case No. 3:05cv169

          vs.                              :
                                  JUDGE WALTER HERBERT RICE

SUPERVALU HOLDINGS, INC., et al.,        :

    Defendants.                          :


---

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF JESSE SMITH, JR. (DOC.
#85); JUDGMENT TO ULTIMATELY ENTER IN FAVOR OF
DEFENDANTS AGAINST PLAINTIFF JESSE SMITH, JR.**

---


The Plaintiffs in this litigation are African-American employees of SuperValu

Holdings, Inc. ("SuperValu"). Doc. #3 (Am. Compl.) ¶¶ 3-13. The Plaintiffs

originally brought suit as a class action, but subsequently stipulated to the

dismissal, with prejudice, of all class action claims set forth in the Amended

Complaint, leaving only the eleven individually named Plaintiffs.[1] Doc. #23. The

---

[1]The Amended Complaints lists the Plaintiffs as follows: Dion Berryman,
Robert Bush, Lemenzo Clegg, Andre Hightower, Kevin Huff, Ricardo Hughly,
Ronald Lanton, Roosevelt Leverett, Albert Robinson, Jesse Smith and Leroy
Thompson. Doc. #3 (Am. Compl.). The Deposition of Ricardo "Hughley", which
has been signed by Mr. Hughley, contains a different spelling for that Plaintiff's
name. The Court will, therefore, use the spelling as indicated in Mr. Hughley's
Deposition.

Defendants are SuperValu and several individually named SuperValu employees, all of whom serve in a supervisory capacity.[2] Id. ¶¶ 14-22. The Amended Complaint sets forth six causes of action, to wit: (1) race discrimination, under 42 U.S.C. §§ 2000e - 2000e-17 ("Title VII"); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981; (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99; (4) retaliation, in violation of Title VII and/or Ohio law; (5) hostile environment, under federal and Ohio law; and (6) respondeat superior. Id. ¶¶ 39-77. The Complaint appears to allege all claims, except the sixth, against all Defendants.[3] The sixth is brought against SuperValu alone.

The Defendants previously moved for dismissal on some of the Plaintiffs' claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. #14. In ruling on that Motion, the Court dismissed the following Title VII claims: (1) race-based harassment; (2) retaliation occurring prior to the filing of the Plaintiffs' EEOC charges, and (3) all claims against the individual Defendants. Doc. #31.

---

[2]The Amended Complaint lists the individual Defendants as follows: Peter Gunderson, Rick Zoll, Fred Dunwoodie, Cindy Keyes, John Schultz, Tim Doran, Sue Zimmerman and Carol Gibson. Doc. #3 (Am. Compl.). The Deposition of John "Schulcz", which has been signed by Mr. Schulcz, contains a different spelling for that Defendant's name. The Court will, therefore, use the spelling as indicated in Mr. Schulcz's Deposition.

[3]The Amended Complaint does not specify against which Defendant(s) each claim is brought, but each cause of action uses the plural word "Defendants." See Doc. #3 (Am. Compl.).

2

Presently before the Court is a Motion for Summary Judgment, as to the remaining claims brought by Jessie Smith, Jr. ("Plaintiff"). Doc. #85. In his response to said Motion, the Plaintiff clarifies that he is not bringing a § 1981 claim against the individual Defendants. Doc. #92 at 4. Thus, at this stage of the litigation, the following claims remain: (1) race discrimination (disparate treatment), under Title VII (against SuperValu) (Count I); (2) hostile environment and disparate treatment, under 42 U.S.C. § 1981 (against SuperValu) (Count II); (3) race discrimination, under Ohio Revised Code §§ 4112.02, 4112.99 (against all Defendants) (Count III); (4) retaliation, in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and against all Defendants as to Ohio claim) (Count IV); (5) hostile environment, under Ohio law[4] (against all Defendants) (Count V); and (6) respondeat superior (against SuperValu) (Count VI). The Defendants have moved for summary judgment on all of Smith's claims. Doc. #85.

The Court will begin its analysis of the Defendants' Motion with an overview of the pertinent facts. It will then turn to a review of the standard that guides its summary judgment decisions, followed by an analysis of the merits of the Defendants' Motion.

---

[4]As to the Plaintiff's federal hostile environment claim, the Court's earlier opinion (Doc. #31) clarified that the surviving Title VII claim is limited to disparate treatment. Further, the Plaintiff has indicated that it is bringing a hostile environment claim, under 42 U.S.C. § 1981, as Count II. Therefore, in order to reduce redundancy of claims, the Court has removed the reference to federal claims, in Count V.

3

I.     Facts[5]

SuperValu hired Smith in 1987. Doc. #63-1 (Smith Dep. at 10).  Since that

time, Smith has worked as an order selector and a forklift operator. Id. at 11.


A.     Collective Bargaining Agreement and Anti Harassment/Discrimination
       Policy

As a member of the local union, Smith's employment terms are covered by

the collective bargaining agreement ("CBA") between SuperValu and the union.

Doc. #63-1 (Smith Dep. at 12-13); Ex. #2 (CBA).  Some of the specifics covered

by the CBA include the following:

- Job Bidding.  Bargaining unit jobs are awarded by seniority.  Job
  openings are posted for five days and are then filled with the
  qualified employee with the most seniority. Doc. #63-8 (CBA) at
  12.

---

[5]Since this case comes before the Court on the Defendants' Motion for
Summary Judgment, the Court sets forth the facts and circumstances giving rise to
such Motion in the manner most favorable to the Plaintiff, as the party against
whom the Motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments,
475 F.3d 783, 790 (6th Cir. 2007).
     The Court has spent an inordinate amount of time organizing the facts, in
this case.  Not only did the Defendants file an excessively long memorandum in
support of their Motion for Summary Judgment (36 pages, not including table of
contents or summary of arguments) (Doc. #85), but they also set forth the majority
of their lengthy factual assertions in single-spaced footnotes, in small font.  In
doing so, the Defendants have set forth far more facts than the Plaintiff.  In
drafting the present Opinion, the Court has relied upon those facts pointed to by
the Plaintiff, in opposition to the Defendants' Motion (Doc. #92), as well as facts
generally set forth in the Amended Complaint (Doc. #3), which have been
expounded upon by the Defendants.  As to the facts raised by the Defendants, but
not relied upon by the Plaintiff in either the Amended Complaint or memorandum in
opposition to the Motion for Summary Judgment, the Court considers those facts
inapplicable to the present case.

4

- Overtime Assignments. Overtime assignments are made to the most senior employee who volunteers and is qualified. If an insufficient number of employees volunteer, then the most junior qualified employees are required to work the overtime. Doc. #63-9 (CBA) at 1-2.

- Nondiscrimination. The CBA protects members against discrimination on the basis of race, as well as other protected characteristics. Doc. #63-10 at 4.

- Grievance and Arbitration Procedure. The CBA provides grievance and arbitration procedures, which allow members to file a grievance for complaints arising over the interpretation or application of Agreement." Doc. #63-8 at 17-19.

Besides the CBA's nondiscrimination provision, SuperValu has an Anti Harassment and Discrimination Policy, with reporting requirements for employees who experience harassing or discriminatory behavior. Doc. #85-9. SuperValu also has conducted training for all employees and distributes periodic memoranda and notices to remind employees that workplace harassment will not be tolerated. Doc. #85-7 (Schulcz Aff.) ¶ 4, Attachs. C-D.


B.    Facts Specific to the Plaintiff's Disparate Treatment Claim

The parties set forth the following facts pertinent to Smith's disparate treatment claim:

- Alleged Disparate Treatment with Regard to Break Times and Socializing
  - Between 1992-1997, supervisor Cooper frequently told Smith to "get back to work" when he was not working. Doc. #63-2 (Smith Dep. at 122, 125). Smith alleges that when he asked Cooper why he was always stopping the minorities whenever they were talking, Cooper responded, "they told him that's what he's supposed to do to the black

employees, keep [them] in line." Id. at 122.

- In 2004, supervisor Keyes told Smith to "go back to work" when he was talking to co-worker Clegg during work hours, but did not tell other unidentified employees to go back to work who were outside smoking. Doc. #63-1 (Smith Dep. at 53-56). When Smith asked Keyes about the other employees, Keyes indicated that she would speak to someone else in management about the other employees, because "she didn't understand it either." Id. at 54.

- On several occasions in 2003-2004, supervisor Keyes came into the breakroom and directed her comments to return to work, to Smith and the black co-workers at his table, while ignoring the other employees (black and white) in the breakroom. Doc. #63-1 (Smith Dep. at 60-64).

- In 2003 or 2004, manager Gunderson instructed black co-worker Robinson to return to work, but did not instruct unidentified white employees to return to work. Doc. #63-1 (Smith Dep. at 67-70).

- In April 2004, supervisor Keyes told Smith and two black co-workers to go back to work, but did not tell white co-worker Allen, who worked in a different area and was supervised by another supervisor, to go back to work. Doc. #63-1 (Smith Dep. at 57-59).

- Supervisor Zoll stopped Smith when he (Smith) was on his way to the breakroom ten minutes before break time started and told him he was too early for his break. Doc. #63-1 (Smith Dep. at 74-76). However, Zoll did not correct two co-workers who were already in the breakroom - - Coates and an unidentified co-worker (neither's race is identified). Id. at 76. It is unclear whether Coates and the other co-worker were also supervised by Zoll. At his deposition, Smith was not asked for a date of this incident, nor did he volunteer one. See id.

- On an unknown date, supervisor Zoll approached black employees when they were talking and said, "when there's [sic] more than two, I always take up a collection," which Smith interpreted as meaning "get back to work." Doc. #63-2 (Smith Dep. at 94-95, 100-01).

- In 2007, white co-worker Graham did puzzles during work hours, yet did not receive discipline, while Smith would get reprimanded if he was "two minutes late" doing his work. Doc. #63-2 (Smith Dep. at 94-96 (errata)). Smith does not know if a supervisor saw Graham doing puzzles and it is unclear if Smith and Graham had the same supervisor. Id. at 96.

- On unknown dates, supervisor Brown ignored unidentified white employees (whose supervisors are unknown), who were talking during work hours, but told Smith and black co-workers (like Huff and Clegg) to

get back to work. Doc. #63-2 (Smith Dep. at 101-02).[6]

- <u>Alleged Disparate Treatment in Job Assignments</u>
  - Sometime prior to 2002, supervisors passed over Smith for temporary job reassignments, when he was not available during the job reassignment session, while holding open reassignments for unidentified white employees who were not present.[7] Doc. #63-2 (Smith Dep. at 110-13).
  - Daily in 2003-2004, supervisor Zoll assigned Smith to the "heaviest" aisles for picking tickets. Doc. #63-1 (Smith Dep. at 39-41). Other employees (to include white and black employees) were also sometimes assigned to the heavy aisles. <u>Id.</u> at 47-48 (noting one occasion where eight black employees were in the same heavy aisle, at the same time); <u>id.</u> at 50 (noting that white co-worker Niemer was "down there a lot").
  - On unknown dates, the company stopped making upgrade assignments on the seniority list just prior to reaching Smith's name. Doc. #63-2 (Smith Dep. at 106-10).

---

[6]Smith also makes the following allegation, for which he does not provide an exception to the hearsay rule of evidentiary exclusion:

- The company sent him for drug testing after a fork lift accident, but did not send white co-worker McIntosh for drug testing after a similar fork lift accident. Doc. #63-1 (Smith Dep. at 32-38). Smith relies on hearsay information gained from co-worker Hightower, as to the incident involving McIntosh. <u>Id.</u> at 36-37.

The Plaintiff points to no exceptions to the hearsay rule, which would allow the Court to consider this assertion. Thus, the Court will not consider the same when ruling herein.

[7]The Court assumes that the job assignment to which Smith is referring is the temporary assignment of jobs (as opposed to a permanent assignment of jobs), which happens on a day-to-day basis, when employees are temporarily reassigned for the day, depending on work load and absenteeism. <u>See</u> Doc. #63-2 (Smith Dep. at 110-13) (wherein Smith speaks of routine reassignments occurring after the breaks). In their memorandum in support of their Motion for Summary Judgment, the Defendants refer to the job assignment in question, as an "occasional reassignment[] and fluctuation[] of job responsibilities that [is] temporary in nature" and the Plaintiff does not correct this perception, in his memorandum in opposition. Doc. #85 at 27; <u>see also</u> Doc. #92.

- Alleged Disparate Treatment with Regard to Training
  - In 2007, superintendent Crawford did not provide Smith with "LOQ" forklift training, but did provide such training to an unidentified white co-worker. Doc. #63-3 (Smith Dep. at 126-30).

C. Facts Specific to the Plaintiff's Hostile Work Environment Claim

The parties set forth the following facts pertinent to Smith's hostile work environment claim:

- In approximately 2005, Smith saw "three Xs in a box" on a wall, which he thought to be a Ku Klux Klan symbol. Doc. #63-3 (Smith Dep. at 137-38). He did not report the graffiti to management. Id. at 138.

- In 2005, Smith saw the word "niggerz" [sic] written on the bathroom wall. Doc. #63-1 (Smith Dep. at 21-24). He did not report the graffiti to management. Id. at 25-26.

II. Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party,

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." <u>Talley v. Bravo Pitino Rest., Ltd.</u>, 61 F.3d 1241, 1245 (6th Cir. 1995); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).  Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations, it is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.  "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" <u>Hancock v. Dodson</u>, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).  In determining whether a genuine issue of material

fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. <u>Anderson</u>, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." <u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989), <u>cert. denied</u>, 494 U.S. 1091 (1990); <u>see also</u> <u>L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.</u>, 9 F.3d 561 (7th Cir. 1993); <u>Skotak v. Tenneco Resins, Inc.</u>, 953 F.2d 909, 915 n.7 (5th Cir. 1992), <u>cert. denied</u>, 506 U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III.  Legal Analysis

A.  Disparate Treatment, under Title VII (Count I), under 42 U.S.C.
    § 1981 (part of Count II) and under Ohio Law (Count III)

Smith brings race discrimination claims against SuperValu, based on the

theory of disparate treatment, under Title VII (Count I), § 1981 (part of Count II)

and Ohio law (Count III). Doc. #3 (Am. Compl.).  He also alleges disparate

treatment against the individual Defendants, under Ohio law (Count III). Id.

At the onset, the Court notes that both parties have relied upon certain

factual allegations, in support of their arguments for and against Smith's disparate

treatment claim, which pertain to the alleged disparate treatment of other

employees, rather than to the alleged disparate treatment of Smith.  Because a

disparate treatment claim, in a non-class action suit, is an individual claim wherein

an employee is alleging that his employer discriminated against him because of his

race, rather than that the employer discriminated against another employee

because of his or her race, see Upshaw v. Ford Motor Co., 576 F.3d 576, 584

(6th Cir. 2009) (setting forth *prima facie* case of race discrimination claim, which

focuses entirely on alleged disparate treatment of plaintiff), the Court will not

consider the following factual allegation, in analyzing Smith's disparate treatment

claim:

• Manager Gunderson instructing black co-worker Robinson to return to work,
  but not instructing unidentified white employees to return to work.

The Court will now proceed with an analysis of the Defendants' Motion, as it

11

pertains to the alleged disparate treatment of Smith, with the remaining applicable factual assertions.

### 1.    Whether Certain Claims are Time Barred

SuperValu initially argues that certain of the Plaintiff's disparate treatment claims are time barred.  Initially, the Court notes that the proper starting point for this analysis is the date that each discrete discriminatory act occurred. See AMTRAK v. Morgan, 536 U.S. 101, 110-11, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002).  In other words, in a disparate treatment context (as opposed to a hostile work environment context),[8] a plaintiff may not "convert[] related discrete acts into a single unlawful practice for the purposes of timely filing." Id. at 111.  As to the extent that discrete acts of discrimination that fall outside the applicable statute of limitations are helpful or harmful to a plaintiff's case, the Supreme Court instructs as follows:

---

[8]In contrast, plaintiffs may convert related discrete acts into an unlawful practice, for purposes of timely filing in the hostile work environment context.  As explained by the Supreme Court,

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.  The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

Morgan, 536 U.S. at 115 (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 348-349 (3d ed. 1996); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)).

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. . . .  The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

Id. at 113.  Relying on the final sentence quoted above, the Plaintiff correctly argues that this Court may consider, even if untimely, "prior acts as background evidence in support of a timely claim." Id.  In sum, therefore, although the Court will not take outdated acts into consideration for purposes of determining whether those acts constitute disparate treatment, it will take them into consideration as background evidence in considering timely acts of alleged discrimination.  Having established that the starting point for its statute of limitations analysis is each discrete act of discrimination, the Court will proceed with its analysis of the proper time periods within which to examine the allegedly discriminatory conduct.

As to the Title VII claim, the Defendants correctly point out that Title VII requires complainants to file a claim with the Equal Opportunity Employment Commission ("EEOC") within 300 days after each discrete act of alleged discrimination. 42 U.S.C. § 2000e-5(e)(1); see also Russell v. Ohio, 2008 U.S. App. LEXIS 24531, *9, 302 Fed. Appx. 386 (6th Cir. Dec. 3, 2008) (noting that in a "'deferral' state such as Ohio, any instance giving rise to a Title VII claim must have occurred within 300 days of [the filing of the EEOC claim]") (citing Amini v.

Oberlin College, 259 F.3d 493, 498 (6th Cir. 2001)).  In the present case, the

Plaintiff filed his EEOC claim on August 20, 2004. Doc. #3-10 (Smith EEOC

Charge).  Therefore, as to the Plaintiff's Title VII claim, the Court will not consider

allegations of discrete acts of disparate treatment that occurred prior to October

25, 2003 (300 days prior to the filing of the EEOC claim on August 20, 2004).

As to the Plaintiff's § 1981 claim, such has a four year statute of

limitations.[9] 28 U.S.C. § 1658(a); see also Jones v. R.R. Donnelley & Sons Co.,

541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004).  Thus, for purposes of

the Plaintiff's § 1981 claim, the Court will not consider allegations of discrete acts

_____

[9]The Defendants argue that claims arising in Ohio, under § 1981, are subject
to a two year statute of limitations. Doc. #85 at 14-15.  Such was the law prior to
2004.  See Bd. of Regents v. Tomanio, 446 U.S. 478, 483, 100 S. Ct. 1790, 64 L.
Ed. 2d 440  (1980) (noting that when Congress does not establish a statute of
limitations, courts typically "borrow" the state law statute of limitations governing
analogous causes of action); Nelson v. GE, 2001 U.S. App. LEXIS 1145, **7-8, 2
Fed. Appx. 425 (6th Cir. Jan. 17, 2001) (recognizing two year statute of
limitations for such claims).  However, in 2004, the Supreme Court decided Jones
v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645
(2004), which recognized that Congress had enacted 28 U.S.C. § 1658(a),
establishing a four year statute of limitations period for "civil action[s] arising under
an Act of Congress enacted after the date of the enactment of this section
[enacted Dec. 1, 1990]." Id. at 375.  The Court further concluded that the
plaintiff's claims for hostile work environment, wrongful termination, and
failure-to-transfer "'ar[ose] under' the 1991 Act in the sense that petitioners'
causes of action were made possible by that Act," given that the 1991 Act
overturned case law precedent that previously held that "racial harassment relating
to the conditions of employment is not actionable under § 1981." Id. at 383
(quoting Patterson v. McLean Credit Union, 491 U.S. 164, 171, 105 L Ed 2d 132,
109 S Ct 2363  (1989)).  Thus, the current Plaintiff's § 1981 claim for race
discrimination (as well as hostile work environment) is covered by the § 1658 four
year statute of limitations. See also Dandy v. UPS, 388 F.3d 263, 269 (7th Cir.
Wis. 2004) (applying § 1658's four year statute of limitations period to disparate
treatment and hostile work environment claims, based on Jones).

of disparate treatment that occurred prior to May 17, 2001 (four years prior to the filing date of May 16, 2005).

Finally, with regard to the Plaintiff's claim under Ohio Revised Code §§ 4112.02, 4112.99, "the statute of limitations for bringing a lawsuit under § 4112 is six years." Harrison v. City of Akron, 2002 U.S. App. LEXIS 16263, *5, 43 Fed. Appx. 903, 905 (6th Cir. Aug. 8, 2002) (citing Ohio Rev. Code §§ 2305.07, 4112.99; Cosgrove v. Williamsburg of Cincinnati Mgmt. Co., 70 Ohio St. 3d 281, 638 N.E.2d 991, 992 (Ohio 1994)). Thus, for purposes of the Plaintiff's Ohio claim, the Court will not consider allegations of discrete acts of disparate treatment that occurred prior to May 17, 1999 (six years prior to the filing date of May 16, 2005).

With regard to the claims that are undated, the Defendants urge the Court to consider the same as time barred. In support of this argument, they point to a Southern District of Indiana case, which holds as follows:

> [The plaintiff] cannot avoid the 300 day statute of limitations merely by failing to provide the dates on which the alleged acts occurred. Baker's obligation as the plaintiff is to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To create a "genuine issue" Baker must present evidence such that a reasonable jury could find in his favor. We find that Baker has failed to present such evidence.

Baker v. Ind. Family & Soc. Servs. Admin., 2004 U.S. Dist. LEXIS 25838, *13 n.10 (S.D. Ind. Dec. 10, 2004) (one citation omitted); see also French v. Potter, 2005 U.S. Dist. LEXIS 44605, *7 (S.D. Ohio July 12, 2005) (pointing out that a

court "is unable to determine whether plaintiff has complied with the statutory prerequisites to bringing suit under Title VII" if the plaintiff does not provide dates on which the alleged violations occurred). Although the Court agrees with the ultimate conclusion urged by the Defendants, it finds the approach used by the Southern District of Indiana to be inconsistent with Sixth Circuit case law, as to the burdens the parties carry in cases such as the one presently before this Court.

In speaking of which party carries the burden of establishing an affirmative defense, such as the statute of limitations, the Sixth Circuit instructs as follows:

> A party who moves for summary judgment "bears the initial burden of showing the absence of a genuine issue of material fact." Furthermore, [the defendant] has the burden of proof on all affirmative defenses, such as the statute of limitations. Thus, if [the defendant] failed to meet its burden of proof, [the plaintiff] had no obligation to proffer any additional evidence in order to rebut the statute of limitations defense.

Fonseca v. CONRAIL, 246 F.3d 585, 590-91 (6th Cir. 2001) (citing, among others, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). Further, in Arnett v. Myers, 281 F.2d 552 (6th Cir. 2002), the Sixth Circuit discussed what the moving party must show to be entitled to summary judgment on an issue upon which it will bear the burden of persuasion at trial. "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" Id.

16

at 561 (quoting 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)).

In the present case, the Court concludes that the Defendants have set forth sufficient evidence to satisfy their burden as to their statute of limitations defense in the instances where they questioned the Plaintiff as to the time period of his various allegations and the Plaintiff provided nothing in response. Once a defendant takes the initiative to satisfy its affirmative defense burden, by asking the proper question regarding the timing of the alleged wrongdoing, a plaintiff should not be able to impede the application of a statutory time bar simply by refusing to provide the answer. Thus, to the extent the Defendants questioned the Plaintiff about the timing of the alleged discriminatory acts and the Plaintiff provided no indication of a time period in response, the Court concludes that the Defendants have satisfied their burden, as to this affirmative defense.

In sum, therefore, for purposes of analyzing the Plaintiff's Title VII claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after October 25, 2003. With regard to the § 1981 claim, the Court will only consider allegations of discrete acts of disparate treatment that occurred from and after May 17, 2001, and with regard to the state law claim, from and after May 17, 1999. Thus, the following alleged incident of disparate treatment is time barred, for purposes of all disparate treatment claims:

- Supervisor Cooper frequently telling Smith to "get back to work" when he was not working, between 1992-1997.

17

Furthermore, the Court will not consider the following alleged facts, given that the Defendants questioned the Plaintiff about the timing of the same and the Plaintiff provided no indication of a time period, in response:

- Supervisor Zoll approaching black employees when they were talking and saying, "when there's [sic] more than two, I always take up a collection," which Smith interpreted as meaning "get back to work."

- Supervisor Brown ignoring unidentified white employees who were talking during work hours, but telling Smith and black co-workers (like Huff and Clegg) to get back to work.

- Supervisors not assigning upgrades, once they reached Smith's name on the seniority list.

Based on the remaining factual allegations, all of which are timely, the Court will now turn to a consideration of whether the Plaintiff has pointed to sufficient evidence to create a genuine issue of material fact, as to the various elements of his disparate treatment claim.

## 2. Disparate Treatment - Burden Shifting Analysis

Absent direct evidence of discrimination, the Court initially notes that courts analyze all three of the Plaintiff's disparate treatment claims (under Title VII, § 1981 and Ohio law) using the burden shifting framework, as set forth by the Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). E.g., Upshaw v. Ford Motor

Co., 576 F.3d 576, 584 (6th Cir. 2009) (race discrimination claim under Title VII);

Amini v. Oberlin College, 440 F.3d 350, 358 (6th Cir. 2006) (race discrimination

claim under § 1981); Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio

Civil Rights Comm., 66 Ohio St. 2d 192, 197 (Ohio 1981) (race discrimination

claim under Ohio Revised Code Chapter 4112). The Sixth Circuit provides the

following summary of that analytical framework:

> First, the plaintiff must make out a prima facie case of race
> discrimination, after which the burden shifts to the employer to proffer
> a legitimate, nondiscriminatory reason for its decision. If the employer
> carries its burden, the plaintiff must then prove by a preponderance of
> the evidence that the reasons offered by the employer were
> pretextual. Throughout this burden-shifting process, "the ultimate
> burden of persuading the trier of fact that the defendant intentionally
> discriminated against the plaintiff remains at all times with the
> plaintiff."

Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009) (quoting and citing

DiCarlo v. Potter, 358 F.3d 408, 414-15 (6th Cir. 2004) and citing Dews v. A.B.

Dick Co., 231 F.3d 1016, 1020-21 (6th Cir. 2000)).

In employment discrimination cases, "[t]he prima facie showing is not

intended to be onerous." Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d

405, 412 (6th Cir. 2008) (citation omitted). The Sixth Circuit instructs that in

order to establish a *prima facie* case of disparate treatment, a plaintiff must show

that 1) she is a member of a protected class; 2) she was qualified for the position;

3) she was subjected to an adverse employment decision; and 4) she was replaced

by a person outside the protected class, or treated differently than similarly

situated non-protected employees. <u>Vaughn v. Louisville Water Co.</u>, 2008 U.S. App. LEXIS 24224, **16-17, 302 Fed. Appx. 337 (6th Cir. Nov. 24, 2008) (citing <u>Vincent v. Brewer Co.</u>, 514 F.3d 489, 494 (6th Cir. 2007)).

In the present case, the Defendants do not argue that the Plaintiff fails either the first or second prong of his *prima facie* test; rather, they claim that he has not set forth sufficient proof to create a genuine issue of material fact as to the third and fourth prongs. The Court will begin with a consideration of the fourth prong (whether the Plaintiff was treated differently than similarly situated non-protected employees) and then turn to the third prong.

a.    <u>Whether Plaintiff was Treated Differently than Similarly Situated Non-Protected Employees</u>

The Sixth Circuit states that in order for a plaintiff to demonstrate that a non-protected employee is "similarly situated", he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998) (quoting <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994)) (alteration in original). Further-more, in order to be deemed similarly situated, "the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." Id. (quoting

Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

The following sets forth the ways in which the Plaintiff contends that

SuperValu discriminated against him, as well as the individuals with whom the

Plaintiff seeks to compare his treatment (if any), for each alleged instance of

discrimination:[10]

> (1) Supervisor Keyes telling Smith to "go back to work" when he
> was talking to co-worker Clegg during work hours, but not telling
> other, unidentified employees to go back to work who were
> outside smoking. *The Plaintiff seeks to compare his situation*
> *with that of the unidentified employees who were outside*
> *smoking. He does not identify the other employees' supervisor,*
> *but it is presumably not Keyes, since she indicated that she*
> *would have to talk to someone else in management about the*
> *situation.*

> (2) Supervisor Keyes coming into the breakroom and directing her
> comments regarding returning to work to Smith and the black co-
> workers at his table, while ignoring the other employees (black

---

[10]The Plaintiff also attempts to argue that he has satisfied the fourth prong
of his disparate treatment *prima facie* case, because of the casual attitude of the
supervisors toward the alleged racial harassment.

> The supervisors' casual attitude toward harassment, and their own
> use of racial slurs[] is indicative of the atmosphere of the warehouse.
> A general working environment that tolerates this sort of harassment
> is evidence that implies a discriminatory reason for the adverse
> employment actions experienced by the Plaintiffs.

Doc. #92 (Mem. Opp'n) at 16. While this sort of argument is not applicable to a
disparate treatment claim, the Court will consider the same when assessing the
Plaintiff's hostile work environment claim below.

and white) in the breakroom.[11]  *The Plaintiff seeks to compare his situation with that of the other employees (black and white) in the breakroom.*

(3)    Supervisor Keyes telling Smith and two black co-workers to go back to work, but not telling white co-worker Allen to go back to work.  *The Plaintiff seeks to compare his situation with that of white co-worker Allen, who worked in a different area and was supervised by another supervisor.*

(4)    Supervisor Zoll stopping Smith when he (Smith) was on his way to the breakroom ten minutes before break time started and telling him he was too early for his break, but not correcting Coates and another employee who were already in the breakroom.  *The Plaintiff seeks to compare his situation with that of Coates and the unidentified co-worker in the breakroom, yet does not identify the races of either, does not identify their supervisors and does not note whether they were on the same shift as Smith.*

(5)    Unidentified supervisors not disciplining white co-worker Graham for doing puzzles during work hours, while reprimanding Smith if he was "two minutes late" doing his work.  *The Plaintiff seeks to compare his situation with that of Graham, yet does not identify Graham's supervisor and does not know whether the supervisor saw Graham doing puzzles.*

(6)    SuperValu passing over Smith for temporary job reassignments, when he was not available during the job reassignment session, while holding open reassignments for white employees who were not present.[12]  *The Plaintiff seeks to compare his situation with that of white co-workers who were presumably on his shift and supervised by the same supervisor.*

---

[11]The Plaintiff alleges that this incident occurred in approximately 2003-2004.  It is cognizable under Title VII only if it occurred from and after October 25, 2003.

[12]The Plaintiff alleges that this incident occurred sometime prior to 2002.  It is, therefore, not cognizable under Title VII, and is cognizable under § 1981 only to the extent it occurred from and after May 17, 2001, and under state law only to the extent it occurred from and after May 17, 1999.

22

(7)     Supervisor Zoll assigning Smith to the "heaviest" aisles for picking tickets.[13]  *The Plaintiff seems to be comparing his situation with that of all other order selectors on his shift, to include black and white employees.*

(8)     Superintendent Crawford not providing Smith with "LOQ" forklift training, but providing the same to an unidentified white co-worker.  *The Plaintiff seeks to compare his situation with that of the unidentified co-worker who was also presumably supervised by Crawford, but the Plaintiff points to no evidence to indicate whether the co-worker had the same position as he or whether he had been subject to the same standards and had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish his conduct or the employer's treatment of him for it.*

As noted in the italicized text above, the Court concludes that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact, as to whether the non-protected individuals with whom he seeks to compare his treatment were similarly situated, with regard to any of his claims except the allegation that SuperValu passed over him for temporary job reassignments, when he was not available during the job reassignment session, while holding open reassignments for unidentified white employees who were not present.  The Court will, therefore, proceed to an analysis of the third prong of the *prima facie* case (whether the alleged action constituted an adverse employment action), with regard to this remaining disparate treatment claim.

---

[13]The Plaintiff alleges that this incident occurred daily, in 2003-2004.  It is cognizable under Title VII only to the extent it occurred from and after October 25, 2003.

b. Whether the Alleged Misconduct Constituted an Adverse Employment Action

The third prong of the *prima facie* case of disparate treatment requires a plaintiff to establish that he suffered an adverse employment action. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Burlington Industries v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257 (1998)), cert. denied, 129 S. Ct. 2380 (2009). Stated another way, an adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002) (quotation omitted). Thus, the Court must discern whether the Plaintiff's remaining alleged adverse employment action constitutes a materially adverse change in the terms or conditions of his employment.

As to the Plaintiff's claim pertaining to SuperValu holding open temporarily vacant job reassignments for white co-workers, when they were not present during the reassignment session, but not doing the same for him, the Court concludes that the Plaintiff has not pointed to sufficient evidence to demonstrate that this was an adverse employment action. The Plaintiff has pointed to no evidence to

24

indicate that the reassignment would have included a salary or work hour change and the Sixth Circuit has held that "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." <u>Kocsis v. Multi-Care Mgmt.</u>, 97 F.3d 876, 885 (6th Cir. 1996) (citing <u>Yates v. Avco Corp.</u>, 819 F.2d 630, 638 (6th Cir. 1987)).

In sum, the Plaintiff has not set forth sufficient facts to create a genuine issue of material fact as to any part of his disparate treatment claims. Thus, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. #85), with regard to the disparate treatment claims, under Title VII (Count I), § 1981 (part of Count II) and Ohio law (Count III).

B. <u>Hostile Environment, under 42 U.S.C. § 1981 (remaining part of Count II) and under Ohio Law (Count V)</u>

Smith brings hostile work environment claims against all Defendants, under § 1981 (remaining part of Count II) and Ohio law (Count V). Doc. #3 (Am. Compl.). He submits that he suffered a hostile work environment based on his race, at the hands of unknown perpetrators, to wit: in approximately 2005, seeing "three Xs in a box" on a wall and also seeing the word "niggerz" [sic] on the bathroom wall.[14]

_____

[14]The Court relies only on the acts of harassment that allegedly happened to the Plaintiff or of which the Plaintiff was otherwise aware, and, as to the latter,

The Sixth Circuit instructs that courts are to use the same standard when

---

only for those which one or the other of the parties has pointed to admissible evidence in support thereof.  The Court is aware that the Sixth Circuit has instructed that courts must consider the "totality of circumstances" when deciding cases such as the present. Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999).

In Jackson v. Quanex Corp., the Appellate Court directed that the "totality of circumstances" approach necessitates aggregating alleged acts of harassment towards minority employees, in cases such as the present one. Id.  In so doing, the Appellate Court pointed to the Supreme Court's decision in Meritor Savings Bank v. Vinson, in stating that "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself." Jackson, 191 F.3d at 661 (citing Meritor, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)).  Implicit in such a consideration, however, is that the plaintiff in question was aware of the incidents of harassment that were allegedly directed toward other minority employees.  "Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment at Quanex was objectively hostile to African Americans, and evidence that Jackson learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her." Id. (emphasis added); see also id. ("We have also credited evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." (emphasis added)).

In the present case, the Plaintiff points to nothing to indicate that he was aware of any of the acts of harassment alleged by the other Plaintiffs in this litigation, other than those set forth above.  Nor can the Court infer that this Plaintiff worked in such close proximity with some or all of the other Plaintiffs that he necessarily would have been aware of the acts of harassment alleged to have happened to one or more of them.  The Plaintiff states only that the Plaintiffs were "employed, in different capacities, as warehouse workers in SuperValu's Xenia, Ohio facility" (Doc. #92 at 1), yet the Defendants point out that employees at the Xenia facility are assigned to either the "grocery warehouse" or the "perishable warehouse", with different supervisors and on different shifts. Doc. #70 (Gunderson Dep. at 17); Doc. #77-4 (Doran Aff.) ¶ 3.  Given that the Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim," InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), the Court is constricted to considering only those facts pertinent to the present Plaintiff, which are set forth above.

26

evaluating hostile work environment claims under Title VII, § 1981 and Ohio

Revised Code Chapter 4112. <u>Noble v. Brinker Int'l, Inc.</u>, 391 F.3d 715, 720 (6th

Cir. 2004). To establish a *prima facie* case of hostile work environment, racial

harassment, a plaintiff must point to evidence demonstrating the following:

> (1) [He] is a member of a protected class . . . ; (2) [he] was subjected
> to harassment, either through words or actions, based on [his
> protected class]; (3) the harassment had the effect of unreasonably
> interfering with [his] work performance and creating an objectively
> intimidating, hostile, or offensive work environment; and (4) there
> exists some basis for liability on the part of the employer.

<u>Gallagher v. C.H. Robinson Worldwide, Inc.</u>, 567 F.3d 263, 270 (6th Cir. 2009)

(quoting <u>Grace v. USCAR</u>, 521 F.3d 655, 678 (6th Cir. 2008)).[15]  As to the final

prong, whether there is a basis for employer liability, such depends on whether the

plaintiff is alleging harassment by supervisors or co-workers. Quoting from a

Second Circuit case, the Sixth Circuit recently summarized the appropriate analyses

as follows:

> The Supreme Court has ruled that employers are not automatically
> liable for [] harassment perpetrated by their employees. <u>See</u> <u>Burlington
> Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257, 141 L. Ed.2d
> 633 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct.
> 2275, 141 L. Ed.2d 662 (1998).  Where an employee is the victim of
> [] harassment, including harassment in the form of a hostile work
> environment, by non-supervisory co-workers, an employer's vicarious
> liability depends on the plaintiff showing that the employer knew (or
> reasonably should have known) about the harassment but failed to

---

[15]<u>Gallagher</u> was a hostile work environment case, based on sexual
harassment, as opposed to racial harassment.  The Sixth Circuit applies the same
legal standard to both sorts of claims, however. <u>See</u> <u>Ladd v. Grand Trunk Western
R.R.</u>, 552 F.3d 495, 500 (6th Cir. 2009).

take appropriate remedial action. See Faragher v. City of Boca Raton, 524 U.S. at 789; accord Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 72 (2d Cir.2000). Where the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee, Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; if it did, "the employer will, ipso facto, be vicariously liable," Mack v. Otis Elevator Co., 326 F.3d at 124 [(2d Cir. 2003)]. In the absence of such tangible action, an employer will still be liable for a hostile work environment created by its supervisors unless it successfully establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765, 118 S. Ct. 2257; accord Faragher v. City of Boca Raton, 524 U.S. at 807, 118 S. Ct. 2275; Mack v. Otis Elevator Co., 326 F.3d at 125.

Gallagher, 567 F.3d at 275 (quoting Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004)).

The Defendants, in the present action, do not contest the first prong of the *prima facie* case. They do, however, assert that Smith has failed to set forth sufficient proof as to the second prong, for one of his assertions of harassment, and for the third and fourth prongs for both of his assertions.[16]

_____

[16]The Defendants also argue that some of the Plaintiff's allegations of harassment were not "sufficiently related" to the allegations of harassment occurring within the limitations period so as to form one continuous hostile work environment claim. Doc. #85 at 33 n.18. The Court having concluded that the Plaintiff has not set forth sufficient evidence to create a genuine issue of material fact on his *prima facie* case of harassment, assuming all of the alleged incidents did form one continuous hostile work environment, need not consider the Defendants' argument, on this point. Thus, the Court does not reach the statute of limitations issue on the allegations constituting the hostile work environment claims.

1.     Whether the Plaintiff was Subjected to Harassment Based on Race

In order to be actionable as a racial harassment claim, a plaintiff must demonstrate that he was harassed because of his race. Booker v. Budget Rent-A-Car Sys., 17 F. Supp. 2d 735, 743 (M.D. Tenn. 1998). SuperValu argues that the incident involving seeing the "three Xs in a box" on a wall was not "based on race." The Court agrees. The Court knows of no racial connotation associated with the letters "XXX" and the Plaintiff has pointed to no legal or other source to support his contention of such.[17] Therefore, the Plaintiff has not pointed to sufficient evidence to create a genuine issue of material fact, on his hostile work environment claim, with regard to the incident involving the "three Xs in a box."

2.     Whether Harassment Had Effect of Unreasonably Interfering with Plaintiff's Work Performance and Creating an Objectively Intimidating, Hostile, or Offensive Work Environment

The Sixth Circuit has identified the governing standard for the third prong of a plaintiff's *prima facie* case of harassment as follows:

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the

_____

[17]Lest the Court be criticized as not being up on contemporary jargon, it has checked the web site www.urbandictionary.com, for guidance in this matter. That web site does not include any concepts with racial overtones in its definition of the letters "XXX".

conditions of the victim's employment, and there is no Title VII violation.

Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 273 (6th Cir. 2009)

(quoting Williams v. GMC, 187 F.3d 553, 566 (6th Cir. 1999) (which quoted

Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 126 L. Ed.

2d 295 (1993)).  The Supreme Court states that, in making these assessments,

courts must consider "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance;

and whether it unreasonably interferes with an employee's work performance."

Harris, 510 U.S. at 23.  Further, in order to constitute a "change in the terms and

conditions of employment", conduct must be "extreme". Faragher v. City of Boca

Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

In the present case, SuperValu contends that the only incident of

harassment remaining was not severe enough to alter the terms and conditions of

Smith's employment.  As to the objective view of the facts, SuperValu argues that

the alleged incident of harassment happened only once, was not directed at Smith

and was not physically threatening.  As to the subjective view of the facts,

SuperValu asserts that Smith did not regard the workplace as hostile or abusive, as

evidenced by his concession that he has always been able to effectively perform

his job. Doc. #63-3 (Smith Dep. at 148).  In response, Smith argues that his filing

of the present lawsuit, along with the fact that he recalls the incident in question

years after it happened, is evidence that he subjectively considered his

mistreatment to be severe and pervasive.

In resolving the question presently before it, the Court will turn to factually similar cases decided by the Sixth Circuit. In <u>Smith v. Leggett Wire Co.</u>, the Appellate Court found that the following facts were not "severe or pervasive enough" to create an objectively hostile work environment: "a racial slur in 1974 by an unknown co-worker, a racially offensive and obscene cartoon passed around in the late 1980's or early 1990's by one who was not involved in Smith's termination decision, Bobby Guy's racist joke sometime after 1993, and supervisor Ronnie Curry's reference to a black employee as 'gorilla'." <u>Smith</u>, 220 F.3d 752, 760 (6th Cir. 2000) ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at Smith, over a twenty-year span of time.").

Conversely, in <u>Jackson v. Quanex Corp.</u>, the Appellate Court found the following facts probative of a severe and pervasively hostile work environment: the "persistent use" of racial slurs, by supervisors (including supervisors regularly referring to black employees as "colored" or "boys", a supervisor stating that the company "did not want blacks inside of the electric shop", another supervisor telling a new hire "you're working for a nigger now, boy did you get screwed" and a supervisor opening a meeting with the comment "we are up to our asses in nigger sludge"), the pervasive presence of graffiti in the workplace (including graffiti in the women's restroom "depicting a male and a female and accompanied

by comments comparing the penis sizes of white and black males," graffiti in the men's restroom "depicting lynchings accompanied by the phrase, 'KKK is back'," graffiti on the back door that said "blacks out back," graffiti in the seam grinding area that "depicted the lynching of African-American men," graffiti in the restrooms on 25-30 occasions and graffiti on worker's lockers); and incidents of extreme racial misconduct (including calling a new hire "nigger" and "motherfucker", and after he reported these comments, telling him, "Nigger, we want you to quit your job . . . ."; defacing a work shirt with the words "Nigger Sucker"; hanging "Black O'Lantern" and "Sambo" drawings near a worker's machine; tampering with acid valves in an attempt to create a safety hazard that would appear to be attributable to a minority worker, and a co-worker calling another co-worker a "nigger bitch" and physically assaulting her). <u>Jackson</u>,191 F.3d 647, 651-55, 62 (6th Cir. 1999).

SuperValu also points the Court to the Sixth Circuit's unpublished opinion in <u>Kelly v. Senior Centers, Inc.</u>, wherein the Court found that the following incidents of misconduct, which occurred over four months, did not amount to actionable harassment: "two staff members' use of the pejorative slur word 'nigger' referring to the foster grandparents; Dangelo's description of a Board Member as a 'token black' and her comments that the foster grandparents were slovenly or were 'pigs' at meals, and her alleged tolerance of others' conduct; Gee's three racist 'jokes'; and comments about an African-American staff member's bathroom habits." <u>Kelly</u>,

2006 U.S. App. LEXIS 3139, **16, 32, 169 Fed. Appx. 423 (6th Cir. Feb. 8, 2006). In concluding its findings, the Court stated, "[w]hile we believe that a single utterance of a deeply offensive word is, as a matter of social conscience, a single time too many, it is clear from the record that such conduct in front of Kelly was not a daily or even a weekly event." Id. at *17.

SuperValu also cites Bourini v. Bridgestone/Firestone North American Tire, L.L.C., 2005 U.S. App. LEXIS 5194, 136 Fed. Appx. 747 (6th Cir. Mar. 30, 2005), in support of its position. In Bourini, a Muslim employee alleged that the following incidents of national origin and religious harassment took place at his place of employment: (1) a co-worker said, "I don't want to ... see your camel tied to my wheels;" (2) a co-worker called him a "camel jockey;" (3) soon after the September 11 attacks, a co-worker attempted to back over him while reversing a forklift; (4) a co-worker said, "If it were up to [me], they would . . . put [plaintiff] in a box and send [him] back to [his] country;" (5) a co-worker said, "If you'd get the sand out of your ears you'll hear me better;" (6) a co-worker mocked plaintiff's voice over the intercom system; (7) someone painted Islamic slurs on the restroom wall; (8) someone left a Christian pamphlet at plaintiff's work station entitled, "For my Muslim Friend;" and (9) the human resources department sent an email relating to plaintiff's immigration status to all employees. Id. at **2-5. The Appellate Court concluded that these incidents "were not sufficiently pervasive to establish an abusive working environment." Id. at *10. Because the incidents were spread

33

out over a five year period, the Court found them to be "relatively infrequent and isolated incidents" that were "insufficient to constitute discriminatory changes in the terms and conditions of employment." Id.

In the present case, Smith alleges one incident of harassment since he was hired in 1987, to wit: seeing the word "niggerz" [sic] written on the bathroom wall, in 2005. While this conduct is reprehensible, the Court cannot conclude that it is sufficiently severe and pervasive, as a matter of law, to be said to have altered the conditions of Smith's employment. The incident is far less severe than those the Sixth Circuit found insufficient to constitute discriminatory changes in the terms and conditions of employment in Smith v. Leggett Wire Co., 220 F.3d 752, 760 (6th Cir. 2000), as explained above. Thus, regardless of whether he subjectively found that the alleged incident created a hostile work environment, Smith has failed to set forth sufficient facts to create a genuine issue of material fact as to the objective component of the third prong of his *prima facie* case of race-based harassment. Given that the Plaintiff has not satisfied the third prong of his *prima facie* case of harassment, the Court finds it unnecessary to determine whether he has pointed to sufficient evidence to satisfy the fourth prong (whether there exists some basis for liability on the part of the employer).

In sum, therefore, the Plaintiff has failed to establish a genuine issue of material fact as to all of the elements of his *prima facie* case of hostile work

environment based on race. Therefore, the Court SUSTAINS the Defendants'
Motion for Summary Judgment (Doc. #85), as to Smith's hostile work environment
claim, under § 1981 (remaining part of Count II) and Ohio law (Count V).

C. Retaliation, in violation of Title VII and/or Ohio law (Count IV)

As Count IV in his Amended Complaint, Smith asserts a claim for retaliation,
in violation of Title VII and/or Ohio law (against SuperValu, as to Title VII, and
against all Defendants, as to the Ohio claim). Doc. #3 (Am. Compl.) ¶¶ 60-64.
These claims are limited to allegations of retaliation that occurred after the filing of
Smith's EEO Complaint. Doc. #31.

In order to prove both a federal and state law claim of retaliation, absent
direct evidence of retaliatory discrimination, a plaintiff must show the following:

> (1) [he] engaged in activity protected by Title VII;
>
> (2) this exercise of protected rights was known to defendant;
>
> (3) defendant thereafter took adverse employment action against the
> plaintiff, or the plaintiff was subjected to severe or pervasive
> retaliatory harassment by a supervisor; and
>
> (4) there was a causal connection between the protected activity and
> the adverse employment action or harassment.

Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 595 (6th Cir. 2007) (citing
Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000)); see
also Putney v. Contract Bldg. Components, 2009 Ohio App. LEXIS 5634, **30-
31, 2009 Ohio 6718 (Ohio 3rd App. Dist. Dec. 21, 2009). In their memorandum in

support of their Motion for Summary Judgment, the Defendants state that they are entitled to summary judgment on this claim, because Smith admitted that he experienced no retaliation and also because he has set forth no facts to support his retaliation claim. Doc. #85 at 42.

It is true that Smith conceded that he experienced no retaliation for engaging in activity protected by Title VII. Doc. #63-3 (Smith Dep. at 152). It is also true that Smith makes no argument nor presents any facts in support of his retaliation claim. See Doc. #92 (Mem. Opp'n). Because the Plaintiff has pointed to no facts to support his retaliation claim, there is no genuine issue of material fact as to the same and the Defendants' Motion for Summary Judgment (Doc. #85) is SUSTAINED, as to Count IV.


D. Respondeat Superior (Count VI)

As Count VI in his Amended Complaint, Smith alleges that SuperValu is liable for the actions of the individual Defendants, under the theory of respondeat superior. Doc. #3 (Am. Compl.) ¶¶ 74-77. In their memorandum in support of their Motion for Summary Judgment, the Defendants correctly argue that respondeat superior is not a separate theory of recovery, but, rather, is conceptually a component of the various discrimination claims set forth above (e.g., employer liability component of hostile work environment claim). Therefore, the Defendants' Motion for Summary Judgment (Doc. #85) is SUSTAINED, as to

Count VI.


IV.     Conclusion

     The Defendants' Motion for Summary Judgment (Doc. #85) is SUSTAINED,

in its entirety.  Judgment is ultimately to be entered on behalf of Defendants

against Plaintiff Smith, at the conclusion of this litigation.


March 31, 2010


                         ___/s/ Walter Herbert Rice_____
                         WALTER HERBERT RICE, JUDGE
                         UNITED STATES DISTRICT COURT
Copies to:
Counsel of record